UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
———————————————————————X
                                                              :
ROHAN BOLT,                                                   :
                                                              :          **FIRST AMENDED**
                                      Plaintiff,              :          **COMPLAINT**_____
                                                              :
                                                              :           22 CV 3318 (DG)(PK)
                   -against-                                  :
                                                              :          (Jury Trial Demanded)
THE CITY OF NEW YORK;NANCY CARDAMONE,                         :
Voluntary Administrator for  the Estate of                   :
Police Officer Andrew Cardamone; POLICE                      :
OFFICER DENNIS BROOKS; POLICE OFFICER                        :
LOUIS PIA; POLICE OFFICER RICHARD SICA;                      :
POLICE OFFICER PAUL HEIDER; POLICE OFFICER                   :
FRANK BOVINO; POLICE OFFICER MARYANN                         :
BUBELNIK; POLICE OFFICER WILLIAM NEVINS;                     :
DETECTIVE MICHAEL FALCIANO; and POLICE                       :
OFFICER JOSEPH FEZZA ,                                       :
                                                              :
                                      Defendants.            :
                                                              :
———————————————————————X

        ROHAN BOLT, by his attorney THOMAS HOFFMAN, ESQ., complaining of the

defendants, respectfully alleges, upon personal knowledge and information and belief, as

follows:

## NATURE OF ACTION

        1.      This civil rights action under 42 U.S.C. §§ 1983 and 1988, and New York law,

arises from the wrongful arrest, prosecution, and conviction of Rohan, one of three innocent men

whose lives were destroyed by police and prosecutors who railroaded them for a high-profile

Queens murder they did not commit, and caused each of them to lose 24 years of their lives in

prison.

1

2.      Bolt and his codefendants Gary Johnson and George Bell were convicted of the December 21, 1996, murder of Charles Davis, an off-duty police officer, and Ira "Mike" Epstein in the failed holdup of Epstein's Astoria Boulevard check cashing store when it opened just after 7:00 a.m. on December 21, 1996.[1]

3.      Twenty-four years after Bolt  and his codefendants were falsely convicted, the Queens District Attorney's Office admitted that the prosecutors handling the three men's cases had suppressed a mountain of exculpatory and impeaching material from their attorney's, and agreed to vacate the three men's conviction and to dismiss their indictments.  The withheld evidence consisted of a mountain of third-party culpability evidence exculpating Bolt and his codefendants and pointing to the murderous "Speedstick" gang as the true perpetrators of the crime, and evidence that a key witness —Mark Bigweh— that sparked the police investigation of Bolt's codefendants, leading to Bolt being implicated, entered into a secret cooperation agreement with prosecutors, committed perjury, and suffered from hallucinations.

4.      The State court, in vacating the convictions and ordering the three men's immediate release from prison, castigated law enforcement and found that their handling of the case, which left "the distinct impression that the suppression of the information [exonerating him] was not an isolated instance of misconduct, but part of a larger pattern of behavior that was calculated to deprive the defendants of fair trials[.]" *People v. Bolt*, 71 Misc.3d 646, 665 (Sup. Ct.  Queens Co. 2021) (Zayas, J.). The court found that "[t]he extensive record before the Court . . . makes clear that . . . the District Attorney's Office . . . deliberately withheld from the defense

---

[1]Two other men, Mark Bigweh and Jason Ligon, were initially charged with the crime as well.  Bigweh ended up becoming a witness for the prosecution, and the State dropped the charges against Ligon after Bolt was convicted.

credible information of third-party guilt that was in its possession and that had in fact been investigated." *Id*

5.      Three months after Bolt's conviction was vacated, the Queens District Attorney's Office ("QDAO") announced it had conducted an "extensive and exhaustive investigation" of the murders at issue, and found no evidence linking Bolt to the crime. The QDAO then finally dismissed all charges against Bolt, and his two codefendants, Bell and Johnson.   But by then, all three men had lost nearly a quarter of a century of their lives in prison for a crime they did not commit.

6.      This lawsuit seeks to hold those responsible for this catastrophic injustice accountable.   It also names several police officers and the City of New York as defendants, as the City's employees' misconduct, and the subsequent 24-year cover-up of it, was substantially caused by the City's policies and customs, deliberate indifference to the likelihood that constitutional violations would occur, and the City's failure to supervise and discipline police and prosecutors who committed such misconduct, even though such misconduct was rampant throughout the Police Department and QDAO at the time Bolt was arrested, prosecuted, and convicted.

## JURISDICTION, VENUE & CONDITIONS PRECEDENT

7.      This action arises under 42 U.S.C. §§ 1983 and 1988, and under the common law of the State of New York.

8.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by principles of pendent jurisdiction.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

10.     On or about June 3, 2021, Bolt filed with Defendant City of New York a timely Notice of Claim under General Municipal Law § 50-e.   Bolt's General Municipal Law§ 50-h hearing was held on October 13, 2021.

11.     More than 90 days have elapsed since Bolt's submission of his notice of claim and 50-h hearing.  Bolt has complied with all conditions precedent to commencement of this action.

## THE PARTIES

12.     Plaintiff Rohan Bolt ("Bolt") is a citizen and resident of the State of New York.

13.     Defendant, City of New York (the "City"), of which the County of Queens is a subdivision, is a municipal corporation of the State of New York and a resident of the Eastern District of New York.

14.     Nancy Cardamone  is the Voluntary Administrator for the Estate of Police Officer Andrew Cardamone. PO Officer  Cardamone died on March 5, 2005.   Nancy Cardamone was appointed voluntary administrator of PO Cardamone on March 11, 2005 and is sued herein only in her capacity as administrator of the Estate of Andrew Cardamone. Andrew Cardamone at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

15.     Defendant Dennis Brooks at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and the CITY,

4

and acted within the scope of his employment. He is sued in his individual and official capacities.

16.     Defendant Louis Pia, at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

17.     Defendant Richard Sica, at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and the CITY, and acted within or outside of the scope of his employment. He is sued in his individual and official capacities.

18.     Defendant Paul Heider, at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

19.     Defendant Frank Bovino, at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

20.     Defendant Maryann Bubelnik at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes,

ordinances, regulations, policies, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. She is sued in her individual and official capacities.

21.     Defendant William Nevins at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

22.     Defendant Michael Falciano, at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

23.     Defendant Joseph Fezza, at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

### ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**A.     The Crime: An Off-Duty Police Officer And A Check-Cashing Store Owner Are Murdered In Queens**

24.     In the early morning hours of December 21, 1996, Ira "Mike" Epstein, the owner of a local check cashing store on Astoria Boulevard in East Elmhurst, Queens, and NYPD Officer Charles A. Davis, who was working off-duty as Epstein's security guard, were shot and

6

killed in the failed armed robbery of Epstein's store (the "Astoria Boulevard Murders" or the "Murders").

25.     A manhunt for the killers began immediately. The *New York Times* described an "intensive sweep throughout northwestern Queens" that ensued in an attempt to identify and arrest the perpetrators — with "thousands of cars" stopped, "thousands of summonses" issued, and "hundreds of suspects" questioned. Randy Kennedy, *3 Charged in Killings of Officer and Businessman in Queens*, N.Y. Times, Dec. 26, 1996.

26.     Then-Mayor Giuliani and top NYPD officials immediately declared that they "would not rest" until the crime was solved and began exerting intense pressure on the Police Department to solve this "Christmas Tragedy" before the holiday a few days away.

27.     The initial investigation of the crime immediately pointed to a murderous local gang (later revealed to be known as "Speedstick" that had committed multiple similar armed robberies around the neighborhood.

28.     The day after the murder, the *Daily News* reported that a "gang" had "ambushed" Epstein and Davis and that "[i]nvestigators believe the killers may be the same robbers who hit two other check-cashing businesses in Queens last week, the latest one on Friday [December 19, 1996] in Queens Village."

29.     Consistent with this belief that a local gang that had robbed two other check-cashing businesses in the neighborhood had also committed this crime, the NYPD covered the neighborhood with wanted posters stating that the suspects "were involved in a past robbery at a check cashing business in the 105 Pct. [in Queens]." These wanted posters described the suspects as three black men ranging from 5'11" and 6'3" in height and weighing 180, 185 and 190 pounds, respectively.

30.    Rohan Bolt did not fit any of these descriptions.

31.    The NYPD also put out an "all points bulletin" which pointed to this stickup gang as the lead suspects. The bulletin described three suspects in a robbery of another check cashing store nearby and stated that "two of the above individuals may be connected to the murder of the police officer on 12/21/96 in 115PCT.

**B.     A Mentally Unstable Drug Dealer Implicates Bolt's Codefendants Bell And Johnson**

32.    On December 23, 1996, police arrested 20-year-old John Mark Bigweh for selling marijuana.

33.    Bigweh was on probation for robbery and assault charges and faced significant criminal and immigration consequences if he did not cooperate with the police.

34.    Police saw an opportunity and they used this leverage and their desperation to solve the murder before Christmas (as Mayor Giuliani had directed police brass to do) to somehow turn Bigweh from a low-level drug dealer to an accomplice to murder.

35.    Over the course of three unrecorded interrogations over two days, Bigweh told an evolving story that eventually ended with Bigweh confessing to participating in the crime and falsely claiming that George Bell was the shooter.

36.    Bigweh's evolving description of the crime made clear from the start that he was not a reliable witness.

37.    When Bigweh was first interrogated about the murder (after being arrested for marijuana possession), he stated that he was not a participant in the crime. He claimed he had been out partying with Bell and Johnson on December 20th and 21st, and they later approached him on the street about going with them to commit a robbery, which Bigweh refused to do. Bigweh also named an unknown accomplice named "Zebedia" as a participant in the robbery.

8

38.     Bigweh was then driven around in a van for six hours with Detective Michael

Falciano, known as "the Falcon."

39.     After six hours with the Falciano  Bigweh as a result of coercion by Falciano

implicated himself in the crime. In his second statement, Bigweh admitted that he had

participated in the crime along with Bell, Johnson, someone named "Roti," and a getaway driver

named "Jason." Zebedia had now disappeared from the story. Bigweh also oddly claimed that the

five men had driven to Bigweh's home so he could change from a green jacket to a navy blue

one.

40.     To this day, there is no independent evidence (i.e. evidence other than Bigweh's

own statement) tying Bigweh to this crime.

41.     Nonetheless, based on Bigweh's statement *alon*e, police turned their attention

away from a local robbery gang with an MO of sticking up check cashing stores, and towards

Johnson and Bell.

**C.     Police Arrest Johnson And Bell And Coerce Them**
**Into Adopting A Statement They Manufactured**

42.     Defendants obtained false "confessions" from Bolt's codefendants Gary Johnson

and George Bell.

43.     Specifically, Defendants Cardamone, Bovino, and Brooks interviewed Johnson

and did not record anything that occurred, or discarded their notes, during the twelve hours that

they interrogated him.

44.     Johnson's confession was facially unbelievable in numerous ways.

45.     Johnson stated that after an evening of hard partying the night before, he passed

out, and that he "was still drunk" the next morning and "[didn't] know what time it was when I

woke up."

46.     Johnson stated that he had driven to the check cashing store with someone named "Jason" and "two of Jason's friends that I didn't know." He added that he didn't really know Jason either.

47.     Johnson also claimed (contrary to Bigweh and Bell) that Bell was already at the check cashing store when they arrived and the he and Bell did not speak that morning. In other words, Johnson claimed that he committed this crime with three people he did not know and Bell—who he hadn't spoken to prior to arriving. When pressed on this striking claim, Johnson stated that he did not even remember the crime but had "seen it on the news" but he "didn't think [he] was involved in it because [he ] woke up and it was just another day for [him]."

48.     Johnson also could not decide if he had spoken to Bell after the murders, first claiming that when he "woke up in the morning [he] called [Bell]. We were talking and I was asking him what are you gonna do today. He said he was sick or something." Johnson then changed his mind and said he had only spoken to Bell's sister and he "never really got a chance to talk to Bell" in the four days since they had apparently committed a double homicide together.

49.     Johnson screamed as he was being interrogated. Johnson's confession was also obtained through police coercion.

50.     Defendants Cardamone and Brooks knew this unbelievable confession was false.

51.     Defendants Cardamone and Brooks provided this false confession, to prosecutors.

52.     Defendants Cardamone and Brooks never informed prosecutors that Johnson's confession was false.

53.     Defendants Cardamone and Brooks never informed prosecutors that this confession was obtained through coercion.

54.     Detectives Pia and Sica coerced and manufactured a statement from Bell that implicated Bolt. *See* Complaint in *Bell v. City of New York*, 22 CV 3251 (DG)(PK) (E.D.N.Y.), Doc # ¶¶ 64-139, which we incorporate here, and in all following paragraphs.

55.     Specifically, Detectives Pia and Sica beat Bell, threatened him, and caused him to adopt a manufactured statement that implicated a "Roti" who police would later inform prosecutors was Rohan Bolt. *Id*. Defendants  Pia, and Sica  knew this unbelievable confession was false. Defendants Pia and Sica  provided this false confession that implicated Bolt  to prosecutors.

56.     In addition to coercing Johnson and Bell's "confession," police secretly manufactured and coerced the confessions of Jason Ligon (who would later be charged with the murder but have the charges dismissed before trial).

57.     Bigweh had identified someone named "Jason" as the getaway driver, a detail that Bell and Johnson both repeated (having been fed the statement by the police).

58.     On May 30, 1997, the police arrested a man named Jason Ligon. After five hours in police custody, Defendants Bubelnik and Bovino secured Ligon's confession to his purported involvement in the Murders.

59.     Defendants Bubelnik and Bovino worked in close collaboration with Detectives Sica and Pia, and fed the same facts to Jason Ligon that Pia and Sica fed to Bell. Defendants Bubelnik and Bovino were intimately familiar with both the true facts and coerced falsehoods about the Astoria Boulevard Murders. Defendant Bubelnik was one of the officers present at Bigweh's confession.

60.     Like Bell, Ligon confessed that he (Ligon) was the driver, that Bell was the shooter, and that Bolt (his name now having evolved from "Roti" to "Rohan") put the robbery plan together.

61.     In fact, Ligon went into even more extensive detail than Bell about the plan for the robbery, what was discussed among the men committing the crime, and how the plan was executed.

62.     Though Ligon's video and written confession mirrored Bell's (except it was more detailed), Ligon was not even in New York at the time of the murders.

63.     Ligon's counsel hired a private investigator who determined that Ligon was in Washington, D.C. at the time of the Murders. *See Bolt*, 71 Misc.3d at 650.  Ligon's private investigator provided this alibi to District Attorney Investigators Teddy Wess and Stanley Carpenter, who confirmed its accuracy on their own trip to D.C.  Months before Bolt's trial, Wess and Carpenter determined that the evidence established that Ligon was not involved in the Astoria Boulevard Murders.

64.     Ligon had no motive to falsely implicate himself in  a crime he did not commit, and Ligon's (false) confession was obtained through police coercion.

65.     Ligon has since told investigators that police officers provided him with alcohol during the interrogation.  Wess and Carpenter stated to Ligon's private investigator that, notwithstanding Ligon's innocence, the charges against him would not be dismissed until Bolt, Johnson, and Bell were tried.

66.     Wess and Carpenter further told Ligon's private investigator that they were aware that Ligon was facing felony drug charges in a separate case, and that the time he spent incarcerated as a result of his arrest in connection with the Astoria Boulevard Murders (crimes

the QDAO knew he did not commit) would be credited against the time he would ultimately serve on the drug charges.

67.     The QDAO contemporaneously acknowledged that (1) they knew Ligon was innocent and had given a false confession; but (2) would nonetheless not dismiss the case against Ligon until after Bell, Bolt, and Johnson were tried.

68.     Wess and Carpenter, in conjunction with Defendants Bubelnik and Bovino, did not want to admit that Ligon was innocent and the police had coerced a false confession.

69.     Even though Defendants Bubelnik and Bovino and the DA investigators knew of Ligon's' alibi months before Bolt's trial, charges against Ligon were not dropped until Bell, Johnson, and Bolt had all been convicted.

70.     Bolt's counsel was never informed by the QDAO that Ligon's confession was false.

71.     Defendants Bubelnik and Bovino knew Ligon's confession was false, but nonetheless provided it to prosecutors.

72.     Bolt's defense counsel was never informed that Ligon was innocent, that his confession was false, or that police officers coerced his confession.

73.     This proof of Mr. Ligon's innocence was *Brady* material that was not produced to Bolt's counsel.

74.     On information and belief Defendants Bubelnik and Bovino never informed prosecutors that Ligon's confession was obtained through coercion. Alternately, if prosecutors knew that Ligon's confession was obtained through coercion, they wrongfully withheld this *Brady* material from Bolt's defense team.

13

75.     Moreover, as the QDAO acknowledged in June 2021, "Det. Bubelnik also had a pending lawsuit against her at the time of trial which stemmed from a previous case in which she was accused of coercing a false confession from the defendant in that case."

76.     Defendant Bovino was also a defendant in that "pending lawsuit," and was also accused of participating in extracting a false confession.

77.     That lawsuit was ultimately settled.

78.     That Defendants Bubelnik and Bovino were accused of coercing false confession from a criminal defendant was *Brady* material.

79.     Prosecutors never disclosed to Bolt's defense team that Defendants Bubelnik and Bovino were accused of coercing false confession from a criminal defendant.

80.     Defendants Bubelnik and Bovino did not inform the QDAO about this prior lawsuit. Alternately, if prosecutors knew about this prior lawsuit, they wrongfully withheld this information from Bolt's defense team.

81.     Because these Defendants concealed their coercion of Bell, George, and Ligon, Bolt never learned of this *Brady* material.[2]

82.     Because these Defendants concealed Ligon's false confession, the jury never learned that Bell's "admission" in his coerced confession that Jason was the driver was indisputably false.

**D.    Police Arrest Bolt, A 35-Year-Old Father And Owner Of A Caribbean Restaurant**

83.     The day after Bell and Johnson's arrest, Detective Joseph Fezza claimed a crack user witness identified Bolt, the 35-year-old owner of a local Caribbean restaurant, as a participant in the double homicide.

---

[2]*See e.g. Kyles v. Whitley*, 514 U.S. 419, 446 (1995) (evidence undermining the State's investigation is favorable material for *Brady* purposes).

84.     Bolt's wife was a registered nurse at a hospital in the Bronx, and Bolt had no record except for two minor marijuana offenses from 20 years earlier.

85.     Detective Joseph Fezza claimed in a police report that he along with two other detectives picked up a female crack user. who "spotted a male Black who she identified as Roadie driving a red van," and the detectives then followed the van to a parking lot.  Detective Fezza claimed that Bolt then admitted that his name was Roti.

86.     Detective Fezza's claim was false.  Bolt was a 35-year-old father and business owner, who did not know or have any connection with 21-year-old Bell and Johnson, and Bolt actually responded "that's not my name" when asked if he was "Roti."   Bolt and his mother confirm that he has never "been called Roti."  Moreover, upon information and belief, the purported crack user witness never identified Bolt as a participant in the crime.

87.     Gregory Turnbull, who was taken into police custody the day of the murders and questioned for 14 hours, eventually winding up at One Police Plaza, where detectives asked him to provide a description to a sketch artist.   Turnbull later testified that he declined to provide a description to the artist because he thought the sketch he would provide "could have been anybody" and he "didn't want the wrong person to be picked up."

88.     Turnbull stated that while he was standing at a telephone booth, at 7:05 a.m., he saw two males standing at the corner of 95th Street and Astoria Boulevard, and observed that "these two males soon after began walking down Astoria Boulevard ... until they got to the front of the check cashing location, when [Turnbull] looked away."   From that location, Turnbull would have been 230 feet away from the individuals he observed.

89.     Although he did not mention it on December 21, when re-questioned five days later, on December 26, Turnbull claimed he saw the same three men as they fled the check cashing store, which was no less than 170 feet from Turnbull's claimed vantage point.

90.     When Turnbull viewed Bolt in a lineup he failed to identify Bolt.  However, following that failed lineup, upon information and belief, Bovino pressured Turnbull into claiming he actually had identified Bolt in the lineup but was scared to say so.  Turnbull would later relay this false account at Bolt's trial to explain his failed lineup identification.

**E.      A Media Frenzy Follows Bolt's Arrest**

91.     Bolt was convicted in the press before he ever entered a courtroom.

92.     Mayor Giuliani appeared at a press conference on Christmas Day with high-level police brass to praise the detectives who led the investigation for cracking the case.

93.     Mayor Giuliani kissed Detective Falciano at the press conference as he thanked him for cracking the case by eliciting Bigweh's confession.

94.     The *Daily News* ran a front-page story with a picture of Bolt's codefendant Bell in tears and labeled him the "CRYBABY COP KILLER"—crybaby because he was brought to tears by the terror of being falsely accused of a double murder.  Another article, "Rap sheets of 4 held in slays," prominently displayed a picture of Bolt upon his arrest for the murders.

95.     The *Daily News* would later run a full-page editorial advocating that Bolt's codefendant, Bell, be  put to death.

96.     The police orchestrated a "perp walk" of Bell and the *New York Post* ran a front-page story with a picture zoomed in all the way on Bell's face during the perp walk with the

16

headline "THE FACE OF EVIL."   The article stated that Bolt committed the murders along with Bell.

**F.      The Pre trial Proceedings And The Grand Jury**

97.      Upon information and belief, Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, Fezza, independently or collectively forwarded or caused to be forwarded their misleading police reports to the Queens County District Attorney's Office to convince that office to formally charge Bolt with the murders.

98.      Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, Fezza, also met with prosecutors prior to the grand jury presentation and either confirmed the information contained in the reports .

99.      At no time did Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, Fezza, disclose their fabrication of evidence, including the Bigweh, Bell, Johnson, and Ligon statements, and Turnbull's "identification" of Bolt.

100.     On December 26, 1996, Bovino prepared a blatantly false felony complaint report alleging Bolt, along with Bell, Johnson, and Bigweh, committed the murders, and that Bolt displayed a handgun and demanded money from one of the victims (Ira Epstein).

110,     The felony complaint further alleged, falsely, that Bolt had been identified by Turnbull in front of the check-cashing store.

111.     In January 1997 the Queens County District Attorney's Office presented  Bolt's case to a grand jury through a false, misleading, and incomplete grand jury presentation.

112.     The prosecutor presenting Bolt's case did not inform the grand jury of

      a.      A December 24, 1996, NYPD all-points bulletin issued the day before Bolt's  arrest, describing  Speedstick gang members involved in a different robbery in a manner substantially identical to the wanted poster issued in connection with the Astoria Boulevard double murder;

    b.      Evidence that on December 24, 1996, before Bolt was arrested, witness Al Pratt told police that days before the robbery he saw three black males (who looked nothing like Bell, Bolt, or Johnson) casing out the check cashing place, and that one the males had a horseshoe scar on the left side of his face, which could not have been Bell, Bolt, or Johnson, (and was likely Jamal Clark, who had such a scar and who would later admit to committing the robbery);

    c.      The police coercion of Bell, Johnson, Bigweh, and Ligon's statements;

    d.      Within a month after falsely implicating Bolt, Bigweh attempted to kill himself, and suffered from auditory hallucinations of his dead mother telling him to "go home"; auditory hallucinations].

    e.      Bovino's fabrication of Turnbull's identification of Bolt; and

    f.      Bolt's alibi witnesses, who informed police in substance that Bolt could not have committed the crime.

113.    The grand jury, unaware of the above exculpatory and impeaching evidence, returned an indictment charging Bolt with the murder and robbery.

### G.    Bolt's Trial: The Prosecutor Suppresses *Brady* Material And Uses False Or Misleading Evidence And Argument

114.    Bolt was incarcerated at the Brooklyn House of Detention, a violent pretrial detention jail, for almost three years while awaiting trial on the murder charges.

115.    Bolt's case was tried from April 6 to April 13, 2000.

116.    ADA Brad Leventhal —who along with ADA Charles Testagrosa had previously tried codefendant George Bell's case— tried Bolt's case.

117.    The principal items of evidence against Bolt was the testimony of Bigweh and Gregory Turnbull. The witness who was using crack who first identified Bolt did not testify. Bigweh claimed that he was the lookout to the crime, that he stationed himself at a pay phone just outside the Deerhead Diner, and that he watched the entire crime unfold from that location. He claimed on direct that Bolt was holding a specific gun: a "black Barretta." On cross-

18

examination, Bigweh testified that this identification of the type of gun was a "wild guess," adding implausibly that he could identify the gun as an automatic from its appearance a block away.

118.    Bigweh also claimed that he identified Bolt when he was being driven around by an unnamed detective.  But that testimony was not corroborated by Det. Fezza, the officer who drove the unnamed "crack lady" around and who arrested Bolt on her identification.

119.    ADA Leventhal, elicited perjury from Bigweh. Bigweh gave perjured testimony about his cooperation agreement with the QDAO in response to questioning by ADA Leventhal. Bigweh testified on redirect in response to questioning by Leventhal that "the first time [he was] offered any leniency for cooperating with the District Attorney's Office in the prosecution of this case[]" was "October 28, 1999."  Bolt's trial counsel then asked Bigweh on recross if he had "talked about leniency [from the District Attorney's Office] prior to signing the [October 28, 1999] cooperation agreement," to which Bigweh responded "No."

120.    Unbeknownst to Bolt, his attorney, or the court and jury, just over a month after Bolt's arrest, Bigweh had actually entered into a secret written cooperation agreement with the QDAO on January 30, 1997 (the "secret cooperation agreement"), prior to entering into the October 28, 1999, cooperation agreement revealed at trial.  That secret cooperation agreement was far more beneficial to Bigweh and gave him an even greater incentive to fabricate evidence against Bolt.

121.    The secret cooperation agreement provided that in exchange for Bigweh's cooperation, "the Office will make a recommendation on the disposition of the pending cases that depends on the nature and extent of the cooperation."  This agreement — which created a direct incentive for Bigweh to help the Queens DA obtain a conviction — was not disclosed to

19

Bolt or his codefendants' lawyers.  (The secret cooperation agreement would not be revealed until 24 years later, when the CRU reinvestigated Bolt's case.)

122.    Also undisclosed was the fact that Bigweh entered into the secret cooperation agreement only after Bigweh attempted suicide attempt, was found by prison staff to have suffered from hallucinations.

123.    Further, ADA Leventhal suppressed from Bolt and his attorney that Bigweh's secret cooperation agreement was repudiated on the eve of Bell's trial when Bigweh refused to cooperate because he did not want to lie.

124.    All of this impeached the false impression created by Bigweh's perjury that he cooperated in the case merely because he felt that it was wrong, not because he expected leniency.

125.    Leventhal also presented Turnbull's false testimony that when Turnbull viewed the lineup he recognized Bolt  and was getting ready to point him out, but did not do so because he was scared.

126.    Bolt and his mother both testified that Bolt was at home getting ready for work "five or six minutes after 7:00 [a.m.]," and that "20 or 25 minutes later," Bolt was with his mother at the restaurant he owned opening up for another day's work.

127.    During summation, ADA Leventhal argued that Bigweh was a credible witness.

128.    ADA Leventhal then gave blatantly false summation arguing Bigweh did not enter into a cooperation agreement until 1999 when, in truth, he had entered into an extraordinarily favorable cooperation agreement just over a month after cooperating with the police and QDAO:

> A benefit that he's going to receive? Absolutely.  If he completes
> and abides by the terms of his agreement, he will receive the

20

benefit that he has been offered in the terms of his cooperation agreement, a cooperation agreement which was *signed on October 28, 1999*, three years after he provided the information and the identity of his accomplices to the police. *Three years later* he enters an agreement where he is given a promise of leniency, given a promise of cooperation, of a reduced sentence. *Three years earlier he had none of that and he still named his accomplices* Tr. 797-798 (emphasis added).

129.    ADA Leventhal also cited Bigweh's identification of codefendants Bell and Johnson as an additional reason for the jury to credit Bigweh's testimony.

130.    Despite this testimony and the lack of any physical evidence, Bolt was found guilty on all counts.   On May 9, 2000, Bolt was sentenced to 50 years to life in prison.

131.    Because the Individual Defendants concealed that they coerced Johnson, Bell, Ligon, and Bigweh, neither the prosecutors, Bolt, his attorney, or the jury ever learned of that conduct.

132.    Nor did ADA Leventhal disclose the mountain of *Brady* material implicating the Speedstick gang as the real perpetrators.  *See* ¶¶ 150-157 below.

133.    Bolt was convicted of two counts of depraved indifference murder, one count of felony murder, and related charges.  On February 22, 2000, he was sentenced to 50 years to life in prison.  The QDAO then successfully opposed Bolt's direct appeal by relying on the false evidence and trial narrative ADA Leventhal used during Bolt's trial.

**H.    Twenty-Four Years After Bolt Is Falsely Convicted, A New District Attorney's Conviction Integrity Unit Reinvestigates His Case And Reveals A Mountain Of *Brady* Material Suppressed By Police And Prosecutors**

134.    In the years following Bolt's conviction, significant *Brady* material has emerged that was never turned over to the defense.

135.    The most significant of these revelations is DD5 288. This DD5 documents that by May 1997 at the latest, police were aware that a member of the Speedstick gang had confessed to the Astoria Boulevard Murders for which George was convicted.

136.    DD5 288, dated May 16, 1997, and prepared by Defendant Heider (one of the very witnesses Bell had attempted to call at trial to explore the connection between the May 1997 robbery and the murder with which he was charged), memorializes an interview of "Witness #1" who provides a detailed account of the activities "of a Robbery Ring that was run by the Twins Aaron and Ammon Boone."

137.    By way of background, DD5 288 provides a detailed description of the robbery gang's operations and provides summaries of at least *seven* armed robberies carried out by the group in 1996 and 1997.

138.    Witness #1 identified Jamal Clark as a member of the robbery gang and stated that he had personally participated in several of the robberies with Clark and one or both of the Boone Twins.

139.    Several of these robberies carried out by Speedstick involved victims being shot, stabbed, or sliced.

140.    DD5 288 then goes on to directly implicate this robbery gang in the murder for which George Bell was convicted. The DD5 provides:

> ***[Witness #1] stated that he was told by Jamal Clark that the group robbed a check cashing store on Astoria Blvd. This job was set up by the [Boone] Twins and that Jamal Clark was outside and that something went bad. They did not get any money.*** Witness #1 stated that this was a phone call and that Jamal Clark was down south at the club with the Twins after this robbery. Jamal told him that he was upset because he was doing a lot of jobs also in NY and down south and that he was not getting a fair share of the money. He was concerned that if he left that the Twins may kill him because they felt that he knew to[o] much and could tell the police. Jamal told him he was leaving and he did.

22

> Witness #1 stated that Jamal Clark had a code name for all the robberies that he participated in with the group. The name is JASON.

(emphasis added).

141.   DD5 288 also reports that Clark's fear of being murdered was well-founded.

142.   Witness #1 stated that another gang member, Kevin McKinney, told him that Ammon Boone, a Speedstick member, later shot Clark who knew of Speedstick's crime wave, in the back of the head.

143.   Subsequent events make clear that the QDAO viewed Witness #1 to be a credible witness.

144.   In January 1999, months before Bolt's trial, the QDAO indicted Aaron Boone for Clark's murder—consistent with the information supplied by Witness #1 in DD5 288.

145.   Additional wrongfully withheld DD5s further corroborate DD5 288.

146.   In DD5 291, Witness #1 provides additional details regarding members of the Speedstick robbery gang, including their nicknames, addresses, appearance, and more—further bolstering his credibility and specifically identifying the likely murderers.

147.   In DD5 548, another member of the robbery ring identified as "Witness #2" told detectives in an interview that took place *at the Queens DA's Office* that Jamal Clark had told him "I'[]m tired of this shit." When Witness #2 asked Clark what he was tired of, Clark responded "that shit in Corona"—an apparent reference to the Astoria Boulevard Murders for which Bolt was convicted.

148.   It is clear that Jamal Clark and the Boone twins—not Bolt—murdered Epstein and Davis and that police and QDAO knew it in 1997, but chose to withhold this information from Bolt's defense team despite multiple specific requests.

149.     As Justice Zayas unequivocally found: "Under no circumstances could the prosecutors in these cases have reasonably believed that this information—which suggested that another group of perpetrators, with a history of armed robberies targeting large amounts of cash, was responsible for the Murders of Epstein and Davis and thus contradicted the People's theory of the case—was not favorable to Bell, Bolt, and Johnson and did not have to be disclosed." *Bell*, 71 Misc. 3d at 662.

150.     Trial counsel for Robert Majors (one of the alleged Speedstick members charged with another neighborhood robbery along with Aaron Boone) was only provided with a redacted, two-page copy of DD5 288 and a redacted copy of DD5 291 in the year 2000, when Bolt was tried.

151.     The copies that Majors's counsel received had all of the information that would have exonerated Bolt either redacted or, in the case of DD5 288, with the third page containing information exculpating Bolt missing in its entirety.

152.     In other words, the QDAO was well aware of Speedstick's involvement in the Astoria Boulevard Murders by 1997 (per ADA Testagrossa's notes) and was in possession of these specific DD5s by at least 2000, and chose to suppress this clear evidence that Bolt was innocent.[3]

153.     The information withheld from Bolt's defense team was far from limited to these DD5s. Following the revelations of DD5 288, Bolt's and Johnson's post-conviction attorney,

---

[3]It is worth noting DD5 288 was uncovered only through the most fortuitous of circumstances. Robert Majors has maintained his innocence and, in connection with his challenges to his convictions, these DD5s were produced to his lawyer, the undersigned. Majors's lawyer happened to have been familiar with Johnson's case, recognized the significance of these productions, and contacted Bolt's counsel. But for that event, Bolt and his codefendants would still be serving a life sentence for a crime they did not commit.

along with attorneys at Wachtell Lipton Rosen & Katz, for Bell, approached the QDAO's newly-formed Conviction Integrity Unit ("CIU").

154.     CIU did a thorough re-investigation of Bolt's conviction, which identified other exculpatory information that was in the possession of law enforcement, but had never been disclosed to Bolt.

155.     All of this newly-discovered information either points to Speedstick gang as the culprits or evidences that Bell's and Johnson's confession were unreliable.

156.     The below documents were never produced to Bolt before the CIU reinvestigation:

a.     DD5 548 (discussed above).

b.     The NYPD "all points bulletin" from before Bolt's arrest which stated that the robbery ring were the lead suspects in the Murders.

c.     Additional police reports reflecting similar modus operandi between the suspects in the Astoria Boulevard Murders and other recent robberies in Queens, including (1) the time of day the crime occurred; (2) the number of perpetrators; and (3) the manner in which the perpetrators forced entry into the business.

d.     A DD5 reflecting that just days before the murder, three or four men appeared to be casing Epstein's check cashing store and that one of them had a scar on the left side of his face near his lip in a horseshoe shape and a thin mustache. A photo of Jamal Clark from the time of the Murders reveals a scar and mustache matching this description.

e.     A DD5, authored by Defendant Brooks, memorializing an interview with Jamal Clark's girlfriend at the time of the Astoria Boulevard Murders that further corroborates Witness #1's claim that Clark was closely associated with the Boone twins and that he went to the Boones' club in South Carolina with them shortly after the murder. Upon information and belief, Defendant Brooks did not provide this information to the QDAO or, in the alternative, this information was not provided by prosecutors to the defense.

f.  Additional evidence corroborating that Boone murdered Jamal Clark, adding more credence to the statements of Witness # 1 regarding Clark and Boone's involvement in the Murders for which Bolt was convicted.

g.  A DD5 memorializing the interview with a victim of the May 9, 1997 robbery of a Flushing, Queens business stating that "Green Van which was occupied by a M/B wearing a Green Army Jacket and sitting in drivers side of Van." This description matches the description from a witness to the Murders who testified at Bolt's trial that the shooter was wearing a "green army jacket."

h.  A DD5 reflecting that Bigweh told Witness #2 that he actually was not involved in the robbery and Murders (when his supposed involvement was the only thing leading the police to Bell and Johnson in the first place).

i.  Records reflecting that Bigweh had attempted suicide in custody and then needed mental health evaluations.[5] The QDAO had "obtained medical records related to the suicide attempt, which included information that Bigweh had a history of experiencing 'AH [auditory hallucinations]' of his dead mother at stressful times like his birthday or hers or the anniversary of her death. The voice tells him to 'go home.'" *Bolt*, 71 Misc.3d  at 650. "None of these records, which were in the District Attorney's file related to this case, were disclosed to the attorneys representing Bell, Bolt, and Johnson, despite specific requests for information of this sort having been made." *Id.* These records included handwritten notes with the name "Greg Lasak" at the top of the page recording that Bigweh had been sent for a psychiatric evaluation.

j.  Bigweh's cooperation agreement that was terminated shortly before Bolt's trial, even though Bolt's defense team had specifically requested any such cooperation agreements.

k.  A DD5 describing an interview with witness Altagralia Durna, who described the getaway car as a light blue Aerostar van with white stripes and who identified the stolen blue Ford Aerostar van recovered near the crime scene as the likely getaway vehicle. Incredibly, the QDAO did not disclose to Bolt's defense team that this witness existed until two-and-a-half months after his trial began and the day after the witness had left the country, and even when disclosing her still did not disclose the DD5 reflecting the interview in which she identified the blue van recovered by the police as the getaway vehicle. Bell stated that the van was burgundy in his false confession.

l.      During the same undisclosed interview, Ms. Duran also described the assailant as "light skinned male black or Hispanic." Neither Bell, Johnson, or Bolt meet that description;.

m.      Interviews with an additional five eyewitnesses identifying the color of the van as either blue or green. Two of the witnesses also identified the van as having either North Carolina or South Carolina plates—further tying the crime to the Boone twins, who owned a night club in South Carolina.

n.      The DD5 from an interview with a man named Dennis Knight days before Bolt was arrested in which Knight stated that he had "no specific information" of the crime but had a hunch that someone that he knew named Devon might have been involved in the Murders and that Devon "usually drives a red or burgundy Plymouth Voyager van" (*i.e.*, the source of the "burgundy" van information—corroborated by none of the eight eyewitnesses who gave statements to the police—fed to Bell by the police).

157.   The CIU investigation also uncovered a DD5 63, dated March 28, 1997, reflecting that just three weeks after Jamal Clark's murder, Queens Homicide Detectives supplied information regarding Clark's murder to Defendants Pia and Sica.  This coordination between the detectives investigating Clark's murder and Defendants Pia and Sica—who were investigating the murder with which Bolt was charged—further demonstrate that these cases were always related and the investigating detectives were well-aware of the alternative suspects.

158.   The information in this DD5 and its clear implication that the police knew about the relationship between Speedstick and the murder for which Bolt was convicted was also confirmed during CIU's reinvestigation.

159.   One of the lead detectives in the Speedstick investigation, Detective Stacey Calantjis, confirmed he and the other Speedstick investigators shared everything they uncovered about Speedstick with Defendants Pia and Sica.

160.     Calantjis also confirmed that he provided all of the information he had to Defendant Pia and Sica's boss, Defendant Nevins, but that Nevins did not pursue any of the leads regarding Speedstick's involvement.

161.     Defendants Nevins, Pia, and Sica did not provide this information to the QDAO or, in the alternative, prosecutors wrongfully withheld this information from Bolt's defense team.

162.     The CIU reinvestigation also revealed that Defendant Bubelnik fabricated evidence against codefendant Bell.

163.     In May 1997, Detective Bubelnik drafted a DD5 575 regarding an interview with Rodney Boone (no relation to the Boone twins). Detective Bubelnik stated that Mr. Boone (1) informed her that she "had the right people"; (2) told her that the "word on the street" was that Rohan Bolt supplied the guns and got them in Brooklyn; and (3) identified Jason Ligon as a participant in the crime.

164.     Rodney Boone was interviewed as part of the CIU investigation and vigorously denied making any of these statements. Mr. Boone told investigators that he never told the police they had the right people, never told police anything about Bolt who Boone only knew of because he owned a local restaurant, and never identified Ligon, who he had no basis to believe had any involvement in the crime.

165.     Instead, Rodney Boone told investigators that *Defendant Bubelnik* said to him "we have the right people," a statement which Mr. Boone did not confirm or deny since he had no knowledge of who committed in the crime.

166.     Defendant Bubelnik fabricated this DD5 claiming that Mr. Boone told her that they "have the right people."

28

167.    In addition to the voluminous documents discussed above reflecting Bolt's innocence, the CIU also produced the handwritten notes of ADA Charles Testagrossa.

168.    These notes taken *before* Bolt's trial in a folder labeled "Speedstick" reveal that as early as 1997 Testagrossa "[b]elieve[d] Jamal was driver in Davis homicide"; "Jason was Jamal"; and knew of "Speed Stick Bosses: Twin Boones. Bernard Johnson. Jamal Clark 'Jason.'"

169.    As Justice Zayas put it, "[i]t is . . . mindboggling that Testagrossa asserted in open court that there was no link between the Boone-led Speedstick gang and this case." *Bolt*, 71 Misc.3d at 662.

170.    Even if Testagrossa had forgotten about his conversations with Defendant Heider by the time Bolt went to trial in 1999, they were readily available to him throughout the trial. Rather than consult his own notes of the relationship between the cases when Bolt's defense team sought to call Heider to testify, Testagrossa, in consultation with Defendant Heider, made blanket assertions that there was no connection between the cases and impugned the defendants' counsel for implying otherwise.

171.    Moreover, additional documents only recently disclosed reflect that police were investigating Clark as early as March 1997, when Defendants Bovino and Bubelnik did a "complete workup" of Jamal Clark and obtained numerous photographs of Clark. Defendant Sica then placed a picture of Clark in a photo array with pictures of  Bell, Bolt, Johnson, and Bigweh to at least one witness.

172.    Even though Defendants Pia, Sica, Bubelnik, and Bovino had had been actively investigating Jamal Clark, upon information and belief, once law enforcement learned Jason Ligon was in Washington, D.C. at the time of the murder, the NYPD made no further attempt to locate "Jason"—the supposed fifth participant in the murder of an off-duty police officer—

because they knew that the real "Jason," *i.e.*, Jamal Clark, was deceased. This underscores that the police knew that the person they had previously identified as "Jason" was Jamal Clark, who was deceased.

173.     In other words, Defendants Pia, Sica, Bubelnik, and Bovino, in addition to Defendant Heider, not only knew and withheld that Jason Ligon was innocent, but also withheld from Bolt their apparent knowledge that they had identified Jamal Clark, a deceased member of the Speedstick gang, as a participant in the murder. Clark's inclusion would have unquestionably warranted further investigation into Speedstick's involvement in the crime.

174.     Upon information and belief, when Defendant Heider was called to testify at Mr. Bell's trial in 1999, ADA Testagrossa consulted with Defendant Heider as to the relationship between Mr. Bell's case and Speedstick.  Upon information and belief, Defendant Heider falsely told ADAs Testagrossa and Leventhal that there was no connection between the cases In the alternative, upon information and belief, Defendant Heider truthfully told Testagrossa and/or Leventhal that there was a connection between the cases.

175.     Yet, notwithstanding Defendant Heider's revelation about the connection between Mr. Bell's case and Speedstick, Testagrossa and Leventhal lied to the Court. In other words, upon information and belief, either Defendant Heider lied to ADAs Testagrossa and Leventhal or the ADAs lied to the Court.

176.     These facts create the inescapable inference that Defendants Pia, Sica, Bubelnik, Bovino, and Heider stopped their own investigation into Clark once he was deceased in order to avoid implicating Speedstick and establishing that Messrs. Bell, Bolt, and Johnson who had been arrested for the murders were in fact  innocent.

I.     **The State Court Vacates Bolt's Conviction, Dismisses His Indictment, And Excoriates The QDAO For The Prosecutorial Misconduct That Caused His Wrongful Conviction**

177.    Armed with this trove of newly discovered evidence, the QDAO, through its Conviction Integrity Unit, together with Bolt and his co-defendants jointly moved to vacate the convictions in March 2021.

178.    Justice Zayas granted the motion on March 5, 2021 (amended March 8, 2021) and excoriated the law enforcement officials involved in the process.

179.    Justice Zayas found  that the QDAO's handling of the case "leaves the distinct impression that the suppression of the Speedstick information was not an isolated instance of misconduct, but part *of a larger pattern of behavior* that was calculated to deprive the defendants of fair trials." *Bolt*, 71 Misc.3d at 664-65 (emphasis added).

180.    Justice Zayas elaborated that law enforcement's conduct in this case was particularly "egregious given that the death penalty was being sought against 19-year-old George Bell[,]" and the QDAO  nonetheless "completely abdicated its truth-seeking role." *Bolt*, 71 Misc.3d at 659.

181.    In addition to his finding of clear prosecutorial misconduct, Justice Zayas noted that the QDAO *conceded* that the circumstances surrounding Bell's and Johnson's confession "raise legitimate concerns about [its] reliability" *Id.* at 663.

182.    On June 4, 2021, Bolt's indictment was dismissed with prejudice upon motion by the QDAO on newly discovered evidence grounds and all charges were dropped.

183.    In announcing the decision to seek to dismiss the indictment, the QDAO explained that between March and June of 2021, it had "conducted an extensive and exhaustive investigation" in which it: (1) reviewed all relevant documentary evidence, including both

documents related to Bolt's case and the files of numerous other NYPD investigations of the alternate suspects in this case; (2) interviewed over 60 fact witnesses; (3) reviewed "hundreds and hundreds" of hours electronic evidence; and (4) reviewed "hundreds of hours" of forensic testing involving DNA evidence, ballistics evidence and the re-testing of fingerprint evidence.

184.     This thorough investigation did not turn up a shred of evidence implicating Bolt.

## J.     Bolt's Damages And Injuries

185.     Bolt's injuries and damages include, but are not limited to:

(a)     His false and malicious arrest, prosecution and conviction for murder and robbery, and sentence to life in prison;

(b)     The wrongful denial or delay of his challenges to his conviction filed in State and Federal Court;

(c)     His 24-year loss of his liberty, his belief that he would die in prison, and the additional time he spent in jeopardy of being subjected to a retrial;

(d)     Injuries he suffered witnessing assaults by other inmates, including the mental and emotional effects of such assaults;

(e)     Past and future physical illnesses and economic injuries as a result of his wrongful conviction and experiences in prison;

(f)     Past and future mental and emotional injuries and suffering;

(g)     Substantial lost income from his restaurant business;

(h)     The loss of the services, society, companionship, and consortium of his wife and fiancée, mother, brothers and sister, four children, and other family members and friends;

(i)     Legal fees and expenses for which he is responsible exceeding $200,000 based upon attorney time necessitated by exhaustive investigation and litigation required to uncover the QDAO's misconduct.

## FIRST CAUSE OF ACTION
(Malicious Prosecution and Deprivation of Liberty Under the Fourth,
Fifth, Sixth, and Fourteenth Amendments; 42 U.S. C. § 1983; All Defendants)

186.    Bolt realleges the allegations in the above paragraphs of this Complaint, and

incorporates them here and in all following paragraphs.

187.    Defendants Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins,

Falciano, and Fezza, individually, collectively (referred to as the "Individual Defendants"),

acting in concert and aiding abetting one another, intentionally, knowingly and willfully

manufactured,  or caused the manufacturing of, false statements and identifications by Bigweh,

Johnson, Bell, and Ligon, which they improperly compelled or induced those individuals to

adopt, accusing Bolt of the double murders and attempted robbery, and causing the QDAO to

commence or continue criminal charges against Bolt.

188.    The Individual Defendants knew that the statements and identifications would be

relied on by the QDA and the court as a basis to authorize Bolt's arrest, actually arrest him, and

to formally initiate his prosecution, continue his prosecution, and that the statements and

identifications would be introduced into evidence at Bolt's trial.   Those statements and

identifications were forwarded to the QDAO, which in turn did in fact introduce some of them

during Bolt's pretrial hearings and trial.

189.    By virtue of the foregoing, the individual defendants, with actual malice, initiated,

continued, or caused the initiation and continuation of, criminal proceedings against Bolt that

they knew, or should have known, there was no probable cause for, and for which in fact there

was no probable cause, and thereby caused Bolt to be deprived of his liberty.

190.    Those proceedings were ultimately terminated in Bolt's favor, in a manner

affirmatively indicating his innocence.

191.    As a direct and proximate result of these acts and omissions, Bolt suffered the damages set forth in ¶ 185, above.

**SECOND CAUSE OF ACTION**
(Evidence Manufacturing; Denial of A Fair Trial Under The Fifth, Sixth,
and Fourteenth Amendments; 42 U.S. C. § 1983;  All Defendants)

190.    Plaintiff realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

191.    Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, and Fezza, acting individually and in concert, fabricated evidence  and concealed material exculpatory and impeachment evidence thereby depriving Bolt of his Fifth, Sixth, and Fourteenth Amendment rights.

192.    The Individual Defendants fabricated statements and identifications from Bigweh, George, Bell, and Ligon,  false videotaped statements from Bell, Johnson, and Ligon, upon information and belief, Turnbull's identification of Bolt at the lineup, and along with the other unarmed coconspirators, created a host of other false police report as detailed above and in Bell's 42 U.S.C. § 1983 complaint, regarding Bolt's involvement in and commission of the crime.

193.    The Individual Defendants, including Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, and Fezza~~, and Does 1-4,~~ did not intervene when each other created false evidence.

194.    Fezza and the Individual Defendants, falsely represented to prosecutors, in the course of  charging and indicting Bolt, and at trial, that all of that false evidence was accurate, and all of the evidence factored into the QDAO's decision to charge Bolt with the crime and continue his prosecution.

34

195.    Bigweh's statement and Turnbull's identification were introduced against Bolt at trial and was a basis for the jury's verdict against him.

196.    The Individual Defendants, deliberately and recklessly coerced and/or fabricated, and created the above evidence.   These fabricated evidence was all provided to the QDAO, convinced them of Bolt's guilt, and would have been likely to influence a jury's decision were the evidence to be presented a trial.

197.    Upon information and belief, the Individual Defendants  affirmatively misled ADAs Testagrossa and Leventhal at trial by representing that the Speedstick investigation had no relation to the Astoria Boulevard Murders.

198.    Upon information and belief, the Individual Defendants knowingly and deliberately chose not to document and/or disclose to the prosecutors information that was favorable and material to Bolt's defense. The suppressed evidence included but is not limited to:

   a.    That Defendants Pia, Sica, Heider, Bubelnik and Bovino were investigating Speedstick in connection with the Astoria Boulevard Murders, including investigating Jamal Clark;

   b.    That Ligon's confession was coerced;

   c.    That Johnson's confession was coerced;

   d.    That Bell's confession was coerced

   e.    That Defendants Bubelnik and Bovino had been sued on allegations that they had previously coerced a false confession; and

   f.    That Defendant Bubelnik falsified a DD5 claiming that a third-party had told her she "had the right people" (Defendants Bubelnik and Bovino only).

199.    Moreover, Defendants Pia, Sica, Heider, Bubelnik, and Bovino worked in concert deliberately to stop developing evidence that Jamal Clark was "Jason" and had participated in the

Astoria Boulevard Murders in order to hide Speedstick's involvement and not undermine the prosecution of Bolt.

200.     If these fabrications and exculpatory and material impeachment evidence were known to Bolt's defense team and had been documented and/or disclosed, such evidence would have tended to prove that Speedstick, not Bolt, committed the Astoria Boulevard Murders and cast doubt on the entire police investigation and prosecution.

201.     The aforesaid conduct, which Defendants committed, operated to deprive Bolt of his rights under the Constitution and the laws of the United States to timely disclosure of all material evidence favorable to the defense pursuant to the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

202.     As a direct and proximate result of these acts and omissions, Bolt suffered the damages set forth in ¶ 185, above.

### THIRD CAUSE OF ACTION
(Suppression of *Brady v. Maryland*, 373 U.S. 83 (1963) and Denial Of A
Fair Trial Under The Fifth, Sixth, Fourteenth Amendments; All Defendants)

203.     Bolt realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

204.     Defendants Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, and Fezza, individually, collectively, acting in concert, aiding and abetting, and conspiring with each other, intentionally, recklessly, and with deliberate indifference to Bolt's constitutional rights, suppressed from the QDAO and Bolt (a) the exculpatory and impeaching information detailed in above, (b) their creation of false police reports, (c) their false representations to the QDAO to convince that office to criminally charge Bolt, and (d) their own and each other's misconduct.

205.    As a result of those defendants' suppression, prosecutors were unable to disclose to Bolt and his attorney the exculpatory information detailed in the preceding paragraphs, and to correct the false testimony and argument that flowed from the suppression of that evidence.

206.    The suppressed evidence was material, likely to influence a jury's decision, and there is a reasonable probability that had the evidence been disclosed to the defense, the result of Bolt's trial would have been different.

207.    These actions deprived Bolt of his right:

    (a)    Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution;

    (b)    Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

    (c)    To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

208.    The foregoing violations of Bolt's federal constitutional rights by the Individual Defendants and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Bolt's criminal prosecution, loss of liberty, detention without bail, wrongful conviction, subsequent imprisonment, and other injuries and damages.

209.    The foregoing violations of Bolt's rights amount to constitutional torts and were affected by actions taken under color of State law, and within or without the scope of their employment and authority.

210.    The Individual Defendants committed the foregoing violations of Bolt's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Bolt's constitutional rights or to the effect of such misconduct on those rights.

211.    As a direct and proximate result of these acts and omissions, Bolt suffered the damages set forth in ¶ 185, above.

212.    The CITY is liable for these wrongs by virtue of DA Brown's and the NYPD's policies, customs, and deliberate indifference to, and failure to supervise, discipline, and rectify their employees conduct regarding such matters, despite the likelihood that the failure to do so would result in the injuries pled here.

## FOURTH CAUSE OF ACTION
(*Monell*/42 U.S.C. § 1983: Claim Against the CITY based on the QDAO's
unconstitutional policies, customs, and practices, and failure to supervise,
discipline, and rectify amounting to deliberate indifference)

213.    Bolt realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

214.    During Bolt's criminal trial prosecutors suppressed a mountain of *Brady* material from Bolt and his defense attorney.

215.    The misconduct of the QDAO in Bolt's case was not the result of one bad actor but of office-wide policies and practices that encouraged *Brady* violations as a means of securing convictions.[4]

---

[4] A "plaintiff is allowed to plead in the alternative."  *Breton v. City of New York*, 404 F.Supp.3d 799, 814 (S.D.N.Y. 2019) (Koeltl, J), citing Federal Rule of Civil Procedure 8(d).

216.    These practices routinely deprived criminal defendants of their fair trial rights.

217.    These practices were employed in Bolt's case and cost him over  twenty-four years of his life.

218.    There are two unlawful practices of the QDAO office that significantly contributed to Bolt's conviction.

219.    *First*, the  QDAO had no effective mechanism for prosecutors to obtain *Brady* information known to other QDAO prosecutors in their office.  This practice made it easy for prosecutors disinterested in satisfying their *Brady* obligations to have "plausible deniability" that they were not aware of exculpatory materials.

220.    Under governing Supreme Court precedent, a prosecutor "has a duty to learn of any favorable evidence known to others in the prosecutor's office, as well as others acting on the government's behalf, including the police." *Kyles* v. *Whitley*, 514 U.S. 419, 437 (1995).

221.    Yet, the QDAO had no effective mechanism for prosecutors to access information known to others in the prosecutor's office. As a result, an ADA attempting to locate materials related to a particular topic or investigation could not easily do so.

222.    QDAO provided no training to prosecutors on how to locate *Brady* material known to other prosecutors in the office.

223.    QDAO policies and procedures inhibited prosecutors from learning of "favorable evidence known to others in the prosecutor's office."

224.    This case presents a stark example of how this grossly deficient and constitutionally infirm method of information storage would lead to the violation of criminal defendants' Constitutional rights.

225.    Based on the information he developed while reinvestigating Bolt's case, CIU Director Bryce Benjet stated that "significant" *Brady* material connecting Speedstick to the murders was "not contained in the files of these defendants [Bell, Bolt and Johnson]."

226.    This finding was confirmed by ADA Testagrossa.

227.    ADA Testagrossa has stated that all of the Speedstick material in question, including his handwritten notes reflecting that "Jason" was Jamal Clark, were in a separate Speedstick file with a separate ADA in a separate bureau.

228.    The Speedstick files were in the Major Crimes and Career Criminal Bureau where the Speedstick case was being investigated.

229.    The Johnson files were in the Homicide Bureau.

230.    As a result, ADA Leventhal could falsely claim that the QDAO did not have exculpatory files documenting Speedstick's involvement in the crime.

231.    

232.    Indeed, ADA Testagrossa stated that the failure to produce these exculpatory files in co-defendant Bell's case was a "law office failure" that occurred as a result of "silo procedures engaged in by the Queens District Attorney's Office during the late 1990s."

233.    ADA Testagrossa stated that "as a result of this procedure, there was minimal sharing of information among the various bureaus and divisions, i.e. the Homicide Investigations and Homicide Trial Bureaus of the Major Crimes Division were siloed from the Career Criminal/Major Crimes Bureau of the Trial Division."

234.    ADA Testagrossa explained that these various bureaus were located in different buildings and thus were "not physically available to prosecutors outside of those bureaus and their contents were not shared."

235.    The relevant exculpatory files were located in files related to various prosecutions against Speedstick members.

236.    ADA Testagrossa stated that these exculpatory Speedstick files "were not only in a separate bureau, but also in a separate division apart from the division and bureau which handled the Bell[,]"as well as Bolt and Johnson prosecutions.

237.    ADA Leventhal, like ADA Testagrossa, called the failure to produce *Brady* material a "law office failure" in which "material, known to be gathered by others was not made available to [the ADAs trying the case]."

238.    ADA Leventhal similarly described the QDAO's practice of isolating information within bureaus.

239.    ADA Leventhal admitted that "information silos developed that on occasion failed to ensure that necessary information sharing [sic] resulting in rare failures to meet all discovery obligations."

240.    ADA Leventhal stated the failure to turn over exculpatory material "was the result of the organization's [referring to QDAO's] architecture during the last millennium, which created an environment in which significant possibilities for the failure to share critical information existed."

241.    ADA Leventhal acknowledged that these processes were sufficiently inadequate at the time of the prosecutions of Bell, Bolt, and Johnson, that the office had to later develop procedures to "ensure that those [prosecutors] assigned to matters were adequately advised of

41

information necessary to meet all statutory and constitutional discovery, *Brady and Giglio* obligations."

242    The QDAO could have developed such procedures at the time of the prosecutions of Bell, Bolt, and Johnson, but did not. ADA Leventhal stated that the "blame" for failing to produce the exculpatory Speedstick materials should not be placed on "the last prosecutors in the long line of those who were tasked with assignments in this matter, but, rather . . . [on] the organization as an entity."

243.    That is, ADA Leventhal says, in effect, "don't blame me, blame the practices of the QDAO."

244.    Other corroborate that QDAO policy failures resulted in the unconstitutional failure to produce exculpatory material to Bell's defense counsel.

1.    

2.    ADA Dorfman stated that because "ADA Testagrossa apparently held the exculpatory material regarding the Speedstick Gang in another bureau and never made it part of the files for the Davis/Epstein homicide investigation" he would "have had no means of accessing this information" at the time he submitted his false affidavit in co-defendant Bell's case claiming that there was no *Brady* material available.

3.    

4.    ADA Lasak stated repeatedly that, despite his role as lead trial attorney in co-defendant Bell's case for nearly all of pre-trial discovery, he would not have had any reason to check the files of the Major Crimes and Career Criminal Bureau (where the Speedstick case was being

investigated) for *Brady* material and, rather, that it was "incumbent on [the attorneys in that Bureau]" to "alert [him] to the existence of these [exculpatory] reports." In other words, he acknowledges there was no expectation he would search for material in other bureaus absent a member of another Bureau explicitly seeking him out.

245.    The QDAO also failed to train its prosecutors on their *Brady* obligations, further encouraging them to undertake the "look only within your bureau" approach.

246.    ADA Dorfman stated that the QDAO "fail[ed] to adequately train junior ADA's" like himself and that he has no recollection of ever being trained on his *Brady* obligations at all.

247.    In short, the QDAO both deliberately siloed information within each bureau and then did not train its prosecutors on their obligations to seek out *Brady* material that was not readily accessible.

248.    As a result, prosecutors could falsely claim that the QDAO did not have exculpatory files documenting Speedstick's involvement in the crime at the time that they responded to Bolt's requests for *Brady* material.

249.    Because this *Brady* information known to other prosecutors was not properly stored and/or not sufficiently accessible, Mr. Benjet concluded that the trial prosecutors' denials of the existence of such *Brady* materials were made "in good faith."

250.    In short, the ADAs responding to Bolt's discovery requests did not have ready access to those files and there was no policy, practice, or training for how these attorneys would obtain and review other prosecutors' files.

251.    This policy failure does not excuse the prosecutors' misconduct. Bolt, as well as his codefendants counsel, cited to specific newspaper reports indicating that Speedstick members

were suspects and prosecutors should have sought out materials, wherever located  relating to that subject matter.

252.    Moreover, Testagrossa was personally aware of Jamal Clark's involvement in the murder two years earlier and, given the notoriety of Bolt's alleged crime, it is inconceivable that he did not check his prior notes, or review any files related to Jamal Clark at all, before issuing false denials of the relationship between the cases in open court during codefendants Bell's case.

253.    This lack of any mechanism (or training) for prosecutors to access other prosecutors' files enabled an "ostrich" approach to *Brady* obligations, where prosecutors could claim not to have seen exculpatory materials. This is exactly such a case. It is not plausible that the revelation that Speedstick was involved in the Astoria Boulevard Murders in 1997 would have just been glossed over. This case was notorious. It involved the murder of a police officer, was the only death penalty case in the office, and defense counsel (and the press) specifically probed the relationship between Speedstick, the Astoria Boulevard Murders, and the Flushing attack.

254.    Nevertheless, because this information was not stored in the case files, the ADAs running discovery in Bolt's case could simply avoid this information.

255.    The QDAO's policy, practice, and procedure of failing to have an effective mechanism for prosecutors to access information known to others in the prosecutor's office made it foreseeable to the City that prosecutors would not locate *Brady* material and thus would withhold *Brady* material from criminal defendants.

256.    This unlawful policy, practice, or custom of the City was a substantial factor in bringing about the violations of Bolt's rights under the Constitution and laws of the United States and in causing his wrongful conviction, imprisonment and related damages.

257.    ***Second***, the DA Richard Brown, as a municipal policymaker for the City, had a custom and practice not to internally investigate, reprimand, sanction or discipline prosecutors for trial and pre trial misconduct, including *Brady* violations, summation misconduct and/or failure to correct false testimony and the use of <u>false or improper evidence and argument.</u>

258.    D.A. Richard Brown served as a justice of the Appellate Division, Second Department, from March 1981 until 1991, when he became D.A.

259.    There were numerous decisions by the Appellate Division during the period preceding his initial term as D.A., when Brown was a justice of the same court, excoriating ADAs for violating the aforementioned fair trial rights of criminal defendants.

260.    Thirty-three of these decisions, from the period 1985 through 1990, are listed in Exhibit A, which is incorporated herein by reference.

261.    These decisions were so numerous and so strongly worded that they suggested the existence of an anything-goes culture and practice aimed at obtaining convictions no matter the cost to criminal defendants' constitutional rights.

262.    Nevertheless, upon becoming D.A. himself in 1991, Brown, through his deliberate indifference, permitted this culture to continue.

263.    He did so by failing to conduct internal disciplinary investigations or to discipline the prosecutors who were known to commit such violations, failing to refer such individuals for possible discipline by the Appellate Division's Disciplinary or Grievance Committees, and failing to ensure they were properly trained and supervised.

264.    Instead of disciplining prosecutors who were found to have violated the constitutional right of criminal defendants to a fair trial, the D.A.'s policy, custom, or practice was to give these prosecutors raises, promotions, and commendations, based in part on their

record of winning at trial and extracting guilty pleas, even in weak cases, while ignoring or discounting judicial findings of misconduct by these prosecutors.

265.    Among the acts of serious misconduct found by courts and known to D.A. Brown during his tenure were 84 court decisions listed and summarized in Exhibit A (numbers 34-117).

266.    These decisions found that Queens prosecutors, as in Bolt's case, had wrongfully withheld favorable information from the defense, used or failed to correct improper, false, or misleading evidence or argument in the grand jury, at pretrial hearings, or at trial, or engaged in misconduct, often pervasive, during summations.

267.    None of the prosecutors responsible for the wrongdoing that occurred in these cases were meaningfully disciplined, if they were disciplined at all, by the D.A. or his designees.

268.    The D.A.'s failure to take any reasonable measures to discipline prosecutors responsible for these and other constitutional violations incentivized them and their colleagues to continue to violate the constitutional rights of criminal defendants.

269.    As established by the deposition testimony of Queens DA executives in *Su v. City of New York*, 06 Civ. 687 (E.D.N.Y.) (RJD)(CLP), another § 1983 case involving the wrongful conviction of a young man due to Queens prosecutors' knowing use of false evidence and argument and *Brady* violations, the District Attorney himself read every appellate decision concerning the Office and made the decision in each instance where misconduct was alleged or found whether to initiate an investigation of the ADA involved or to impose discipline.

270.    By 1996, the year Bolt was arrested, at least 65 Appellate Court decisions that alerted the final policy maker that defendants were deprived of their constitutional rights because of prosecution misconduct involving failure to disclose *Brady* material, failure to correct false testimony  and improper summations.

46

271.    Of the more than 130 instances, occurring after 1985 and continuing to date, of prosecutorial misconduct in summations, no trial prosecutor has been disciplined or sanctioned for actions which an appellate court found to be improper or to constitute prosecutorial misconduct.  No prosecutor was disciplined for any *Brady* violation prior to Plaintiff's trial notwithstanding that serious Brady violations, including withholding of impeachment material, had occurred.

272.    Prosecutors knew they were likely to be rewarded for winning but would suffer no negative personal consequence in the unlikely event their misconduct was exposed.

273.    Further encouraging prosecutors to win at any cost, including violating the constitutional rights of the accused, was their knowledge that the D.A., due to his indifference, had not promulgated or published any employee handbook or other office- wide publication setting forth either rules of behavior for prosecutors in handling criminal investigations or prosecutions, or procedures for disciplining prosecutors who violated established rules of behavior.

274.    D.A.'s indifference to compliance with *Brady* disclosure obligations was further communicated to line prosecutors by the QCDAO's establishment of its self- styled "Internal Wall " policy, which flagrantly violated constitutional requirements.

275.    Under the United States and New York State Constitutions, it was clearly established that the D.A.'s Office as an entity had the obligation to disclose evidence favorable to the defense, without regard to the individual knowledge or intent of any individual prosecutor.

276.    Nevertheless, under the "Internal Wall" policy, prosecutors assigned to try criminal cases were kept in the dark, and encouraged not to inquire, about promises or benefits

that their cooperating witnesses received from other prosecutorial personnel to induce them to testify favorably for the D.A.'s Office.

277.    The predictable result of this policy was that the defense and the jury wouldn't learn about circumstances known to the D.A.'s Office that potentially affected such witnesses' truthfulness and that false testimony by such witnesses denying receipt of promises and benefits would go uncorrected.

278.    Prosecutors were trained in this policy, and D.A. Brown permitted it to continue long after a trial judge, the New York Appellate Division, and then the New York Court of Appeals each condemned it as a flagrant violation of the constitutional rights of the accused.

279.    At the joint trial of co-defendants Gary Steadman and Raymond Blair in 1990, a key prosecution witness, Tony Malloy, testified to certain benefits he had received from the D.A.'s Office but denied that prosecutors had promised him leniency with respect to several pending felonies that could result in a lengthy period of imprisonment.

280.    Later in the trial, the defense learned that his testimony was false; in fact, a senior prosecutor in the D.A.'s Office had promised Malloy's attorney that, in exchange for favorable testimony, Malloy could avoid prison altogether.

281.    Steadman and Blair were convicted of manslaughter and related offenses.

282.    Ruling on the defense's motion for a mistrial or dismissal based on this late revelation of *Brady* material, the trial court found that the deal was "deliberately not communicated from the executive level of the Queens District Attorney's Office to the trial attorneys."  The court denounced the " Internal Wall" policy and directed that it be discontinued:

> [T]his court cannot adequately express in words its disgust that the trial was impacted by a shabbily structured cooperation charade. . . .
>
> Any reasonable interpretation of what happened here must conclude that ........ the executive level of the of the Queens District Attorney's Office improperly attempted to shield a witness from "*Brady*" evidence disclosure . . . . *It is hoped that this..............will never again be attempted*...[emphasis added]

283.    The trial court nevertheless denied the defense motion since the jury had eventually learned of the promises to Malloy.

284.    The Appellate Division "share[d] the trial court's condemnation of the tactics employed" by the D.A.'s Office but affirmed the conviction for the same reason. *People v. Blair*, 186 A.D.2d 665, 668 (2d Dep't 1992), *rev'd sub nom. People v. Steadman*, 82 N.Y.2d 1 (1993).

285.    The Court of Appeals, however, ordered a new trial, ruling that "the scheme employed by the District Attorney's office," which revealed "a determined effort . . . to avoid" its *Brady* obligations, "undermine[d] the purposes of the *Brady* and [related state] rules" and "cannot be condoned." *Steadman*, 82 N.Y.2d at 6-7.

286.    Two years after the trial court in the Blair and Steadman case excoriated the D.A.'s Office for the " Internal Wall" policy and expressed its expectation that the practice would be halted, the same policy was still in effect.

287.    At the attempted murder trial of Shih Wei Su in 1992, a crucial prosecution witness falsely denied, under questioning by the prosecutor, that he had received any leniency in exchange for his testimony, the prosecutor failed to correct this false testimony, and the prosecutor falsely vouched for the truthfulness of this testimony in her summation.

288.    The trial prosecutor, as she later testified under oath, had been trained in the " Internal Wall" policy.

49

289.     Years later, a judge, over the D.A.'s vigorous opposition, directed the disclosure of a sealed plea transcript which, as it turned out, showed that the witness had received an explicit deal for leniency in a robbery case in exchange for his cooperation in testifying against Su.

290.     For years, the D.A.'s Office resisted Su's efforts to overturn his fraudulently-obtained conviction.

291.     Finally, after Su had served 12 years in prison, the United States Court of Appeals for the Second Circuit ordered a rare grant of a federal writ of habeas corpus, overturning Su's conviction and directing his retrial or release.

292.     The court condemned Su's prosecutor for having "knowingly elicited false testimony from a crucial witness," *Su v. Filion*, 335 F.3d 119, 121 (2d Cir. 2003), whose "credibility could not help but be central to the deliberations of any reasonable jury," *id.* at 129, and then "bolster[ing that witness's] credibility" in a false summation, *id.* at 125.

293.     Subsequently, the D.A.'s Office, knowing it lacked any witness to testify against Su, threatened him with a retrial and the potential of many more years in prison if he did not plead guilty to a reduced charge.

294.     When Su insisted on his right to a new trial, the prosecutor suddenly dismissed the case on the scheduled trial date.

295.     Policymakers at the Queens D.A.'s Office were not the least bit disturbed by the prosecutor's behavior or the Second Circuit's condemnation of it.

296.    After learning of the Second Circuit's opinion, Su's prosecutor, Linda Rosero, spoke with D.A. Brown's second-in-command, ADA John Ryan, to complain that no one had warned her of the decision.

297.    ADA Ryan told her, "you are just going to have a bad day, that's all."

298.    Another high-level prosecutor in the office told her, "Don't worry, you're a good attorney. Everything will work out."  (The discovery obtained in that lawsuit is summarized in Joel B. Rudin, The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies That Prove That Assumption Wrong, 80 Fordham L. Rev. 537, 559-566 (2011), a copy of which is attached as Exhibit B and is incorporated herein by reference.)

299.    Petros Bedi was convicted of murder in 2000 after a key alleged eyewitness identified him as the shooter while denying the D.A.'s Office had paid him any financial benefits in exchange for this testimony.

300.    It took 12 years before Bedi finally succeeded in compelling the D.A.'s office, through a FOIL lawsuit, and over its resistance, to reveal its witness relocation file for this witness.

301.    Contrary to the witness's false testimony, he had received approximately $23,000 in relocation benefits, including numerous cash payments totaling thousands of dollars, even though his identity hadn't been revealed and there couldn't possibly have been any threat to his safety.

302.    The records showed that, after his identity was revealed at trial and, for the first time, he had a theoretical reason to fear for his safety, the payments stopped—he had literally been secretly bribed.

303.    When Bedi then brought a motion, in August 2012, to vacate his conviction, the D.A.'s Office resisted.

304.    It defended the prosecutor, Debra Lynn Pomodore, on the basis that, under the "Internal Wall " policy, she did not have actual possession or knowledge of the documents or the payments.

305.    The court, pointing out that this was no defense to Pomodore's violation of the *D.A.'s Office*'s disclosure obligations, vacated the conviction.

306.    Upon information and belief, the D.A.'s Office unlawfully obtained numerous additional convictions through exploitation of its " Internal Wall " policy and through other *Brady* violations.

307.    Further leading to the manufacturing and use of coerced or unreliable evidence was the D.A.'s Office's practice, as in Plaintiff's case, of improperly influencing lineup identifications and knowingly using unlawfully obtained lineup "evidence" in criminal proceedings.

308.    During the 1994 lineup involving a murder suspect, Kareem Bellamy, an eyewitness failed to positively identify Bellamy.

309.    A Queens ADA, Stephen Antignani, was present at the lineup to supervise it and, in theory, to ensure it was conducted fairly.

310.    Knowing that, without a positive identification, there would be an insufficient basis to obtain an indictment, Antignani permitted a detective to take the witness into a private room, where the two talked privately.

311.    After the witness and the detective emerged from the room, the witness suddenly claimed to be able to positively identify Bellamy.

312.    ADA Antignani used this manufactured "identification" in the grand jury to obtain an indictment.

313.    He did so, as the prosecutor also did in Plaintiff's case, by misleading the grand jury into believing the eyewitness had made a positive identification while not revealing the witness's initial uncertainty and the process by which an uncertain identification had been transformed into a positive one.

314.    Bellamy was convicted, and spent 14 years in prison, before his conviction was overturned based upon newly-discovered evidence of innocence.

315.    Similarly, in the Ricardo Benitez case, in 2009, a prosecutor attending a lineup to ensure its fairness, Tina Grillo, knew the lineup was grossly suggestive but allowed it to go forward.

316.    While the suspect was in his 50s and appeared gaunt, sickly, and disheveled, the fillers were all clean-cut, lighter-skinned policemen who were 15 to 20 years younger.

317.    Even though records of the D.A.'s Office described the lineup as "terrible," a prosecutor still used it to obtain an indictment.

318.    The grand jury was informed only of the identification, not of the extraordinarily suggestive and unlawful circumstances by which it was obtained.

319.    Thereafter prosecutor misled a hearing judge into allowing an in-court identification at trial by introducing untrue testimony from the witness that her initial

53

observation of the suspect had lasted five minutes, when a surveillance video showed it had

really lasted a matter of seconds.

320.    Benitez was convicted and spent almost six years in prison before his conviction

was reversed and he was acquitted at a retrial.

321.    Upon information and belief, employees of the D.A.'s Office caused numerous

additional false arrests, prosecutions, and convictions by improperly influencing lineup

identifications and knowingly using unlawfully obtained lineup "evidence" in criminal

proceedings.

322.    Further contributing to the anything-goes atmosphere was the knowledge

among prosecutors that the D.A.'s Office, rather than discipline ADAs who were found by a

court to have engaged in misconduct, instead would personally attack judges who made

unfavorable decisions, try to get the judges transferred out of criminal court, or try to block the

judges' reappointment.

323.    The leadership of the QDAO knew that even a single instance of prosecutorial

misconduct, if it led to no discipline, could poison the atmosphere of the entire office, as Acting

District Attorney John Ryan acknowledged during a sworn videotaped deposition in *Kareem

Bellamy v. City of New York*, 12 CV 1025 (AMD) (PK) (E.D.N.Y.).  Mr. Ryan also

acknowledged the dire consequences inflicted on those who were wrongfully convicted and

agreed that "such dire consequences to others justify dire consequences to prosecutors who act

unethically."

324.    In early 1996, the executive leadership of the QDAO compiled a Prosecutorial

Misconduct Survey (the "Survey").

54

325.     As the City confirmed in a Fed. R. Civ. P. 30(b)(6) deposition on December 1,

2020 in another matter, the Survey found that, in at least *39* cases, either an appellate court held

that the QDAO committed misconduct (22 cases), or the QDAO admitted misconduct absent

such a finding (17 cases).

326.     The QDAO's prosecutorial misconduct in the Survey included all of the above

types of prosecutorial misconduct resulting in constitutional violations, including *Brady* and

related discovery violations, summation misconduct, improper reliance on false evidence, and

prejudicial degradation of criminal defendants.

327.     The instances of misconduct covered by the Survey constituted just a fraction of

the total instances of misconduct the QDAO had committed between 1988 and 1995 and also did

not include numerous additional incidences between 1985 and 1988, when DA Brown was an

appellate division justice and became aware of the pervasiveness of prosecutorial misconduct in

the QDAO.

328.     All, or substantially all, of the QDAO prosecutorial misconduct cited in the

Survey occurred in the few years preceding Bolt's arrest, trial, and conviction.

329.     By way of example, the Survey cited the following cases, which represent a small

sample of the misconduct found in the Survey:

      a.     *People v. Figueroa*, 181 A.D.2d 690 (2d Dep't 1992), ordering a new trial
where the QDAO prosecutor's summation "went well beyond the bounds
of fair advocacy," including suggesting that defendant's alibi was
concocted after the witness met with defense counsel.

      b.     *People v. Steadman/Blair,* 82 N.Y.2d 1 (1993), reversing a defendant's
manslaughter conviction where the QDAO made a "determined effort" to
avoid its obligations to disclose exculpatory evidence and to correct false
testimony, by employing a "scheme" under which a QDAO supervisor
would make a cooperation agreement with a witness's attorney, but not
reveal the agreement to the prosecutors handling the defendant's case at

trial, and not correct the witness's false testimony denying such an agreement.

c. *People v. Fearnot*, 200 A.D.2d 583 (2d Dep't 1994), reversing a conviction where the QDAO withheld potential impeachment material, suggested without evidence that the defendant was a prostitute, and tried to inflame the jury by citing the AIDS epidemic, comments that "went beyond the permissible bounds of broad rhetorical comment and should not be repeated at a new trial."

d. *People v. Montesa*, 211 A.D.2d 648 (2d Dep't 1995), reversing a conviction in part because the QDAO prosecutor elicited hearsay testimony from a witness and committed summation misconduct.

e. *People v. Giersz*, 212 A.D.2d 805 (2d Dep't 1995), reversing a conviction where a QDAO prosecutor's summation "exceeded the broad bounds of rhetorical comment permissible in closing arguments."

f. *People v. Scott*, 217 A.D.2d 564 (2d Dep't 1995), ordering a new trial where the QDAO's misconduct was "so flagrant and so pervasive that it was impossible for the defendant to receive a fair trial," including repeatedly referring to defendant as a convicted felon to convict him based on criminal propensity, and attempting to shift the burden of proof.

g. *People v. Moss*, 215 A.D.2d 594 (2d Dep't 1995), reversing a conviction in part based on the QDAO prosecutor's disregard of the court's ruling limiting unfairly prejudicial evidence, cross–examination questions comparing defendant to Hannibal Lecter in Silence of the Lambs, and waving of a knife in front of the jury during summation.

h. *People v. Leuthner*, 216 A.D.2d 327 (2d Dep't 1995), reversing a conviction due to serial misconduct by the QDAO prosecutor.

i. *People v. James*, 218 A.D.2d 709 (2d Dep't 1995), noting "unacceptable practices engaged in by the [QDAO] prosecutor."

j. *People v. Elder*, 207 A.D.2d 498 (2d Dep't 1994), reversing a conviction in part based on QDAO summation misconduct and reliance on unduly prejudicial evidence.

330. Despite the serial misconduct that the Survey revealed, the City has admitted that the QDAO:

a. Failed to change any QDAO policy;

56

b.      Failed to change any QDAO practice;

c.      Failed to change any QDAO procedure;

d.      Failed to discipline any QDAO prosecutor;

e.      Failed to change its disciplinary process for QDAO prosecutors (in fact, there was no process);

f.      Failed to identify which prosecutors committed the misconduct in the Survey;

g.      Failed to incorporate prosecutorial misconduct, including but not limited to court findings of prosecutorial misconduct, into employment evaluations of QDAO prosecutors;

h.      Failed to make any changes to the way prosecutors were evaluated;

i.      Failed to make any changes to the way prosecutors were supervised;

j.      Failed to create additional oversight by upper-level executives in the office;

k.      Failed to change any hiring practices for QDAO prosecutors;

l.      Failed even to inform trial QDAO prosecutors about the results of the Survey;

m.      Failed to inform appellate QDAO prosecutors about the results of the Survey;

n.      Failed to have any office-wide meeting to discuss the Survey or response to the Survey;

o.      Failed to track QDAO prosecutorial misconduct post-Survey;

p.      Failed to analyze QDAO prosecutorial misconduct, by type, by prosecutor, or by any other method; and

q.      Failed to do any follow-up prosecutorial misconduct survey.

331.    For his part, DA Brown took no action at all in response to the Survey.

332.     Chief Assistant District Attorney Barry Schwartz was Brown's number two in the QDAO, and was delegated responsibility, *inter alia*, for discipline, promotions, and other supervision and personnel matters.

333.     Schwartz has no memory of the Survey or of almost any case cited in the Survey.

334.     Schwartz has stated in sworn deposition testimony that he has no memory of the QDAO "taking any kind of action in response" to the Survey.

335.     The QDAO's leadership in 1996 included Brown, Schwartz, and Chief of Appeals Steven Chananie. John Ryan replaced Schwartz as Chief Assistant in 1997 and remained in that role through Bell's conviction in 2002.

336.     All of them failed to take any of the above steps in response to the Survey.

337.     Nothing in the Survey surprised or could have surprised the QDAO's leadership.

338.     From the beginning of his tenure in 1991, Brown routinely read appellate decisions in QDAO cases. Barry Schwartz also routinely read those cases, as did Chananie. Schwartz also read QDAO reversal memos that summarized the disposition and reasoning of those cases. Those cases formed the basis for the results of the Survey.

339.     Throughout his tenure, from 1991 through the Bell trial and after, District Attorney Brown knew about prosecutorial misconduct by QDAO prosecutors.

340.     Brown and Schwartz purportedly "expressed concern" to each other "about reversals that characterized the trial assistant engaging in what the courts like to call 'prosecutorial misconduct.'"

341.     Yet neither took any systemic action to address, prevent, or punish prosecutorial misconduct in the QDAO.

342.    As damning as the Survey was, it contained a woefully incomplete summary of QDAO prosecutorial misconduct in the early 1990s.

343.    A number of prosecutors apparently failed to respond to the Survey, and the Survey missed recent misconduct of a number of prosecutors who had recently left the QDAO.

344.    As a result, at least *19* decisions (almost all appellate cases) *not* reflected in the survey found additional prosecutorial misconduct by the QDAO between 1991 and 1995 ("Additional Misconduct").

345.    The QDAO, including Brown and Schwartz, read and knew about these decisions, all of which were filed and available to the general public.

346.    The Additional Misconduct cited in these decisions was wide ranging, including *Brady* and *Rosario* violations, improper cross-examination, violation of court orders, summation misconduct, improperly eliciting evidence at trial, and improperly coaching a People's witness at trial.

347.    Decisions reflecting Additional Misconduct include, but are not limited to:

  a.    *People v. Stevens*, 174 A.D.2d 640 (2d Dep't 1991), reversing a conviction in part based on the QDAO prosecutor's statement in summation that "if this defendant wasn't charged with sodomy . . . he should have been," in a case where the defendant had not been indicted for sodomy and the complainant had not testified that sodomy had occurred.

  b.    *People v. Gunther*, 175 A.D.2d 262 (2d Dep't 1991), reversing a conviction where the QDAO prosecutor improperly attempted to show defendant's propensity to commit the charged crime of dealing cocaine by extensively cross-examining him on past convictions for dealing marijuana, in "a deliberate and calculated strategy to convict on the basis of improper and prejudicial hyperbole."

  c.    *People v. Gaskins*, 171 A.D.2d 272 (2d Dep't 1991), reversing a conviction where the QDAO prosecutor failed to disclose the videotape of an interview of the alleged child victim.

  d.    *People v. Parker*, 178 A.D.2d 665 (2d Dep't 1991), ordering a new trial in part based on the QDAO prosecutor's summation misconduct.

e.  *People v. Curry*, 153 Misc.2d 61 (Sup. Ct. Queens Cty. Jan. 16, 1992), dismissing the indictment because the QDAO prosecutor failed to inform the grand jury that the complainant had recanted his identification and report of defendant's involvement in the crime.

f.  *People v. Baba-Ali*, 179 A.D.2d 725 (2d Dep't 1992), reversing a rape conviction where, despite a court order, the QDAO prosecutor failed until the eve of trial to disclose medical records finding no signs of sexual abuse.

g.  *People v. Nieves*, 186 A.D.2d 276 (2d Dep't 1992), reversing a conviction where the QDAO prosecutor engaged in improper cross-examination and summation.

h.  *People v. James*, 184 A.D.2d 582 (2d Dep't 1992), reversing a conviction where the QDAO prosecutor represented that the People would not introduce unfairly prejudicial evidence of defendant's prior possession of drugs, but then cross-examined a police officer extensively on that evidence and emphasized it in summation.

i.  *People v. Andre*, 185 A.D.2d 276 (2d Dep't 1992), reversing a conviction in part because of the QDAO prosecutor's summation misconduct.

j.  *People v. Odle*, 187 A.D.2d 536 (2d Dep't 1992), ordering a new trial where the QDAO prosecutor repeatedly and improperly elicited evidence of uncharged crimes to show criminal propensity and bad character, and committed summation misconduct.

k.  *People v. Banch*, 80 N.Y.2d 610 (1992), reversing a conviction where the QDAO prosecutor failed to disclose several pieces of potential impeachment material, and noting "the People's seeming lack of care in discharging their discovery obligation."

l.  *People v. Jenkins*, Ind. No. 2213/1992, declaring a mistrial "based on [QDAO] ADA Landa's 'prosecutorial misconduct' in 'hold[ing] back exculpatory information as long as possible' from defense counsel."

m.  *People v. Robinson*, 190 A.D.2d 697 (2d Dep't 1993), setting aside the verdict because the QDAO "prosecutor's misconduct deprived [defendant] of a fair trial," including "prepp[ing]" an officer during a recess to "rehabilitate him on his cross-examination," and committing summation misconduct.

n.  *People v. Robinson*, 191 A.D.2d 595 (2d Dep't 1993), ordering a new trial where the QDAO prosecutor "engaged in a series of improper remarks and tactics," including eliciting testimony about defendant's post-arrest

silence, committing summation misconduct, eliciting improper expert testimony, and "derisive[ly]" commenting on the presumption of innocence.

o.    *People v. Kirchner*, 200 A.D.2d 766 (2d Dep't 1994), reversing a conviction where the QDAO failed to disclose potential impeachment evidence.

p.    *People v. Shim*, 218 A.D.2d 757 (2d Dep't 1995), faulting the QDAO for failing to disclose potential impeachment evidence.

348.    The QDAO's failure to include any of the Additional Misconduct in the Survey is further evidence of deliberate indifference to prosecutorial misconduct in the office.

349.    In response to the Additional Misconduct, the QDAO:

a.    Failed to change any QDAO policy;

b.    Failed to change any QDAO practice;

c.    Failed to change any QDAO procedure;

d.    Failed to discipline any QDAO prosecutor; and

e.    Failed to implement any new training.

350.    After yet another reversal due to a finding of prosecutorial misconduct DA Brown himself wrote a note to his Chief Assistant, Jack Ryan, stating: "*Jack – Let's discuss how to handle – I think we've been getting away with this kind of stuff for a long time*."

351.    Notwithstanding rampant, wide-ranging prosecutorial misconduct in the QDAO, from at least June 1991 through January 1997 (Barry Schwartz's tenure as Chief Assistant), and continuing the following five years through January 2002 (under his successor, John Ryan), and DA Brown's acknowledgement that the office had been "getting away with this kind of stuff for a long time," the QDAO still:

a.    Failed to discipline a single QDAO prosecutor for prosecutorial misconduct;

b.      Failed to create a handbook or manual setting forth rules and procedures for prosecutors, including how to comply with their constitutional obligations;

c.      Per Schwartz' sworn testimony, had "no procedure in place" for "investigating prosecutorial misconduct of any type";

d.      Failed to note prosecutorial misconduct in an employment evaluation;

e.      Failed to have any practice or procedure to note prosecutorial misconduct in a personnel file;

f.      Had no policy, practice, or procedure to use reversal memos as part of employment evaluations;

g.      Failed to create any practice, policy or procedure to ensure that supervisors were aware of findings of prosecutorial impropriety;

h.      Failed to create any practice, policy or procedure to make Schwartz, Brown, or Ryan aware of misconduct by prosecutors before promoting them or increasing their compensation;

i.      Failed to include reversal memos, appellate decisions, or any document that might reflect prosecutorial misconduct in the packets compiled before Schwartz or Ryan recommended a promotion;

j.      Failed to keep records of findings of misconduct by individual prosecutor, by bureau, or by the Office as a whole;

k.      Failed to conduct any review of QDAO prosecutorial misconduct before June 1999; and

l.      Failed to do any trend analysis of prosecutorial misconduct over time.

352.    In addition to the approximately 58 cases of prosecutorial misconduct set forth above, in opinions dated 1996, 1997, and after, courts repeatedly assailed the QDAO for yet more prosecutorial misconduct that occurred before Bolt's conviction, yet there was no adverse consequence to the prosecutors who were responsible and no change in office policy, practice or procedure to prevent still more such occurrences in the future.

353.    This misconduct included *Rosario* violations, *Brady* violations, suborning false testimony, and improper opening statements.

354.    Instead of disciplining such prosecutors, the District Attorney's policy, custom or practice was to give them raises, promotions, positive evaluations, and commendations, based in part on their record of winning at trial and their productivity in trying a lot of cases and extracting guilty pleas even in weak cases.

355.    The Office used evaluation forms, approved by the District Attorney or his Chief Assistant, with which bureau chiefs and other supervisors rated prosecutors in numerous categories of performance, but which nowhere asked for comment on their respect for or compliance with the due process or fair trial rights of criminal defendants.

356.    Every one of these evaluation forms were reviewed by John Ryan, the chief assistant to District Attorney Brown, and usually by Division chiefs, for purposes of determining raises, bonuses, and promotions.

357.    The district attorney delegated to Ryan and division chiefs the task of reviewing evaluations and recommending raises, bonuses, and promotions and almost always approved their recommendations.

358.    The evaluations were shown to the prosecutors who were evaluated in part for the purpose of communicating to them how successful they were being in implementing the goals of the Office and the types of behavior the Office approved of and wished to encourage.

359.    The completed evaluation forms would not reference court findings of misconduct or complaints by criminal defendants or their attorneys, no matter how egregious the misconduct.

360.   Thus, the message to the prosecutors was that the Office only cared about how aggressive and successful they were in processing and winning cases, not whether, in doing so, they violated the constitutional rights of the individuals they were prosecuting.

361.   The Office kept no records of negative court decisions or of complaints against individual prosecutors so that it could identify prosecutors who repeatedly were the subject of such decisions or complaints and who required greater training, supervision or discipline.

362.   Thus, when a court found that a prosecutor had committed misconduct, it had no database or records from which to determine whether the same prosecutor had a history of engaging in similar or other misconduct.

363.   The Office kept no record of, and did not investigate, the failure of bureau chiefs and other supervisors to properly supervise staff attorneys to ensure that they complied with the due process and fair trial rights of criminal defendants.

364.   Although supervisors were supposed to monitor members of their bureau closely enough to ensure that constitutional violations did not occur, executives in the office would not follow up with supervisors to find out why *Brady* violations, summation, or other misconduct found by a court had been allowed or able to occur.

365.   Prosecutors were incentivized to violate the constitutional rights of criminal defendants, since they knew they were likely to be rewarded for winning but would suffer no negative consequence in the unlikely event their misconduct was exposed.

366.   Some examples illustrate how the QDAO created an office culture where prosecutorial misconduct was ignored, condoned, and rewarded.

***Prosecutor A***[5]

367.     In 1990, QDAO prosecutor A. prosecuted Robin Tellier. A. (i) failed to disclose *Rosario* material; (ii) failed to disclose Giglio material; (iii) misrepresented to defense counsel that all *Brady* and *Rosario* material had been disclosed; (iv) misrepresented to the court whether federal prosecutors who had debriefed a People's witness were observing the trial; and (v) allowed a People's witness to claim a loss of memory concerning prior crimes, when information concerning those crimes was contained in the debriefing notes A. had failed to disclose.

368.     The Grievance Committee for the Ninth Judicial District later admonished A. for concealing the notes, for a "misrepresentation" to the court, and for engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation."

369.     On October 1, 1991, the QDAO nevertheless gave A. an "Excellent" evaluation, noting: "This Assistant likes to win and fights towards that end."

370.     On May 1, 1992, the QDAO gave A. a "Very Good" evaluation, stating that A. "is a true warrior in that he never backs down or is intimidated."

371.     Neither evaluation mentioned the Tellier case, or A.'s unethical and illegal conduct in that case.

372.     On March 29, 1993, the Second Department found in People v. Kane that A. improperly in opening and closing arguments "impl[ied] the defendant's guilt of an unrelated burglary."

373.     On September 1, 1993, the QDAO's Dan Saunders gave A. an "Outstanding" evaluation, noting that A. "acquitted himself well with every assignment he's undertaken" and that "[h]is judgment, temperament and advocacy skills are all outstanding." (Emphasis added.)

---

[5]Prosecutors here are identified by the first initial of their last name.

Saunders was then the Chief of Homicide Trials at the QDAO.

374.    Saunders' 1993 evaluation failed to mention the Tellier or the Kane cases, or A.'s improper conduct in both.

375.    On February 2, 1995, the Queens Supreme Court granted a motion to vacate a conviction in *People v. Moustakis*, a decision later affirmed by the Second Department. A. prosecuted that case. The courts found that A. "fail[ed] to turn over 16 pages of notes of detailed admissions by a prosecution witness concerning his prior criminal history," details of which the witness "forgot" on the stand.

376.    On August 28, 1995, a few months after the first Moustakis decision, Schwartz announced to "the Entire Staff" A.'s promotion to Deputy Bureau Chief of the Supreme Court Long Island City Bureau. There, A. supervised 10-11 prosecutors.

377.    Per his regular practice at the QDAO, Schwartz promoted A. "in consultation with the district attorney," Mr. Brown.

378.    About two weeks later, on September 15, 1995, in a decision following a March 31, 1995 argument, the Second Department reversed the conviction in People v. Spinelli. A. prosecuted Spinelli. The Court found that A. improperly cross-examined an officer about the defendant's pretrial silence, engaged in summation misconduct, and held that "the prosecutor's conduct was fundamentally unfair."

379.    This decision also had no effect on A.'s promotion or, on information and belief, A.'s career at the QDAO.

### *Prosecutor B*

380.    On December 13, 1993, Brown promoted QDAO prosecutor B. to Deputy Chief of the Supreme Court Kew Gardens Bureau.

381.     On August 22, 1994, the Second Department reversed the conviction in *People v. Elder*. B. prosecuted Elder. The Court found that B. engaged in "flagrant" "instances of prosecutorial misconduct," in particular, summation misconduct, which "substantially prejudiced defendant's case."

382.     Notwithstanding B.'s flagrant misconduct, B. did not receive any discipline, any adverse consequence, or any new training.

383.     To the contrary, on April 27, 1995, Schwartz announced to "the Entire Staff" B.'s promotion to Chief of the Intake Bureau.

384.     There, B. supervised intake for the entire QDAO.

### *Prosecutor D*

385.     On September 26 1994, the Second Department held in People v. Fanfan that the QDAO "exceeded the bounds of a proper summation." D. prosecuted Fanfan.

386.     On May 15, 1995, the Second Department reversed the conviction in *People v. Moss*.  D. prosecuted Moss. The Court founds that D. (i) compared the defendant to Hannibal Lecter in the film Silence of the Lambs during cross-examination of the defendant; (ii) asked the jury in summation to "place themselves in the position of victims being threatened by the defendant"; (iii) disregarded the Court's Sandoval ruling; and (iv) waved a knife during summation.

387.     Surely a prosecutor like this would be fired, or at least disciplined, in any district attorney's office that cared about prosecutorial misconduct.

388.     Not the QDAO. On August 25, 1996, Schwartz announced to "the Entire Staff" D.'s promotion to Supervisor of the Training Bureau.

389.    There, fresh off comparing a defendant to Hannibal Lecter and waving a knife in front of the jury, D. taught prosecutors at the QDAO how to prepare and try cases. D. himself received no discipline or further training as a result of Fanfan or Moss.

**_Prosecutor K_**

390.    On June 10, 1991, the Second Department reversed the conviction in People v. Stevens. K. prosecuted Stevens. As noted supra, the Court found that K. improperly stated in summation that "if this defendant wasn't charged with sodomy . . . he should have been," in a case where the defendant had not been indicted for sodomy and the complainant had not testified that an act of sodomy had occurred.

391.    In July 1991, Chief of Training Andrew Zwerling and Schwartz made K. a co-supervisor of the new QDAO Training Bureau. There, she trained prosecutors in all aspects of trial practice.

392.    On August 31, 1992, the Second Department reversed the conviction in *People v. Clausell*. K. prosecuted Clausell. The Court found that K. (i) failed to produce Brady material; (ii) before opening statements, misrepresented to the trial court and to defense counsel that the Brady material did not exist; (iii) after an officer's testimony, again misrepresented to the trial court that the *Brady* material did not exist; and (iv) again failed to produce the *Brady* material. The defense then subpoenaed the material from the police department and received it, nine days after the conviction.

393.    After K.'s serial misconduct in Clausell, and notwithstanding that K. was a supervisor in the Training Bureau, the QDAO did not discipline her, give her any additional training, place a note in her evaluation or personnel file, or apparently take any other action.

To the contrary, the QDAO gave K. twelve salary increases, three bonuses, and in 1997 promoted her, again, to become a Bureau Chief.

***Prosecutor L***

394.    On February 29, 1988, the Second Department reversed the conviction in *People v. Romain*. L. prosecuted Romain. The Court found that L. engaged in "gross distortion" in summation, "the magnitude of which was highly prejudicial."

395.    In May 1994, in the case of People v. Moore, L. questioned several witnesses about prohibited evidence (pending and other prior crimes), then compounded the misconduct by summing up on the prohibited evidence.

396.    On May 15, 1996, a QDAO executive (John Ryan) wrote Chief of Appeals Steven Chananie, Schwartz, and Andrew Zwerling a memo that L. "did engage in misconduct," which "we did not defend in our [appellate] brief."

397.    Ryan also wrote that the Second Department "once again, expressed their own concerns about the issue" of the QDAO's "prosecutorial misconduct." (Emphasis added.)

398.    The memo also noted Brown's "continuing concern about prosecutorial misconduct" in the QDAO.

399.    Nevertheless, after this memo, the QDAO gave L. five salary increases, one bonus, and a promotion to Intake Supervisor.

400.    QDAO prosecutors A., B., D., K., and L. are merely a few examples of QDAO prosecutors who violated the Constitution in the years leading to Bolt's conviction and immediately following it, faced no adverse action, received no further training or supervision, and continued to thrive and progress in the office.

401.    While additional training and discipline for misconduct was virtually non-existent, ADA Testagrossa himself has testified at a deposition in another matter that prosecutors in the QDAO's office at the time kept close tally of their trial win-loss records. He also stated he perceived that their victory percentage affected their promotions and compensation.

In sum, policymakers at the QDAO's office created a culture where winning mattered more than following the Constitution. They acted with deliberate indifference to constitutional violations generally, based on policy and practice, including those that injured Plaintiff, and failed to take any steps to protect against constitutional harms certain to occur without policies, practices, or procedures in place to prevent, address, or punish prosecutorial misconduct.[6]

402.    To the contrary, the deliberate indifference and policies and practices of QDAO policymakers, including the District Attorney and his designees, created a culture of prosecutorial misconduct that they knew was highly likely to cause further violations and which, in fact, did so in numerous cases, including Plaintiff's case.

403.    These policies and practices which condoned and encouraged the suppression of *Brady* material in the name of securing a conviction, (and, at a minimum ensured there would be no repercussion for prosecutors who did so) were a proximate cause of the constitutional violations of ADAs Lasak, Testagrossa, Leventhal, Cantoni, Dorfman, Morse, and Fidel set forth supra, which caused the conviction of Plaintiff.

404.    These prosecutors knew that the QDAO valued winning over following the Constitution (and all the more so when a police officer was killed and the Mayor was demanding swift punishment), and they were right, which caused the conviction of Plaintiff.

---

[6] *Accord* Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies That Prove That Assumption Wrong*, 80 Fordham L. Rev. 537, 559-566 (2011).

405.    The QDAO's policy, practice, and procedure of allowing prosecutors to commit prosecutorial misconduct in dozens of cases, without consequence, made it foreseeable to the City that ADA Leventhal would commit misconduct in Bolt's case, including withholding *Brady* material.  These unlawful policies, practices, and customs of the City were a substantial factor in causing the violations of Bolt's rights under the Constitution and laws of the United States and in causing his wrongful conviction, imprisonment and related damages.

406.    Under the principles of municipal liability for federal civil rights violations, the District Attorney of Queens County (or his authorized delegates) has final managerial responsibility for instructing supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," not to abuse judicial process, to make timely disclosure of exculpatory evidence or *Brady* material to the defense, including post-trial, and to refrain from offering, and to correct, false, misleading, or prejudicial evidence, testimony, and argument during pretrial, trial, and post-trial proceedings.

407.    DA Brown who was the highest-ranking New York City official with responsibility for setting and enforcing policy with respect to managing his office's personnel and the functions of the office, had final policymaking authority in all such areas.

408.    DA Brown personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his office's performance of its duties.

409.    DA Brown at all relevant times was an elected officer of Queens County, one of the constituent counties of the CITY, and the office was and is funded out of the CITY's budget

410.    Furthermore, DA Brown, as the District Attorney, was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2) and federal Monell jurisprudence, Bellamy v. City of New York, 914 F.3d 727 (2d Cir. 2019); and New York has provided by statute (N.Y. County Law§§ 53, 941) that the CITY's constituent counties (including Queens County), and hence the CITY itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

411.    DA Brown personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

412.    During all times material to this Complaint, the CITY, through its policymakers, owed a duty to the public at large and to Bolt, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

413.    ADAs Leventhal and Testagrossa , who prosecuted Bolt and his codefendants, acted in accordance with these QDAO practices, policies, and customs when they repeatedly, without fear of reprisal, withheld valuable *Brady* material (and, at times, failed to search and locate exculpatory materials) clearly indicating that someone else had, in fact, committed the murder for which they were seeking the death penalty against Bell (among other valuable exculpatory evidence), made multiple false statements in open court that no *Brady* material existed,

414.    By virtue of the foregoing, the CITY is liable for having substantially caused the foregoing violations of Bolt's constitutional rights and his resultant injuries (¶ 185, above).

415.    The foregoing violations of Bolt's constitutional rights, and his resultant injuries, were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to the City, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to prosecution by the QDAO, namely:

    a.    The institution and implementation by the District Attorney of plainly inadequate or unlawful policies, procedures, regulations, practices and/or customs concerning:

        i.    The duty not to use false, misleading or unreliable evidence, testimony, statements or argument during criminal proceedings;

        ii.    The obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument, whenever such misconduct is discovered to have occurred;

        iii.    The obligation not to make false, prejudicial, or inflammatory summation arguments;

        iv.    The continuing obligation to timely and fully disclose material, in the possession, custody or control of the District Attorney's Office or of the police, that is favorable to the defense within the meaning of *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 450 U.S. 150 (1972), and their progeny; and

    b.    The District Attorney's deliberate indifference to the need, and his failure, to adequately investigate, supervise, discipline, and/or rectify his employees' conduct with respect to such matters.

416.    The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs, including the failure to properly investigate, supervise, discipline, and/or rectify employees' conduct with regard thereto, were implemented or tolerated by policymaking officials for Defendant City, including, but not limited to, the District Attorney of Queens County and his delegates, who knew:

a.   To a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b.   That such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult or will incentivize correct choices;

c.   That the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury; and

d.   That employees of the QDAO had a history of making wrong choices in such matters.

417.   The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph, based upon:

a.   Numerous credible allegations, many substantiated by judicial decisions as demonstrated above, that Queens County ADAs had:

i.   Participated in the manufacturing of false testimony or evidence, including identification evidence;

ii.   Presented or failed to correct false or misleading testimony and argument;

iii.   Failed to disclose at all, or on a timely basis, information favorable to the defense that was required to be disclosed by the Constitutions and the laws of the United States and of the State of New York;

iv.   Made arguments at trial that were so false, misleading, inflammatory, or otherwise improper that they deprived the defendant of due process and a fair trial; and

b.   The inherent obviousness of the need to train, supervise and discipline ADAs in their aforementioned constitutional obligations to counteract the pressure that the Queens County District Attorney applied to prosecutors to obtain convictions.

418.   By virtue of the foregoing, the CITY is liable for having substantially caused the foregoing violations of Bolt's constitutional rights and his resultant injuries (¶185, above).

## FIFTH CAUSE OF ACTION

(*Monell*/42 U.S.C. § 1983: Claim Against the CITY based on the conduct of the NYPD)

419.    Bolt realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

420.    The foregoing violations of Bolt's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to the CITY amounting to deliberate indifference to the constitutional rights of persons, including Bolt, who are investigated, arrested, or prosecuted for alleged criminal activities.

421.    Prior to Bolt's arrest, policymaking officials at the NYPD, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting and convicting innocent people, and to the rights of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

(a)    The use of excessive promises of rewards and unduly coercive interrogation techniques with vulnerable potential witnesses, including drug users and addicts, and/or individuals fearing prosecution and imprisonment for their own criminal behavior;

(b)    The determination of probable cause to make an arrest; and

(c)    The continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information (*Brady* material) favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witness has a motive,

bias or interest affecting his credibility or has been pressured or coerced, so that the District Attorney could comply with his constitutional obligation to disclose such information to the defense under *Brady*.

422.    With respect to "a" and "c" in the preceding paragraph, prior to Bolt's 1996 arrest and later prosecution, the NYPD provided no training at all.[7]

423.    The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the CITY, including but not limited to, the New York City Police Commissioner, who knew (or should have known):

(a)    To a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)    That such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

(c)    That the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

424.    The NYPD's policy, custom and practice of approval and/or ratification of, toleration and/or acquiescence in, or deliberate indifference to violations of its constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of Bolt's constitutional rights beginning with his false arrest and the initiation of a

---

[7]Deposition testimony from present and former police detectives, including supervisors, during several civil rights lawsuits, including *Zahrey v. City of New York, et al.*, 98 Civ. 4546 (DLP) (S.D.N.Y.), establishes, prior to and during the time period of Bolt's 1996 arrest, the NYPD provided no training concerning appropriate interrogation of accomplice or informant witnesses and Brady compliance.  Most such witnesses had no idea what "*Brady*" was and no clue about their obligation to comply with it.

criminal prosecution against him without probable cause and continuing throughout his criminal

proceedings, trial and incarceration.

425.    The aforementioned policymaking officials had the knowledge and the notice

alleged in the preceding paragraph based upon, and the need to investigate and supervise officers

by, among other circumstances:

(a)    Credible allegations, many substantiated by judicial decisions, finding that NYPD officers had wrongfully withheld material evidence or knowingly given false or misleading testimony;

(b)    Fifty civil lawsuits, from 1992 to 2000, some of which resulted in substantial civil settlements, credibly alleging that police had falsified, exaggerated, or withheld material evidence, or conducted searches or arrests without probable cause;

(c)    Numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under *Brady* as well as the probable cause requirement of the Fourth Amendment;

(d)    Judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their Brady obligations and for failing to adopt adequate *Brady* disclosure policies, *see Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the CITY could be held liable for its failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under *Brady*, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison*, above;

(e)    Formal reports of the New York City Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the NYC Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action; and

(f)    The inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers and the powerful incentives they have to close cases and to obtain arrests and convictions.

426.    Evidence that the NYPD, in 1996-1999, had notice, and policies and customs of,

deliberate indifference to police misconduct, including the coercion of false or misleading

statements, fabrication of evidence, and withholding information favorable to the defense, is

evidenced by The Report of the Commission to Investigate Allegations of Police Corruption and

the Anti-Corruption Procedures of the Police Department ("Mollen Commission"),  dated July 7,

1994.

427.    The Mollen Commission report establishes that:

> In the face of th[e] problem of corruption, the Department allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than devastating consequences of corruption itself. As a result, its corruption controls minimized, ignored and at times concealed corruption rather than root it out …. Thus, there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what this Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training, and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.

> Mollen Commission Report, p. 2-3.

428.    Other circumstances and government reports put the CITY on notice as well

regarding the need to investigate, discipline, and supervise its police officers:

(a)    In 1990, the Office of Special Prosecutor, which investigated charges of police corruption, was abolished.

(b)    The Mollen Commission concluded police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system:

> "…Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them, …What breeds this tolerance is deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful. As one dedicated officer put it, police officers often view

falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets.  This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."

Mollen Commission Report, p. 36, 40-41.

429.     Furthermore, since at least 1984, well before the police framed Bolt in 1996, the

CITY and the NYPD were on notice of the inadequacy of its training, supervision, and discipline

policies, and that police officers joining the force were disproportionately involved in the same

type of misconduct and abuse as Bolt's case.  *See e.g.* Mayor's Advisory Committee on Police

Management and Personnel Policy, Final Report, February 24, 1987.

430.     The City policymakers were on notice in 1992-1993 of the lack of supervision

and discipline of NYPD officers by virtue of:

(a)     The City of New York Office of the Comptroller, in an unpublished report, found that the police often conduct inadequate investigations;

(b)     Prior to July 1993, the Civilian Complaint Review Board ("CCRB"), which is responsible for receiving and investigating complaints of police misconduct made by citizens  against members of the NYPD, operated as an agency of the NYPD rather than as an independent, unbiased entity;

(c)     During the 1980s, the early 1990s, and a few years before murder investigation in Bolt's case, the CCRB received numerous complaints of police misconduct, but failed to fully investigate many of them and substantiated the guilt of the accused police officer in a suspiciously minuscule number of cases;

(d)     On average, in 1990-1992, the CCRB conducted complete investigations of only 36 percent of the complaints received, closed 40 percent of the total cases without completing full investigations, and substantiated only 3.3 percent of the total complaints received;

(e)     The CCRB has also failed to recommend disciplinary action in the vast majority of its cases;

(f)     On average, in 1990-1992, the CCRB recommended disciplinary action in only 7.5 percent of its disposed of cases;

(g)     Moreover, most of the complaints that are substantiated by the CCRB did not result in any kind of meaningful discipline. For instance, as of November 14, 1991, of the 80 officers who faced departmental trials in 1991, 47 were cleared, and 34 were disciplined with penalties ranging from loss of vacation to a 90- day suspension;

(h)     Damages have been awarded to victims of police misconduct in 300-400 cases annually since 1988, as a result of out-of-court settlements or judgments in civil actions. Meanwhile, on average, only about 107 complaints were substantiated annually by the CCRB in 1988-1992;

(i)     The money paid out by the City in damages to alleged victims of police misconduct rose from approximately $7 million in 1988, to $13.5 million in 1992, to $24 million in 1994;

(j)     More than $82 million was paid in damages to victims of police misconduct in 1,352 cases between 1992 and 1995;

(k)     In the vast majority of police misconduct cases that result in verdicts or substantial settlements for victims, the CITY imposed no discipline, either before or after resolution in court, almost never reopened an investigation previously conducted after such resolution, and sometimes promoted the abusive officer to a position of greater authority despite the judicial resolution; and

(l)     Former New York City Police Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."[8]

431.    The NYPD's policy, custom and practice of approval and/or ratification of, toleration and/or acquiescence in, or deliberate indifference to violations of its constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of Bolt's constitutional rights beginning with his false arrest and the initiation of a criminal prosecution against him without probable cause, and continuing throughout his criminal trial, conviction, and incarceration.

---

[8] *Accord* Amended Civil Complaint in *Negron v. City of New York*, 18 CV 6645 (DG) (RLM) (S.D.N.Y.) (Doc. # 1) at ¶¶ 213-373, incorporated here by reference (detailing numerous additional instances of police misconduct which provided the NYPD with notice of its officers misconduct, and establish the NYPD's policy of acquiescence and ratification).

432.     Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), had final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, the use of only truthful evidence, and the disclosure of *Brady* material.

433.     The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority and constitutes a City policymaker for whom the City is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

434.     During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to Bolt, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training, supervision and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects.

435.     The aforesaid policies, procedures, regulations, practices and/or customs of the City and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations of Bolt's rights under the Constitution and laws of the United States.

436.     By virtue of the foregoing, the CITY is liable for Bolt's damages (¶ 185).

**SIXTH CAUSE OF ACTION**
(42 U.S.C. §1983 Civil Conspiracy; All Individual Defendants)

437.     Plaintiff realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

438.     Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, and Fezza, along with non-City employees such as Bigweh, Gouse, and others, all explicitly and/or implicitly corruptly agreed to commit with each other and/or other unnamed conspirators, the wrongs detailed above, and to ultimately have Bolt falsely arrested, prosecuted, convicted, and to cover-up each others' misconduct.

439.     Each defendant then committed overt acts, as detailed above to accomplish the goal of the conspiracy, including, but not limited to (a) framing and falsely arresting and prosecuting Bolt of the murder, and (b) covering-up those actions and the *Brady/Giglio* material that undermined the case against Bolt.

440.     By virtue of the foregoing, defendants conspired to deprive Bolt of his constitutional rights to:

(a)     Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000) (recognizing "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity");

(b)     Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

(c)     To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

441.    Each of the above conspirators committed the foregoing violations of Bolt's constitutional rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to them, or to the effect of such misconduct upon them.

442.    By reason of the foregoing, those defendants are liable to Bolt pursuant to 42 U.S.C. § 1983, for compensatory and punitive damages detailed in ¶ 185, above.

443.    The City is liable for these wrongs by virtue of the NYPD's deliberate indifference to, and failure to train, supervise, and discipline their employees regarding such conduct, despite the likelihood that the failure to do so would result in the injuries pled here.

## SEVENTH CAUSE OF ACTION
(Malicious Prosecution Under New York Law; All Defendants)

444.    Bolt realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

445.    By virtue of the foregoing, Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, and Fezza, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against Bolt.

446.    The criminal proceedings terminated in Bolt's favor.

447.    There was no probable cause for the commencement or the continuation of the criminal proceedings.

448.    The Defendants acted with actual malice.

449.    The City is liable for these wrongs under the principle of respondeat superior, and for the damages set forth in ¶ 185, above.

## EIGHTH CAUSE OF ACTION
(Intentional Infliction of Emotional Distress Under New York Law;
All Individual Defendants)

450.     Bolt realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

451.     Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, and Fezza, engaged in a continuous pattern of extreme and outrageous conduct directed at Bolt from December 24, 1996, until his release from prison on March 2021.

452.     Those Individual Defendants engaged in that pattern of conduct with an intention to cause, or in reckless disregard of the substantial probability that it would cause, Bolt severe emotional distress.

453.     Specifically, those defendants, individually, acting in concert with, conspiring with, and/or aiding and abetting one another and other persons for whose acts they are liable, coerced witnesses into making false statements to be used against Bolt, including statements from Bigweh, Bell, Johnson, and Ligon, coerced those individuals to adopt statements Defendants manufactured, created false official records to be used against Bolt, initiated or caused the initiation and continuation of false and unfounded criminal charges against Bolt while lacking probable cause to do so, suppressed *Brady* and *Giglio* material, and lied to prosecutors, courts, and the jury at Bolt's trial.

454.     As a result, Bolt suffered severe emotional distress and damages (¶ 185, above) that was proximately caused by the defendants' conduct.

### NINTH CAUSE OF ACTION
(Negligent Training and Supervision, and Discipline Under New York Law; The City)

455.     Bolt realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

456.    By virtue of the foregoing, the City is liable to Bolt because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately supervise, and discipline its agents, servants and/or employees employed by the QDAO and NYPD with regard to their aforementioned duties.  As such, the City is liable for Bolt's damages set forth in ¶ 185, above.

### TENTH CAUSE OF ACTION
(New York State Constitutional Due Process Claim Against The CITY Pursuant To
Respondent Superior; *Buari v. City of New York*, 2021 WL 1198371 (S.D.N.Y.  2021)

457.    Bolt realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

458.    Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, and Fezza, by virtue of their acts and omissions detailed above, violated Bolt's rights under the Due Process and Equal Protection provisions of the New York State Constitution (a) to be free of unlawful arrest not based on probable cause, (b) to not have a government officer acting in an investigating capacity fabricate evidence against him, (c) to due process of law, (d) to a fair trial, (e) to not be convicted based on false or misleading evidence and argument, and suppression of *Brady* material, and (f) to not be incarcerated when actually innocent.

459.    As a direct and proximate result of these defendants' acts and omissions, Bolt was wrongfully arrested, prosecuted, convicted, and imprisoned for 24 years, and suffered other grievous and continuing injuries set forth in ¶ 185, above.

460.    The City is liable under respondeat superior for the acts and omissions of Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, and Fezza, within the scope of their employment, for Bolt's damages (¶ 185, above).

WHEREFORE, Bolt demands judgment against defendants as follows:

a.      For compensatory damages of not less than $75,000,000;

b.      For punitive damages against the individual defendants of $100,000,000;

c.      For reasonable attorneys' fees together with costs under 42 U.S.C. § 1988;

d.      For pre-judgment interest as allowed by law;

e.      For such other and further relief as this Court may deem just and proper.

DATED:      Yonkers, New York
            October 14, 2022


                                    *Thomas Hoffman*
                                    _____
                                    THOMAS HOFFMAN, ESQ.
                                    Law Offices of Thomas Hoffman, LLC
                                    37 Elaine Terrace
                                    Yonkers, New York 10701-5257
                                    Office: (212) 581-1180
                                    Cell: (917) 589-6156
                                    Email: thoff93451@aol.com

                                    *Attorney for Rohan Bolt*

# EXHIBIT A

# Judicial Findings Of Misconduct Involving Queens Prosecutors

# EXHIBIT A

1.  *People v. Roopchand*, 107 A.D.2d 35 (2d Dep't 1985): Affirming conviction but unequivocally condemning trial prosecutor for making inflammatory summation argument intended to elicit sympathy for the complainant and arouse animosity against the defendant and warning the prosecutor that future infractions may lead to disciplinary action, and that the court expected the Queens County D.A. to issue an appropriate internal admonition.

2.  *People v. Jones*, 108 A.D.2d 824 (2d Dep't 1985): Reversing robbery conviction where, among other things, the prosecutor improperly elicited that the defendant had previously hit a woman with a bat, and then suggested on summation that the jury could never believe a man who had done this.

3.  *People v. Valdivia*, 108 A.D.2d 885 (2d Dep't 1985): Affirming conviction but "strongly condemn[ing]" prosecutor for improperly cross-examining alibi witness regarding his taking an affirmation instead of an oath and revisiting the matter in summation, and for characterizing defendant's testimony as "an out and out series of lies."

4.  *People v. Hooks*, 110 A.D.2d 909 (2d Dep't 1985): Reversing conviction for rape, robbery, and burglary where prosecutor cross-examined defendant on his prior conviction in such a way as to improperly create the inference that because defendant had previously committed a burglary, he had also committed the instant offenses.

5.  *People v. Brown*, 111 A.D.2d 248 (2d Dep't 1985): In reversing conviction on other grounds, reprimanding prosecutor for making comments during summation that characterized defendant as lying while characterizing the prosecution as "on the side of truth," and implying that the jury should convict even if not convinced beyond a reasonable doubt, so long as it believed its verdict represented the "truth."

6.  *People v. Torres*, 111 A.D.2d 885 (2d Dep't 1985): Reversing, in part, because prosecutor repeatedly cross-examined alibi witness on why the witness did not contact the police, improperly implying witness was obligated to come forward, and because prosecutor consistently implied during summation that defense had concocted alibi, and improperly suggested that the jury would be subject to derision if they acquitted defendant.

7.  *People v. Williams,* 112 A.D.2d 177 (2d Dep't 1985): In reversing, reprimanding trial prosecutor for intimating to jury during summation that they were required to find that the complainant had lied in order to acquit defendant, and improperly bolstering by injecting his integrity and the integrity of his office into the case.

8.   *People v. Hines,* 112 A.D.2d 316 (2d Dep't 1985): Reversing in part because the prosecutor, during his summation, made inappropriate comments about the defendant, and emphasized the other "police procedures" which led to the selection of defendant as a suspect, clearly inviting the jury to infer that there was other evidence against defendant, of which they had not been told.

9.   *People v. La Rosa,* 112 A.D.2d 954 (2d Dep't 1985): Reversing conviction where the prosecutor, in summation, improperly vouched for his own case, denigrated the defense, misrepresented material facts, and misquoted testimony.

10.  *People v. Reyes*, 119 A.D.2d 596 (2d Dep't 1986): Affirming conviction but noting that prosecutor improperly told jury that "contrary to what the Defense Counsel would have you believe, a trial is not a search for reasonable doubt. Plainly simply a trial is a search for truth. Not supposed to be sitting here trying to pick reasonable doubt out from everything that goes on [sic]."

11.  *People v. Mercado*, 120 A.D.2d 619, 502 N.Y.S.2d 87 (2d Dep't 1986): Ordering new trial where, among other errors, court allowed prosecutor to admit photograph of defendant posing with handguns for no other purpose than to arouse jurors' emotions, and inflammatory nature of photographs was made worse when prosecutor, in summation, commented on jury having seen defendant in his "Al Capone get-up."

12.  *People v. Pascullo*, 120 A.D.2d 687 (2d Dep't 1986): Reversing conviction in part because prosecutor suggested improper inferences of racial motivation and informed the jury that an acquittal would be a condonation of racism.

13.  *People v. Beaman*, 122 A.D.2d 848 (2d Dep't 1986): Reversing conviction because prosecutor called witness to stand knowing he would refuse to testify, and improperly commenting on this refusal during summation, thereby inviting jury to speculate that witness had been threatened and refused to testify out of fear.

14.  *People v. Ciervo*, 123 A.D.2d 393 (2d Dep't 1986): Reversing conviction in part because of prosecutor's improper summation comments implying that a conviction was warranted based solely upon the defendant's character, and repeated characterizations of the defense case as a "con."

15.  *People v. Roudabush*, 123 A.D.2d 649 (2d Dep't 1986): Affirming conviction but "condemn[ing]" prosecutor's misconduct during summation and noting that court made its position on this misconduct "quite clear" during oral argument.

16.  *People v. Anderson*, 123 A.D.2d 770 (2d Dep't 1986): Reversing conviction because prosecutor re-called witness (who had originally been a codefendant in the case) to the stand, even though prosecutor knew the witness was going to

2

invoke his privilege against self-incrimination, and improperly commented several times on this invocation of privilege during summation, thus inviting jury to draw an unwarranted inference against the defendant.

17. *People v. Brown*, 125 A.D.2d 321, 510 N.Y.S.2d 135 (2d Dep't 1986): Reversing conviction because prosecutor improperly bolstered victim's testimony by implying that the defendant's stipulation that the victim had been raped and sodomized was a stipulation that the victim had told the truth, and by telling the jury something was "terribly wrong" with them if they did not believe the victim.

18. *People v. Montalvo*, 125 A.D.2d 338 (2d Dep't 1986): Reversing conviction where prosecutor, in his summation, improperly commented upon the defendant's failure to testify and to call witnesses on his own behalf.

19. *People v. Napoli*, 126 A.D.2d 674 (2d Dep't 1987): Affirming conviction but noting that prosecutor "went beyond the four corners of the evidence" in summation.

20. *People v. Faison*, 126 A.D.2d 739 (2d Dep't 1987): Ordering new trial where prosecutor improperly cross-examined accused (1) on his failure to disclose alibi to police after being given *Miranda* warnings, and (2) on his failure to produce records indicating that he was at work at time of robbery, which suggested that defendant bore burden of proving alibi defense.

21. *People v. Memminger*, 126 A.D.2d 752 (2d Dep't 1987): Ordering new trial on various grounds and "admonish[ing]" prosecutor "to remain within the bounds of fair comment during summation and to refrain from inappropriate and inflammatory remarks."

22. *People v. Perez*, 127 A.D.2d 707 (2d Dep't 1987): Ordering new trial where, among other things, prosecutor improperly implied on cross-examination of accused that he was involved in previous criminal activity.

23. *People v. Simms*, 130 A.D.2d 525 (2d Dep't 1987): Ordering new trial because of "numerous instances of prosecutorial misconduct which occurred throughout the course of the trial," including prosecutor's (1) eliciting of testimony that had been suppressed, (2) referring to that same evidence during summation, (3) repeatedly referring to facts not in evidence, (4) calling defendant's summation a "fairy tale," and (5) vouching for witnesses' credibility.

24. *People v. Scoon*, 130 A.D.2d 597 (2d Dep't 1987): Ordering new trial where prosecutor improperly (1) argued in summation that witness was not involved in crimes of dishonesty when he knew that the witness had a youthful-offender adjudication for grand larceny, and (2) repeatedly commented on matters not in

3

evidence during summation.

25. *People v. Torriente*, 131 A.D.2d 793 (2d Dep't 1987): Ordering new trial where prosecutor improperly (1) cross-examined shooting victim about drug use, (2) cross-examined defendant on whether he had entered country illegally, (3) called police officer to introduce irrelevant testimony about defendant's place of residence, and (4) made prejudicial statements in summation about defense counsel's summation and witnesses' testimony.

26. *People v. Romain*, 137 A.D.2d 848 (2d Dep't 1988): Ordering new trial in part based on prosecutor's "gross distortion" in summation of defendant's testimony, implying that he had admitted guilt when in fact he had not.

27. *People v. Chin*, 138 A.D.2d 389 (2d Dep't 1988): Ordering new trial where prosecutor improperly made unwarranted inferences in summation that defendant accused of rape against young girl planned to commit similar offenses with one of his character witnesses.

28. *People v. Dunlap*, 138 A.D.2d 393 (2d Dep't 1988): Reversing conviction based on prosecutorial misconduct even though proof of defendants' guilt was overwhelming, where prosecutor in summation diverted jury's attention from witnesses' inconsistencies with elaborate depiction of defendants as sharks hunting prey. *See also People v. Williams*, 162 A.D.2d 488 (2d Dep't 1990) (reversing codefendant's conviction on same ground).

29. *People v. Stewart*, 153 A.D.2d 706 (2d Dep't 1989): Vacating conviction where the "trial was marked by the prosecutor's efforts, even over sustained objections, to characterize the defendant as an individual predisposed to commit the crime charged."

30. *People v. Langford*, 153 A.D.2d 908 (2d Dep't 1989): Ordering new trial where prosecutor suggested, with no evidence, that defendant's alibi witness used drugs and was involved in charged robbery, and made several improper remarks in summation, including denigrating defense counsel and defense witnesses, and suggesting to the jury that, in order to acquit, they would have to find that a witness had lied.

31. *People v. Durham*, 154 A.D.2d 615 (2d Dep't 1989): Ordering new trial in part based on prosecutor's misconduct in summation, which included vouching for prosecution witnesses and referring pejoratively to defendant.

32. *People v. Gomez*, 156 A.D.2d 462 (2d Dep't 1989): New trial ordered where prosecutor (1) defied court's order limiting cross-examination of witness on pending criminal case, prompting court to accuse prosecutor of bad faith, (2)

cross-examined witness on his supposed communications with defendant, even though he knew the two were incarcerated and not free to converse, prompting court again to accuse prosecutor of bad faith, and (3) in summation, attempted to inflame the jury, vouched for witnesses' credibility, denigrated the defense, and shifted the burden of proof.

33.   *People v. Pinkas*, 156 A.D.2d 485 (2d Dep't 1989): Ordering new trial where court ordered counsel not to commingle discrete allegations, but prosecutor "repeatedly sought to join the two incidents during her summation in spite of the direction by the Trial Judge to desist."

34.   *People v. Rivera*, 170 A.D.2d 544 (2d Dep't 1991): Reversing rape conviction because the prosecutor failed to disclose police reports that were "in direct conflict" with the complainant's rape allegation.

35.   *People v. Gaskins*, 171 A.D.2d 272 (2d Dep't 1991): Reversing conviction where the prosecutor failed to disclose the videotape of an interview of the alleged child victim.

36.   *People v. Stevens*, 174 A.D.2d 640 (2d Dep't 1991): Reversing conviction in part based on prosecutor's statement in summation that "if this defendant wasn't charged with sodomy . . . he should have been."

37.   *People v. Delace*, 174 A.D.2d 688 (2d Dep't 1991): Reversing robbery conviction where the prosecutor failed to disclose witness statements.

38.   *People v. Gunther*, 175 A.D.2d 262 (2d Dep't 1991): Reversing conviction where prosecutor improperly attempted to show defendant's propensity to commit the charged crime of dealing cocaine by extensively cross-examining him on past convictions for dealing marijuana.

39.   *People v. Wilkens*, 177 A.D.2d 678 (2d Dep't 1991): Reversing convictions where, despite court order that defendant's use of aliases could be used only for identification purposes, prosecutor cross-examined defendant on the same topic for impeachment purposes and then argued on summation that defendant was not to be believed because he "hides behind three names."

40.   *People v. Parker*, 178 A.D.2d 665 (2d Dep't 1991): Ordering new trial in part based on prosecutor's misconduct in summation, including improperly suggesting that defendant's daughter's unfazed demeanor on witness stand indicated that defendant had exposed her to drug dealing; trying to mislead the jury into finding defendant guilty by association; and announcing in open court that defendant's daughter was wearing T-shirt that court had refused to admit in evidence.

41.   *People v. Baba-Ali*, 179 A.D.2d 725 (2d Dep't 1992): Reversing a rape conviction

involving a four-year-old child where, despite a court order, the prosecutor failed until the eve of trial to disclose medical records finding no signs of sexual abuse.

42. *People v. Mack*, 180 A.D.2d 824 (2d Dep't 1992): Reversing conviction where prosecutor failed to turn over notes that could have been used to impeach witness.

43. *People v. Figueroa*, 181 A.D.2d 690 (2d Dep't 1992): Ordering new trial where prosecutor's summation "went well beyond the bounds of fair advocacy" by calling defendant's alibi witness untruthful, by suggesting that defendant was selling drugs on the night of his arrest for a crime he was alleged to have committed on another day, and by suggesting that defendant's alibi was concocted after the witness met with defense counsel.

44. *People v. Clausell*, 182 A.D.2d 132 (2d Dep't 1992): Reversing a narcotics conviction where the prosecutor repeatedly denied the existence of a "buy report," which turned out to include a description of the buyer wholly at odds with the description the arresting officer had said he received and matched to the defendant.

45. *People v. James*, 184 A.D.2d 582 (2d Dep't 1992): Reversing conviction where prosecutor represented that People would not introduce unfairly prejudicial evidence of defendant's prior possession of drugs but then cross-examined police officer extensively on that very evidence and emphasized it in summation.

46. *People v. Andre*, 185 A.D.2d 276 (2d Dep't 1992): Reversing conviction where, among other things, prosecutor in summation improperly called People's key witness a "brave young girl" and asked jury not "to let her down."

47. *People v. Campbell*, 186 A.D.2d 212, 587 N.Y.S.2d 751 (2d Dep't 1992): Reversing a robbery conviction because the prosecutor withheld hospital records which contained statements of the complainant contradicting her trial testimony.

48. *People v. Nieves*, 186 A.D.2d 276 (2d Dep't 1992): Reversing conviction where prosecutor cross-examined accused on psychiatric history and then commented on the matter in summation even though there was no relevance whatsoever to the defendant's psychiatric history or condition.

49. *People v. Odle*, 187 A.D.2d 536 (2d Dep't 1992): New trial ordered where prosecutor repeatedly elicited evidence of uncharged crimes against accused in order to show his criminal propensity and bad character, attempted to paint him as guilty by association, and committed summation misconduct.

50. *People v. Banch*, 80 N.Y.2d 610 (1992): Reversing manslaughter conviction where the prosecutor "mistakenly" gave the defense the wrong police memo book, withheld prior affidavits of a People's witness, and falsely represented that a report by another People's witness contained no information required to be disclosed.

6

51. *People v. Robinson*, 191 A.D.2d 595 (2d Dep't 1993): Ordering new trial where prosecutor "engaged in a series of improper remarks and tactics," including eliciting testimony about defendant's post-arrest silence and stressing the point in both his opening and summation; eliciting improper expert testimony and mischaracterizing the issue in summation; and, also in summation, referring to defense counsel's summation as a "con job," vouching for the complainant's truthfulness, and "derisive[ly]" commenting on the presumption of innocence and defendant's right to remain silence.

52. *People v. Hill*, 193 A.D.2d 619 (2d Dep't 1993): Ordering new trial where prosecutor cross-examined defendant in a manner intended to improperly to show defendant's criminal propensity and then focused on this line of argument in summation.

53. *People v. Davis*, 196 A.D.2d 597 (2d Dep't 1993): Reversing a rape and robbery conviction where the prosecutor had refused to disclose the basis for the People's expert's conclusion that defendant's DNA matched that found on the victim.

54. *People v. Steadman/Blair*, 82 N.Y.2d 1 (1993): Reversing a defendant's manslaughter conviction where the District Attorney's Office made a "determined effort" to avoid its obligations to disclose exculpatory evidence and to correct false testimony, by employing a "scheme" under which a supervisor in the Office would make a cooperation agreement with a witness's attorney, but not reveal the agreement to the prosecutors handling the defendant's case at trial, and not correct the witness's false testimony denying such an agreement. *See also People v. Blair*, 186 A.D.2d 665 (2d Dep't 1992) (noting that the scheme operated at "the executive level of the District Attorney's Office").

55. *People v. Gaines*, 199 A.D.2d 335 (2d Dep't 1993): Reversing manslaughter conviction where the District Attorney's Office employed the same scheme condemned in *Steadman*, i.e., withholding a cooperation agreement made between the trial assistants' superior and the principal prosecution witness's attorney.

56. *People v. Torres*, 199 A.D.2d 442 (2d Dep't 1993): Ordering new trial based in part on prosecutor's persisting in lines of cross-examination over sustained objections, including questioning a defense witness excessively about his drug use, questioning defendant about irrelevant matter of whether he thought drugs were a problem in schools, and accusing defendant of tailoring his testimony after hearing other witnesses testify.

57. *People v. Fearnot*, 200 A.D.2d 583 (2d Dep't 1994): Reversing robbery conviction where the prosecutor withheld prior statements of the complainant describing the robbery, suggested, without evidentiary support, that the defendant was a prostitute, and tried to inflame the jury by citing the AIDS epidemic.

58.   *People v. Kirchner*, 200 A.D.2d 766 (2d Dep't 1994): Reversing assault conviction where the prosecution failed to disclose witness statements.

59.   *People v. Baxley*, 84 N.Y.2d 208 (1994): Remitting a CPL 440 motion challenging a murder conviction for a hearing to determine the truth and materiality of a witness's affidavit, which stated that before trial he had informed the prosecutor that he and a People's witness had been induced by police to fabricate a jail-house confession, evidence the Court of Appeals deemed "crucial" to the People's case.

60.   *People v. Elder*, 207 A.D.2d 498 (2d Dep't 1994): Reversing conviction in part based on prosecutor's unspecified improper comments in summation regarding two defense witnesses and a prosecution witness.

61.   *People v. Giersz*, 212 A.D.2d 805 (2d Dep't 1995): Reversing conviction where prosecutor's summation "exceeded the broad bounds of rhetorical comment permissible in closing arguments."

62.   *People v. Spinelli*, 214 A.D.2d 135 (2d Dep't 1995): Reversing conviction where prosecutor failed to cross-examine defendant on his post-arrest silence then attacked the defendant's credibility on that ground during summation, thus unfairly depriving defendant of chance to explain the silence.

63.   *People v. Moss*, 215 A.D.2d 594 (2d Dep't 1995): Reversing conviction in part based on prosecutor's disregard of court's *Sandoval* ruling when cross-examining defendant, repeated references to defendant as a violent person, cross-examination questions calculated to compare defendant to Hannibal Lecter in *Silence of the Lambs*, remarks inviting jurors to put themselves in the shoes of victims being threatened by defendant, and waiving of a knife in front of the jury during summation.

64.   *People v. Leuthner*, 216 A.D.2d 327 (2d Dep't 1995): Reversing conviction where prosecutor asked defendant whether the complainant was lying, asked defendant's character witness about her personal knowledge of the facts underlying defendant's past conviction, failed to establish a good-faith basis for questioning about a threat made by the defendant's father, and failed to stay within the four corners of the evidence during summation.

65.   *People v. Scott*, 217 A.D.2d 564 (2d Dep't 1995): Ordering new trial based on "flagrant" and "pervasive" summation misconduct, where prosecutor (1) repeatedly referred to defendant as convicted felon, in an attempt to get the jury to convict defendant based on criminal propensity, (2) denigrated defendant, including by suggesting that defendant thought jurors just "fell off the stupid truck," and (3) attempted to shift the burden of proof.

8

66. *People v. James*, 218 A.D.2d 709 (2d Dep't 1995): Ordering new trial on other grounds but noting "some unacceptable practices engaged in by the prosecutor" — namely, the "repeatedly condemned tactic" of suggesting during cross-examination and summation that the complainant, in identifying the defendant, was either correct or lying, and excessive references to the defendant's criminal record.

67. *People v. Shim*, 218 A.D.2d 757 (2d Dep't 1995): New trial ordered where prosecutor failed to disclose police officer's notes.

68. *People v. Ferrara*, 220 A.D.2d 612 (2d Dep't 1995): Affirming conviction but noting that prosecutor "committed several instances of misconduct during the course of his summation" by commenting, without proper foundation, on a defense witness's failure to provide the police with information; suggesting that defense counsel's objections had deprived jury of hearing certain testimony; and telling the jury that it should take only 10 to 15 minutes to decide the case.

69. *People v. Torres*, 223 A.D.2d 741 (2d Dep't 1996): Reversing conviction where prosecutor made personal attacks on defense counsel and argued that there was no evidence that defendant was somewhere other than the scene of the robbery, which improperly shifted the burden of proof to the accused.

70. *People v. Brown*, 224 A.D.2d 539 (2d Dep't 1996): New trial ordered where prosecutor failed to disclose firearms report that contained substantially different information than that given by People's witness at trial, which prejudiced defense by depriving it of the opportunity "to cross-examine the [witness] and test his credibility."

71. *People v. Moustakis*, 226 A.D.2d 401 (2d Dep't 1996): Reversing conviction where the prosecutor presented a cooperating witness who "forgot" the details of his past crimes, but withheld 16 pages of interview notes detailing these crimes for the District Attorney's Office.

72. *People v. May*, 228 A.D.2d 523 (2d Dep't 1996): Reversing a murder conviction where the prosecutor failed to disclose a cooperation agreement with its star witness and failed to correct his false testimony that no such agreement existed.

73. *People v. Croons*, 231 A.D.2d 585 (2d Dep't 1996): Reversing robbery conviction where the prosecution wrongfully withheld prior statements of a key witness, the complainant.

74. *People v. Bonnen*, 236 A.D.2d 479 (2d Dep't 1997): Reversing conviction based in part on prosecutor's failure to present evidence he had promised in opening that defendant had shot an additional victim, and then admitting at end of trial that he

had "no information" as to that victim's whereabouts, prompting court to call prosecutor's representation in his opening statement "disingenuous."

75. *People v. Ying*, 236 A.D.2d 630 (2d Dep't 1997): Reversing robbery conviction on other grounds, while condemning the prosecutor's withholding of the terms of a cooperation agreement with a People's witness.

76. *People v. Brown*, 241 A.D.2d 460, 663 N.Y.S.2d 975 (2d Dep't 1997): Ordering new trial where People agreed that prosecution's failure to disclose prior statements of arresting officer was prejudicial and mandated reversal.

77. *People v. Lippolis*, 246 A.D.2d 557 (2d Dep't 1998): Ordering new trial where prosecutor in his opening statement, among other things, improperly called the defendant a "parasite" and told the jury that "citizens like [them]selves indicted this defendant"; during direct examination of the arresting officer, elicited that defendant had remained silent after his arrest; and during summation, again referred to defendant's postarrest silence.

78. *People v. Mackey*, 249 A.D.2d 329 (2d Dep't 1998): Reversing robbery conviction where the prosecutor "deliberately" set a trap for the defense at trial by withholding critical information required to be disclosed earlier.

79. *People v. Walters*, 251 A.D.2d 433 (2d Dep't 1998): Ordering new trial where prosecutor repeatedly made inflammatory remarks designed to appeal to the jury's sympathy, such as commenting that the victim "was probably going to be a brilliant artist"; shifted the burden of proof by noting that the defendant did not call additional witnesses; stated that "the only real evidence is the People's evidence"; accused the defendant of tailoring his testimony after hearing the prosecution witnesses; described the defendant's testimony as "continued lies on top of lies, on top of lies," and "tales and lies, back and forth, back and forth"; gave his personal opinion on the truth and falsity of witnesses' testimony; vouched for the victim's credibility; and, "most egregious[ly]," insinuated that a gun recovered from defendant two weeks after the crime may have been used in the charged shooting, even though the prosecutor knew that a ballistics test had conclusively established otherwise.

80. *People v. Anderson*, 256 A.D.2d 413 (2d Dep't 1998): Ordering new trial where prosecutor (1) brought out only inculpatory portion of statement at trial and, thanks to trial court error, succeeding in blocking defendant's attempt to bring out exculpatory portion, and (2) compounded misconduct by telling jury in summation that accused had not made any exculpatory statement.

81. *People v. Brown*, 256 A.D.2d 414 (2d Dep't 1998): Reversing conviction on evidentiary grounds but noting as independent ground for reversal the prosecutor's

improper comment on defendant's declining to testify, his misstatements of the evidence, and his references to matters not in evidence.

82.   *People v. Rivera*, 259 A.D.2d 570, 684 N.Y.S.2d 896 (2d Dep't 1999): Affirming conviction but "deplor[ing] the continuous failure of the Assistant District Attorney to follow the admonitions of the trial court regarding his improper summation comments."

83.   *People v. Alfaro*, 260 A.D.2d 495 (2d Dep't 1999): Reversing conviction on evidentiary grounds and noting "clear impropriety" of prosecutor's remarks in summation that the presumption of innocence was "gone" or "vanquished"; that while the court would instruct the jury that the defendant had "a lot of rights," they should also consider the victim's rights; and that the jury should infer the defendant's guilt based on his having had a lawyer with him when he surrendered to police.

84.   *People v. Robinson*, 260 A.D.2d 508 (2d Dep't 1999): Ordering new trial based on prosecutor's summation misconduct where prosecutor improperly vouched for complainant's truthfulness, appealed to the jury's sympathies and fears by describing the elderly complainant as a person who would be a "classic victim anywhere in this city," accused the defense of manufacturing evidence and putting on perjurious witnesses who were "more full of crap than a Christmas turkey," said he was "ticked off" that members of defendant's family were in the courtroom when a defense witness testified, and ended by telling jury that "[t]he only way this defendant walks out of the courtroom is if you let him."

85.   *People v. Lewis*, 262 A.D.2d 584 (2d Dep't 1999): Ordering new trial in part based on prosecutor improperly asking a witness whether defense counsel offered him money or drugs in return for his testimony, and admonishing that such misconduct "is not to be repeated at any subsequent trial."

86.   *People v. Washington*, 278 A.D.2d 517 (2d Dep't 2000): Reversing conviction on other grounds but noting impropriety of prosecutor's arguments in summation that defendant's testimony was "a lie" and "a pile of crock," and was "fabricate[d]" after having had "the benefit of counsel," and that the defense's version of events was "patently absurd" and that the jury should not be "fooled" by it.

87.   *Farakesh v. Artuz*, No 99-CV-3945 (JG), 2000 WL 1480896 (E.D.N.Y. Oct. 3, 2000): Granting habeas petition because prosecutor impermissibly elicited extensive testimony from detectives about defendant's post-arrest silence, and repeatedly used this testimony in summation as evidence of defendant's guilty state of mind, and to impeach defendant.

88.   *People v. Smith*, 288 A.D.2d 496 (2d Dep't 2001): Ordering new trial where

11

prosecutor "repeatedly stated unqualified pronouncements of the defendant's guilt, often inappropriately injecting her personal views," such as the remark, "of course he did it. This isn't an issue of who did it"; vouched for witnesses' credibility; appealed to the sympathy of the jury by commenting that the victim was "courageous" for going to the police and for "coming before you" and that the victim was "ill" but still came to court; referred to evidence as "uncontroverted," which was a veiled (and improper) reference to defendant's declining to testify; and implied that a witness who could not speak and therefore did not testify would have fully corroborated the complaining witness.

89. *People v. Leavy*, 290 A.D.2d 516 (2d Dep't 2002): Prosecutor improperly withheld *Brady* material such as promises of leniency given to cooperating witness, but court upheld conviction because defense had meaningful opportunity to cross-examine witness about it.

90. *People v. Ni*, 293 A.D.2d 552 (2d Dep't 2002): Reversing assault conviction where the prosecutor's flagrantly improper comments during opening and closing statements shifted the burden of proof, inflamed the jury, and denigrated the defense.

91. *Jenkins v. Artuz*, 294 F.3d 284 (2d Cir. 2002): Affirming grant of writ of habeas corpus where first prosecutor caused a mistrial by withholding a crucial witness's cooperation agreement until the day of his testimony, then second prosecutor, on retrial, allowed same witness to falsely deny the existence of the agreement, objected to the defense's efforts to bring it out, reinforced the witness's false denial on redirect, and bolstered the false testimony in summation.

92. *People v. Lauderdale*, 295 A.D.2d 539 (2d Dep't 2002): Ordering new trial based in part on prosecutor's 31 references to defendant's highly prejudicial nickname, "Homicide."

93. *People v. Bhupsingh*, 297 A.D.2d 386 (2d Dep't 2002): Reversing on other grounds, but noting that prosecutor's misconduct could have served as additional basis for reversal, where prosecutor persistently questioned defendant about collateral matters in a manner intended to denigrate him, continually asked leading questions of prosecution witnesses, placed inadmissible hearsay before the jury, improperly elicited evidence of prior consistent statements made by the complainant, and made inflammatory comments in summation that denigrated the defense and appealed to the sympathy of the jury.

94. *People v. Ramashwar*, 299 A.D.2d 496 (2d Dep't 2002): Reversing conviction because prosecutor put her own credibility at issue by seeking to impeach two defense witnesses with their inconsistent prior statements to her, and by commenting upon the inconsistencies in summation.

95.    *People v. Jones*, 305 A.D.2d 698 (2d Dep't 2003): Reversing robbery conviction where the prosecutor deliberately elicited police testimony in a manner that created the unfair impression that the codefendant had implicated the defendant to police, and where the trial court erroneously precluded the defense from cross-examining the complainant, who was the sole eyewitness, regarding the length of time it took him to identify the defendant at a lineup.

96.    *People v. Jamal*, 307 A.D.2d 267 (2d Dep't 2003): Ordering new trial where prosecutor inappropriately told jury in summation that certain evidence was kept from them for "legal reasons"; argued that indictment was evidence of defendant's guilt; repeatedly gave his personal opinion as to the truth of prosecution witnesses' testimony and as to defendant's guilt; and shifted the burden of proof by referring to the People's evidence as "undisputed" and "[u]ncontroverted," while stating that defendant had "no explanation" and "no rational defense" and asking rhetorically, "[w]hat is the defense, ladies and gentlemen?"

97.    *People v. Milligan*, 309 A.D.2d 950 (2d Dep't 2003): Ordering new trial in part based on prosecutor's improper vouching for witnesses' credibility.

98.    *Su v. Filion*, 335 F.3d 119 (2d Cir. 2003): Granting habeas corpus relief in a murder case where the prosecutor failed to disclose a crucial witness's cooperation agreement, knowingly presented the witness's perjured testimony denying the existence of such an agreement and lying about his criminal conduct, and improperly bolstered the witness's false testimony on summation.

99.    *People v. Thomas*, 8 A.D.3d 303 (2d Dep't 2004): Conviction set aside by trial judge after verdict based on *Brady* violations, but verdict re-instated by Appellate Division because issue was not preserved.

100.   *Turner v. Schriver*, 327 F.Supp.2d 174 (E.D.N.Y. 2004): Granting federal habeas corpus relief in a robbery case where the prosecutor failed to investigate and disclose the criminal record of the People's only witness to the crime, elicited false testimony from the witness that he had no record, and gave false summation on the witness' absence of a criminal record to bolster the witness' credibility.

101.   *People v. Mitchell*, 14 A.D.3d 579 (2d Dep't 2005): Reversing conviction where prosecution withheld police reports, causing substantial prejudice to the defendant.

102.   *People v. Brown*, 30 A.D.3d 609 (2d Dep't 2006): Reversing conviction based on jury-instruction error, but citing as independent ground for reversal misconduct by the prosecutor during cross-examination and summation, including "presenting himself as an unsworn witness at trial, suggesting that the defense counsel did not

13

believe his own client, making public safety arguments, and implying that certain key evidence had been kept from the jury due to legal technicalities."

103. *People v. Knight*, 18 Misc.3d 1129(A) (Sup. Ct. Queens Cty. 2007): Setting aside verdict after defense discovered that prosecutor failed to disclose significant *Brady* material concerning one of the homicide victims and related to defendant's legitimate self-defense claim.

104. *People v. Bennett*, 40 A.D.3d 653 (2d Dep't 2007): Ordering new trial where prosecutor ambushed defense by representing that he would not call witness and that no *Rosario* existed, but then turning over *Rosario* material and calling witness, and capitalizing on these unfair tactics in summation.

105. *People v. Frantz*, 57 A.D.3d 692 (2d Dep't 2008): Ordering 440 hearing in murder conviction where prosecutor failed to disclose prior inconsistent statements of cooperating witness, who was the only witness to testify that the defendant committed the crime, concerning such witness's alleged observations of the defendant.

106. *People v. Sayers*, 64 A.D.3d 728 (2d Dep't 2009): Ordering new trial in part based on prosecutor's improper comments in opening and summation regarding evidence of defendant's uncharged crimes.

107. *People v. Spann*, 82 A.D.3d 1013 (2d Dep't 2011): Reversing conviction where prosecutor improperly commented on the defendant's medical evidence, presented to explain his perspiration and rapid heartbeat during traffic stop, by referring to it as a "distraction," a "smokescreen," and "smoke and mirrors"; impermissibly shifted the burden of proof by telling jurors that if they did not find the defendant's testimony "reasonable," they could not "form the basis of reasonable doubt"; and stated 14 times that police had recovered a handgun from under the passenger seat of the car, where defendant was sitting, although no evidence was presented at trial to support that claim.

108. *People v. Anderson*, 83 A.D.3d 854 (2d Dep't 2011): Ordering new trial where prosecutor defied court's *Sandoval* ruling to ask "a series of irrelevant and prejudicial questions" concerning defendant's prior narcotics conviction, and in summation vouched for witnesses' credibility, denigrated the defense, and mischaracterized defendant's testimony.

109. *People v. Robinson*, 34 Misc.3d 1217(A) (Crim. Ct. Queens Cty. 2011): Ordering a hearing where prosecutor's delay in *Brady* disclosure was a "clear and unequivocal breach" of that prosecutor's responsibility.

110. *People v. Bedi*, Ind. No. 4107/96 (Sup. Ct. Queens Cty. March 13, 2013) (Griffin,

A.J.S.C.): Setting aside murder conviction where prosecutor violated *Brady* by failing to disclose payments made to a key witness, and by failing to correct witness's false testimony that he did not receive such benefits.

111. *People v. Joyner*, 126 A.D.3d 1002 (2d Dep't 2015): Reversing weapon possession conviction where prosecutor's summation deprived defendant of a fair trial by accusing him, without evidence, of uncharged crimes, and making statements implying guilt by association.

112. *People v. Singh*, 128 A.D.3d 860 (2d Dep't 2015): Reversing rape conviction where prosecutor, during summation, acted as an unsworn witness, improperly invited the jury to speculate as to certain matters, denigrated the defense while vouching for the complainant's credibility, and shifted the burden of proof.

113. *People v. Negron,* 26 N.Y.3d 262 (2015): Setting aside attempted murder conviction where prosecutor failed to disclose evidence pointing to a third party as the alleged shooter and then successfully precluded a third-party culpability defense by arguing lack of such evidence.

114. *People v. Cantoni*, 140 A.D.3d 782 (2d Dep't 2016): Reversing conviction where prosecutor repeatedly shifted the burden of proof to the defendant, told the jurors that they would have to find the People's witnesses had lied in order to believe the defense, vouched for the credibility of police witnesses, and denigrated the defense.

115. *People v. Redd*, 141 A.D.3d 546 (2d Dep't 2016): Reversing conviction for "pervasive prosecutorial misconduct" where prosecutor, in opening and summation, misstated the evidence, vouched for the credibility of witnesses, called for speculation by the jury, made inflammatory statements, and improperly denigrated the defense.

116. *People v. Brisco*, 145 A.D.3d 1028 (2d Dep't 2016): Reversing conviction because prosecutor, in summation, attacked defense counsel's integrity, improperly referenced facts not in evidence, misstated critical witness testimony, and made inflammatory "safe streets" arguments.

117. *People v. Davis*, 147 A.D.3d 1077 (2d Dep't 2017): Reversing conviction on other grounds but noting that prosecutor "made improper summation comments regarding the failure of the defendant to communicate certain information to the police at the time of his apprehension."

# EXHIBIT B

# Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies that Prove that Assumption Wrong*, 80 Fordham L. Rev. 537 (2011)

# Fordham Law Review

Volume 80 | Issue 2                                                                    Article 5

2011

# The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies that Prove that Assumption Wrong

Joel B. Rudin

## Recommended Citation

Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies that Prove that Assumption Wrong*, 80 Fordham L. Rev. 537 (2011).
Available at: http://ir.lawnet.fordham.edu/flr/vol80/iss2/5

This Symposium is brought to you for free and open access by FLASH: The Fordham Law Archive of Scholarship and History. It has been accepted for inclusion in Fordham Law Review by an authorized editor of FLASH: The Fordham Law Archive of Scholarship and History. For more information, please contact tmelnick@law.fordham.edu.

# THE SUPREME COURT ASSUMES ERRANT PROSECUTORS WILL BE DISCIPLINED BY THEIR OFFICES OR THE BAR:  THREE CASE STUDIES THAT PROVE THAT ASSUMPTION WRONG

*Joel B. Rudin\**

## INTRODUCTION

Section 1983[1] creates a civil damages remedy against "every state official for the violation of any person's federal constitutional or statutory rights."[2]  Under § 1983, citizens are empowered to act as "private attorneys general" to enforce the Constitution against individual governmental actors or municipalities.[3]  In *Imbler v. Pachtman*,[4] the Supreme Court limited the use of this remedy against public prosecutors, finding that, like judges, they are entitled to absolute immunity from liability under § 1983 for conduct "within the scope of [prosecutors'] duties in initiating and pursuing a criminal prosecution."[5]  Recognizing that its decision might "leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty,"[6] the Court reasoned that "the immunity of prosecutors from liability . . . under § 1983 does not leave the public powerless to deter misconduct or punish that which occurs"[7] because "a prosecutor stands perhaps unique, among officials whose acts could deprive persons of constitutional rights, in his amenability to professional discipline by an association of his peers."[8]

---

\* Joel B. Rudin is a New York criminal defense and plaintiff's civil rights attorney who has handled several of the leading cases in New York involving individual and municipal civil liability for *Brady* and other due process violations by prosecutors.  He is the recipient of the New York State Association of Criminal Defense Lawyers' 2011 Justice Thurgood S. Marshall Award as outstanding criminal defense practitioner.  An associate in his law office, Terri S. Rosenblatt, provided invaluable assistance in the research and drafting of this article.

1. 42 U.S.C. § 1983 (2006).

2. Kalina v. Fletcher, 522 U.S. 118, 123 (1997).

3. *See* City of Canton v. Harris, 489 U.S. 378 (1989) (bringing claim against municipality alleging that police officer's failure to provide plaintiff necessary medical attention while in police custody violated her constitutional rights); Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658 (1978) (bringing suit against the City of New York and other governmental actors arguing that forced maternity leave violates constitutional rights).

4. 424 U.S. 409 (1976).

5. *Id.* at 410.

6. *Id.* at 427.

7. *Id.* at 428–29.

8. *Id.* at 429.

*FORDHAM LAW REVIEW* [Vol. 80

*Imbler* foreclosed a significant avenue for wronged criminal defendants to obtain redress, but it did not preclude all potential theories of civil liability against prosecutors and their offices under § 1983. Notwithstanding *Imbler*, a prosecutor may be sued for his or her conduct in an extra-judicial or "investigative" capacity.[9] Additionally, under *Monell v. Department of Social Services of New York*[10] and *City of Canton v. Harris*,[11] a municipality may be sued where the unlawful custom, policy, or practice of its prosecutor's office causes constitutional injury to the plaintiff.[12] Such an "unlawful policy" may be proven by showing that a municipality is deliberately indifferent[13] to its constitutional obligations through its failure to train, supervise, or discipline its agents or employees.[14]

Both of these paths to prosecutorial accountability are under attack in the courts. With anecdotal evidence suggesting a recent upswing in multi-million dollar lawsuits filed against prosecutors' offices,[15] the Supreme Court recently has granted certiorari in a number of cases brought against prosecutors individually or against the municipalities that employ them.[16] In its decision denying *Monell* liability in *Connick v. Thompson*[17] on March 29, 2011, the Court again relied on *Imbler*'s assumption that prosecutors will be deterred from committing misconduct due to their amenability to

---

9. *See* Burns v. Reed, 500 U.S. 478, 494–96 (1991) (holding that prosecutor is entitled only to "qualified immunity" for providing assistance to police that contributes to a misleading arrest warrant application intended to bring a suspect before the court for criminal proceedings); *see also* Kalina v. Fletcher, 522 U.S. 118, 129–31 (1997) (holding that only qualified immunity protects prosecutor who acted like a complainant in personally attesting to the truth of a fact necessary to obtain an arrest warrant); Buckley v. Fitzsimmons, 509 U.S. 259, 269–70 (1993) (holding that only qualified immunity protects prosecutor who obtained a false expert opinion during a matter's investigative stage for later use at a criminal trial).

10. 436 U.S. 658, 694 (1978).

11. 489 U.S. 378, 398 (1989).

12. *See, e.g.*, Walker v. City of New York, 974 F.2d 293, 300 (2d Cir. 1992).

13. *Id.*

14. *Id.*; *see also* Ramos v. City of New York, 729 N.Y.S.2d 678, 695–96 (App. Div. 2001).

15. *See, e.g.*, Anahad O'Connor, *$18 Million to Man Wrongly Imprisoned*, N.Y. TIMES, Oct. 20, 2010, at A22 (reporting on *Newton v. City of New York*, No. 07 Civ. 6211, 2010 WL 4177383 (S.D.N.Y. Oct. 22, 2010); this verdict was subsequently vacated after trial); A. G. Sulzberger, *City to Pay Record $9.9 Million over Man's Imprisonment*, N.Y. TIMES, June 4, 2010, at A19 (reporting on *Gibbs v. City of New York*, 714 F. Supp. 2d 419 (E.D.N.Y. 2010)); Bruce Golding, *'Wrong Man' $30 M. Suit*, N.Y. POST (Feb. 23, 2011), http://www.nypost.com/p/news/local/manhattan/wrong_man_suit_JY7gsJ4EK1HyVSfYWC5V3J (reporting on *Bermudez v. City of New York*, No. 11 Civ. 750 (S.D.N.Y. filed Feb. 3, 2011)).

16. *See* Connick v. Thompson, 131 S. Ct. 1350, 1360–63 (2011) (holding that municipal prosecutor's office cannot be held liable under "failure to train" theory based on a "single incident" of a *Brady* violation); Van de Kamp v. Goldstein, 555 U.S. 335 (2009) (District Attorney has absolute immunity for policy concerning information-sharing with police); McGhee v. Pottawattamie Cnty., 547 F.3d 922 (8th Cir. 2008), *cert. granted*, 129 S. Ct. 2002 (Apr. 20, 2009), *dismissed*, 130 S. Ct. 1047 (Jan. 4, 2010) (considering whether prosecutor is immune from liability for manufacturing evidence; this case settled before a decision was entered).

17. 131 S. Ct. 1350.

"professional    discipline,    including    sanctions,    suspension,    and disbarment."[18]   This position has consistently been advocated by parties and their amici favoring the prosecutor's side of the debate.[19]

This Article challenges that assumption based on information uncovered through the very types of *Monell* and individual liability lawsuits that prosecutors and municipalities seek to curtail.  A number of commentators and scholars already have found that, contrary to *Imbler*, the discipline of prosecutors    rarely    occurs.       They    also    have    analyzed    the    existing mechanisms for internal and external prosecutorial oversight and found that, also contrary to *Imbler*, such mechanisms fail to provide an effective structure for prosecutorial accountability.   The information in these articles generally is drawn from publicly available data, or from voluntary responses by prosecutors' offices to surveys or interviews.   This material is summarized below in Part I.

However, the principal purpose of this Article is to present further evidence that prosecutors are rarely disciplined, and that prosecutors' offices lack effective policies or structures for accountability, based upon material that their offices have been compelled to disclose during the course of civil rights lawsuits brought by the author.   These materials, presented below in the form of case studies, show that in at least three New York City District Attorneys' Offices, *Brady* and related due process violations[20] committed by public prosecutors are tolerated by their respective offices, which almost never discipline or sanction offenders.   Deposition testimony as well as documentary discovery revealed that these District Attorneys' Offices    have    no    codes    of    conduct,[21]    no    formal    disciplinary    rules    or

---

18. *Connick*, 131 S. Ct. at 1363.

19. *See* Petitioners' Brief on the Merits at 13, 28, Connick v. Thompson, 131 S. Ct. 1350 (2011) (No. 09-571); Amicus Curiae Brief of the National District Attorneys Ass'n in Support of Petitioners at 10–11, Connick v. Thompson, 131 S. Ct. 1350 (2011) (No. 09-571); Brief of the National Ass'n of Assistant United States Attorneys & National District Attorneys Ass'n as Amici Curiae in Support Of Petitioners at 8–17, Pottawattamie Cnty. v. McGhee, 129 S. Ct. 2002 (2009) (No. 08-1065); Brief of Petitioners at 36, Van de Kamp v. Goldstein, 555 U.S. 335 (2009) (No. 07-854).

20. Brady v. Maryland, 373 U.S. 83, 87–88 (1963) (holding that prosecutors have an absolute constitutional due process obligation to turn over to defense counsel material information favorable to the defense).   The *Brady* rule includes material impeachment evidence. *See* Giglio v. United States, 405 U.S. 150, 153–54 (1972).   Prosecutors also are obligated under the Due Process Clause to refrain from presenting false or misleading evidence, or making false or misleading arguments, to the jury. *See* United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991).

21. As this Article went to press, the District Attorneys Association of the State of New York released a new ethics handbook. *See* DIST. ATTORNEYS ASS'N OF THE STATE OF N.Y., "THE RIGHT THING": ETHICAL GUIDELINES FOR PROSECUTORS (2011).   This handbook contains strong, generally progressive statements about specific ethical obligations of prosecutors, including the obligation to disclose *Brady* material pursuant to constitutional and ethical rules. *Id.*   It also includes a strong statement of potential consequences for prosecutors who act unethically, such as censure or written reprimand, termination, disbarment, and even criminal prosecution. *Id.* at 6–7.   However, the booklet makes no reference to any obligation of District Attorneys to adopt any formal or regular disciplinary procedures, to actually impose such discipline, or to refrain from ratifying misbehavior by defending it in the courts.   It remains to be seen whether the handbook's exhortations will be

procedures, and no history of imposing sanctions or any other negative consequences on prosecutors who violate *Brady* or related due process rules intended to guarantee defendants the right to a fair trial.  To the contrary, they regularly defend such conduct no matter how strong the evidence that a violation occurred.  The evidence provided in these lawsuits shows that judicial disciplinary bodies virtually never punish prosecutors for violating ethics rules.[22]

Ironically, in one of the cases discussed below, a court's disciplinary body suggested to a complainant that if he was not satisfied with the confidential "admonition" given to a prosecutor who had knowingly relied on false testimony to wrongly imprison him, he could consult with counsel regarding "civil remedies."[23]  When official attorney disciplinary bodies propose civil lawsuits as an alternative to the ineffectual attorney grievance process, it is time to question the Supreme Court's assumption that such "discipline" is an effective deterrent to prosecutorial misconduct.

## I. COMMENTATOR AND COMMITTEE STUDIES OF PROFESSIONAL ACCOUNTABILITY AND DISCIPLINE OF PROSECUTORS

Commentators and research committees have responded to the Supreme Court's assumptions about the susceptibility of prosecutors to professional discipline by studying whether, in fact, such discipline actually occurs.  In reaching the consensus that "professional discipline of prosecutors is extremely rare,"[24] legal commentators and other researchers have, among other things, reviewed published decisions of state bar disciplinary authorities and conducted voluntary surveys of prosecutors' offices.  These published studies uniformly conclude that prosecutors are "rarely, if ever," punished by professional disciplinary bodies, even when they engage in "egregious" misconduct.[25]

Richard A. Rosen, in 1987, surveyed all reported cases of attorney discipline in order to determine the proportion of those cases that involved the discipline of criminal prosecutors for violations of the *Brady* rule.[26]  He also surveyed numerous state bar and prosecutorial oversight committees to

contradicted, as in the past, by official toleration of flagrant or intentional violations of the acknowledged rules.

22. *See infra* Part II.

23. *See infra* note 223 and accompanying text.

24. Bennett L. Gershman, *Reflections on* Brady v. Maryland, 47 S. TEX. L. REV. 685, 722 (2006).

25. Shelby A.D. Moore, *Who Is Keeping the Gate?  What Do We Do when Prosecutors Breach the Ethical Responsibilities They Have Sworn to Uphold?*, 47 S. TEX. L. REV. 801, 807 (2006); *see also* Angela J. Davis, *The Legal Profession's Failure to Discipline Unethical Prosecutors*, 36 HOFSTRA L. REV. 275, 296 (2007) (terming the discipline received by the prosecutor in the "Duke lacrosse" case the "Mike Nifong exception" because the case represents a rare example of prosecutorial discipline); Ellen Yaroshefsky, *Wrongful Convictions:  It Is Time to Take Prosecution Discipline Seriously*, 8 D.C. L. REV. 275, 276 n.7 (2004) (citing BENNETT L. GERSHMAN, PROSECUTORIAL MISCONDUCT § 14.1 n.5 (2d ed. 2002)).

26. Richard A. Rosen, *Disciplinary Sanctions Against Prosecutors for Brady Violations: A Paper Tiger*, 65 N.C. L. REV. 693, 718–20 (1987).

find unpublished or otherwise unreported instances where such discipline was imposed.[27]  He found only "nine cases . . . in which discipline was even considered,"[28] and only six where it was actually imposed.[29]  Ten years later, Jeffrey Weeks updated Rosen's study and found that, although there was no decrease in the amount of *Brady* violations committed, there were only seven additional instances where prosecutorial discipline was considered, and only four cases where it was actually imposed.[30]

In a similar study, Fred C. Zacharias reviewed every reported case of professional discipline for prosecutorial misconduct.[31]  He found only twenty-seven instances[32] in which prosecutors were disciplined for unethical behavior occurring at or affecting the fairness of criminal trials, including, but not limited to, violations of the *Brady* rule.[33]  Zacharias's study compared this rate of discipline to that of all lawyers nationally and concluded that "prosecutors are disciplined rarely, both in the abstract and in comparison to private lawyers."[34]

In connection with special investigative reports on the causes of wrongful convictions, committees of lawyers and other criminal justice professionals in New York and California examined whether prosecutors are disciplined by their own offices.  The New York State Bar Association Task Force on Wrongful Convictions (Task Force) examined fifty-three cases of wrongful convictions that were overturned by "exoneration," and conducted hearings at which both defense attorneys and prosecutors testified.[35]  It concluded that thirty-one of the wrongful convictions were attributable to "governmental practices," which were defined to include the use of false testimony, violation of *Brady*, improper evidence retention or transfer, and refusal to investigate alternative suspects to crimes.  It reported that "research has not revealed any public disciplinary steps against prosecutors."[36]  The Task Force also surveyed District Attorneys' Offices across New York State, twenty of which responded to a written questionnaire, to determine "whether sanctions [for prosecutorial misconduct] had ever been imposed," and found that just one prosecutor

---

27. *See id.* at 720.

28. *Id.*; *see also id.* at 700–03 (collecting as an "example" more than fifty reported cases of prosecutorial misconduct related to *Brady*).

29. *Id.* at 720–31.

30. Joseph R. Weeks, *No Wrong Without a Remedy: The Effective Enforcement of the Duty of Prosecutors to Disclose Exculpatory Evidence*, 22 OKLA. CITY U. L. REV. 833, 881 (1997).

31. Fred C. Zacharias, *The Professional Discipline of Prosecutors*, 79 N.C. L. REV. 721, 743 (2001).

32. *Id.* at 751–54 tbls. VI & VII.

33. As opposed to "plainly illegal activity," such as "bribery, extortion . . . and embezzlement," or "allegedly abusive behavior towards tribunals, usually consisting of criticism of judges." *Id.* at 744–47.

34. *Id.* at 755.

35. FINAL REPORT OF THE N.Y. STATE BAR ASS'N'S TASK FORCE ON WRONGFUL CONVICTIONS 19, 29–31 (2009), *available at* http://www.nysba.org/Content/NavigationMenu42/April42009HouseofDelegatesMeetingAgendaItems/FinalWrongfulConvictionsReport.pdf.

36. *Id.* at 5, 17.

had been referred to an outside disciplinary committee by these offices, and only one prosecutor had been sanctioned internally.[37]  The Task Force also took and credited testimony from the author concerning his law firm's findings as to internal discipline of prosecutors in New York City.[38]  The Task Force concluded, "[T]here is little or no risk to the specific [prosecutor] involved resulting from a failure to follow the [*Brady*] rule."[39]

Meanwhile, in California, the Commission on the Fair Administration of Justice (Justice Commission) made similar findings.  The Justice Commission analyzed 2,131 California cases where criminal defendants raised claims of prosecutorial misconduct in trials, appeals, or post-conviction litigation.[40]  While courts had found prosecutorial misconduct in 444 of these cases, the Justice Commission focused on fifty-four cases that resulted in the reversal of the conviction and which also, pursuant to a specific provision of California Law, should have been reported to the state bar association for disciplinary investigation.[41]  The Commission could not find a single instance where any such referral was made.[42]  The Commission concluded, "[O]ur reliance upon the State Bar as the primary disciplinary authority is seriously hampered by underreporting."[43]  Moreover, the Justice Commission cited no specific examples of internal discipline in those cases, or in any others.[44]

Finally, a study conducted by two journalists at the *Chicago Tribune* in 1999 also investigated whether prosecutors' offices disciplined their employees for prosecutorial misconduct.  Their articles reported that out of 381 nationwide reversals in homicide cases (sixty-seven of which carried death sentences) since 1963 (the year *Brady* was decided) for "using false evidence or concealing evidence suggesting innocence,"[45] only "one [prosecutor] was fired, but [he] appealed and was reinstated with back pay,"[46] "another received an in-house suspension of 30 days," and a "third prosecutor's law license was suspended for 59 days, but because of other misconduct in the case."[47]  None were disbarred or received any public sanction.[48]

Scholars have noted that prosecutors' offices generally lack sufficient internal mechanisms to oversee and discipline attorneys effectively.  As part

---

37. *Id.* at 30–31.

38. *Id.* at 31; *see also infra* Part II.

39. FINAL REPORT OF THE N.Y. STATE BAR ASS'N'S TASK FORCE ON WRONGFUL CONVICTIONS, *supra* note 35, at 29.

40. CAL. COMM. ON THE FAIR ADMIN. OF JUSTICE, FINAL REPORT 71 (Gerald Uelmen ed., 2008), *available at* http://www.ccfaj.org/documents/CCFAJFinalReport.pdf.

41. *See id.*

42. *See id.*

43. *Id.*

44. *See id.* at 73–74.

45. Maurice Possley & Ken Armstrong, *Trial & Error:  The Flip Side of a Fair Trial*, CHI. TRIB., Jan. 11, 1999, at C1.

46. Maurice Possley & Ken Armstrong, *Trial & Error:  The Verdict:  Dishonor*, CHI. TRIB., Jan. 10, 1999, at C1.

47. *Id.*

48. *See id.*

of a Symposium at Cardozo Law School studying prosecutorial compliance with *Brady* and other discovery obligations,[49] several commentators identified design flaws in prosecutors' offices related to this lack of oversight.[50]   Elsewhere, commentators also have faulted prosecutors' offices for failing to implement the type of rigorous organizational oversight models used in administrative agencies[51] and corporations.[52] Rather than being uniquely amenable to professional discipline, prosecutors' offices appear far less equipped than other large organizations, including police departments, to manage and discipline employees.

The above research on prosecutorial discipline and internal supervisory policies, while contradicting the *Imbler* assumption about prosecutorial discipline, is limited by the lack of access to the internal records of prosecuting offices and to insider accounts of how such offices operate, as well as to the often secret disciplinary practices of judicial or bar grievance committees.   The next section presents such previously unavailable information as it relates to three large District Attorneys' Offices in New York:  Bronx, Queens, and Kings (Brooklyn) Counties.  New York City was compelled by court orders in several *Monell*-based lawsuits to provide document discovery and deposition testimony concerning these Offices' disciplinary procedures and practices.   The information that has been disclosed further refutes the Supreme Court's assumptions in *Imbler*.

---

49. *See generally* Symposium, *New Perspectives on* Brady *and Other Disclosure Obligations: What Really Works*, 31 CARDOZO L. REV. 1943 (2010).

50. *See* Rachel E. Barkow, *Organizational Guidelines for the Prosecutor's Office*, 31 CARDOZO L. REV. 2089, 2090–91 (2010) (explaining that prosecutors' offices should take a more "compliance-based" approach to misconduct because "[t]he existing framework for addressing prosecutorial misconduct is entirely backward-looking, and ineffective"). *See generally Voices from the Field:  An Inter-Professional Approach to Managing Critical Information*, 31 CARDOZO L. REV. 2037 (2010) (collecting reports from medical professionals, police department officials, corporate psychologists, and statisticians about alternative models for ensuring prosecutorial accountability); Barry Scheck, *Professional and Conviction Integrity Programs:  Why We Need Them, Why They Will Work, and Models for Creating Them*, 31 CARDOZO L. REV. 2215, 2215–16 (2010) (proposing the creation of an external monitoring body to review dubious convictions).

51. Rachel E. Barkow, *Institutional Design and the Policing of Prosecutors:  Lessons from Administrative Law*, 61 STAN. L. REV. 869, 869–70 (2009) (addressing "design flaws" in the operation of prosecutors' offices, which contribute to "prosecutorial overreaching"). Barkow criticizes the vertical structure of prosecutors' offices, in which the same prosecutor investigating a case also prosecutes it. *Id.*  She recommends that prosecutors' offices should follow the model of administrative agencies in separating officials handling investigations from those handling advocacy functions. *Id.*

52. Stephanos Bibas, *Prosecutorial Regulation Versus Prosecutorial Accountability*, 157 U. PA. L. REV. 959, 961 (2009) ("The resulting dangers [of the lack of prosecutorial accountability] can be enormous.").  Bibas suggests that prosecutors' offices would benefit from following a corporate model in five areas:  office culture; managerial structure; internal policy-making; personnel actions, such as hiring, firing, promotion, and training; and the dissemination of information, performance evaluations, and incentives.   Following a corporate structure would increase accountability of individual prosecutors, as well as of the local District or State Attorney.  Bibas posits that a more formalized and predictable training and disciplinary model would tamp down prosecutors who "suffer from an excess of adversarial zeal and a notches-on-the-belt conviction mentality." *Id.* at 1000–11.

II. Case Studies: The Disciplinary Policies, Procedures, and History of Three New York City District Attorneys' Offices

### A. The Bronx District Attorney's Office

Alberto Ramos was a criminal defendant who was unjustly convicted of rape in 1985, freed upon the discovery of *Brady* violations in 1992, and recovered a $5 million civil rights settlement in 2003. In furtherance of the civil rights suit, the author compelled the Bronx District Attorney's Office to disclose personnel records for prosecutors involved in seventy-two cases in which courts had found improper behavior by prosecutors from 1975 through 1996, and to submit to oral depositions about the Office's "disciplinary" practices. In subsequent companion lawsuits, which are ongoing, brought on behalf of two former criminal co-defendants victimized by *Brady* violations during an attempted murder trial in 1998, the author and his co-counsel[53] have obtained additional records through 2007, as well as the depositions of Robert T. Johnson, Bronx District Attorney since 1989, virtually all of his senior staff, and two line prosecutors. These discovery materials have revealed that this major urban prosecutor's office, employing nearly 400 prosecutors and hundreds of support staff,[54] has no published code or rules of behavior for prosecutors, no schedule of potential sanctions for misbehavior or objective standards governing when such sanctions will be imposed, no written or formal procedure for investigating or disciplining prosecutors, and no procedure for keeping a record of prosecutors who have been cited for or are known to have engaged in improper behavior. Officials could identify just one prosecutor since 1975 who, according to the Office's records, has been disciplined in any respect for misbehavior while prosecuting a criminal case. Officials claim that several prosecutors have been verbally chastised, or temporarily denied raises in compensation, but there is no apparent record of it.

#### 1. The *Ramos* Case

##### a. The Criminal Prosecution

Alberto Ramos was a twenty-one-year-old college student and part-time childcare worker when he was arrested on September 6, 1984, and charged with raping a five-year-old girl at a Bronx day care center. His arrest was the latest in a series of highly publicized day care center sexual abuse cases brought by then-District Attorney Mario Merola, a politically ambitious

---

53. Co-counsel is New York attorney Julia Kuan, who won the cases of each of the former criminal defendants who are now plaintiffs in the lawsuits.

54. Erin Einhorn & Jonathan Lemire, *DAs Urge Council: Save Us!*, N.Y. Daily News, June 4, 2010, at 18 (explaining that the Bronx D.A.'s office is under pressure to fire forty-five prosecutors).

prosecutor.[55]  In May 1985, Ramos's case became the first of the Merola prosecutions to come to trial.[56]

The prosecution's case was based upon the child's sworn testimony claiming that she had been raped in a classroom bathroom while the other children were napping.[57]  For "corroboration," the People relied on a doctor's testimony that the child's mere ability to describe sexual intercourse indicated that she had experienced it, as well as the doctor's observation that the child had a vaginal irritation or rash.[58]  In addition, the child's grandmother testified that when she picked up the girl on the day in question, the child was upset.[59]  Other witnesses informed the jury that earlier that day, Ramos, exasperated by the children's rowdiness and his inability to control them, had inappropriately placed tape on the upper lip of several children, including the complainant, to quiet them.[60]  In her summation, the prosecutor forcefully argued that the child could not "make up" her claim of having sexual intercourse and that her vaginal "bruises" corroborated her testimony.[61]

Ramos was convicted.  He screamed in agony, "Kill me."[62]  Several weeks later, the judge, expressing frustration that he could not sentence Ramos to life in prison, meted out the maximum sentence of eight and one-third to twenty-five years.[63]  Ramos's direct appeal and his post-judgment motion to vacate his conviction were denied.[64]  Because he continued to deny his guilt, Ramos was likely to serve at least two-thirds, if not the entirety, of his maximum sentence.[65]  Meanwhile, the everyday reality of his punishment was brutal:  as a convicted child rapist, he was subjected to constant physical, sexual, and verbal abuse.[66]

Seven years into Ramos's hellish incarceration, fate intervened.  The alleged victim's mother had brought a civil lawsuit against the New York City-funded day care center and against Ramos.  The City's private

55. *See Frontline:  Innocence Lost:  Other Well-Known Cases*, PBS, http://www.pbs.org/wgbh/pages/frontline/shows/innocence/etc/other.html (last visited Oct. 20, 2011) (describing Merola's prosecution of the "Bronx Five" day care center workers).

56. *See* Ramos v. City of New York, 729 N.Y.S.2d 678, 684 (App. Div. 2001).

57. STEPHEN GILLERS, IN THE PINK ROOM 2–3 (2006).

58. *Id.* at 3.

59. *Id.*

60. *Id.*

61. *Id.* at 3–4; *see also* Trial Transcript at 429, 431, People v. Ramos, No. 3280-84 (N.Y. Sup. Ct. Bronx Co. May 9–20, 1985) (on file with author).

62. GILLERS, *supra* note 57, at 4.

63. *See* People v. Ramos, 614 N.Y.S.2d 977, 980 (App. Div. 1994).

64. People v. Ramos, 124 A.D.2d 1077 (N.Y. App. Div. 1986), *appeal denied*, 69 N.Y.2d 832 (1987).

65. *See, e.g.*, Daniel S. Medwed, *The Innocent Prisoner's Dilemma:  Consequences of Failing to Admit Guilt at a Parole Hearing*, 93 IOWA L. REV. 491, 522 (2008) ("[P]ractically all New York state inmates [know] that a failure to 'admit' guilt at [a parole] hearing would probably ring the death knell to [their] chances for parole."); *see also* Edwards v. Goord, 362 F. App'x 195, 198 (2d Cir. 2010) (challenging unsuccessfully New York State Department of Correctional Services' denial of "good time" credit based on inmate's refusal to admit guilt resulting in inmate having to serve his complete sentence).

66. *See* Amended Complaint at 12, Ramos v. City of New York, No. 21770-93 (N.Y. Sup. Ct. Bronx Co. filed Oct. 20, 1995) (on file with author).

insurance carrier, fearing a massive judgment, settled, but a defense investigator, believing Ramos to be innocent, obtained permission to share his investigative discoveries with Ramos and his mother.[67]  They, in turn, hired the author's law firm.  Based largely upon the investigator's records, Ramos moved for a new trial, and an evidentiary hearing was held.[68]

The court found in its decision that the trial prosecutor had assured defense counsel that she would obtain and disclose all relevant social service and day care center records, but had then failed to do so.[69]  Before or during trial, Assistant District Attorney Diana Farrell did obtain numerous documents and interviewed teachers and administrators, but she did not disclose the following information that was in her actual or constructive possession[70]:

(1)  The child initially denied repeatedly that anything had happened other than he "taped my mouth," before finally accusing Ramos;[71]

(2)  Prior to the alleged rape, the child had described watching sexually explicit programs on television, would use dolls to simulate sex during show and tell in school, was described by her teachers as "sexually wiser" than the other children and street smart, and would expose herself;[72]

(3)  The child used to masturbate on a regular basis in school,[73] thereby explaining her vaginal irritation; and

(4)  As revealed by a sign-in, sign-out book, the child's grandmother had not picked her up at all on the day in question; in fact, she had been picked up by her aunt.[74]

In vacating Ramos's conviction, the court issued a scathing opinion crediting the defendant's witnesses over the sometimes contrary testimony of the trial prosecutor.  While declining to find that the prosecutor's misconduct had been willful, the court termed it "cavalier and haphazard," and continued:  "The greatest crime in a civilized society is an unjust conviction.  It is truly a scandal which reflects unfavorably on all participants in the criminal justice system."[75]  The court released Ramos on his own recognizance, pending retrial.

The Bronx District Attorney appealed.  In addition to attacking the evidentiary basis for the lower court's factual findings, the Office's brief, submitted in the name of the Bronx District Attorney Robert T. Johnson, contended that none of the undisclosed information consisted of *Brady*

---

67.  *See Ramos*, 614 N.Y.S.2d at 980.
68.  *See id.*
69.  *See id.* at 982.
70.  Decision and Order at 3, People v. Ramos, No. 3280-84 (N.Y. Sup. Ct. Bronx Co. dated June 1, 1992) (on file with author).
71.  *Ramos*, 614 N.Y.S.2d at 981.
72.  *See id.* at 980–81.
73.  *See id.*
74.  *See id.*
75.  *See* People v. Ramos, No. 3280-84, slip op. at 9, 1992 WL 12620540 (N.Y. Sup. Ct. Bronx Co. June 1, 1992), *aff'd*, 614 N.Y.S.2d 977.

material.[76]  "By placing the dolls in close proximity she could have been simulating wrestling or some other activity," the District Attorney argued.[77] What is more, the dolls were not "anatomically correct."[78]  The District Attorney speculated that the child had not really seen sexual acts on television because "[i]t is common knowledge that such movies do not contain hard-core pornographic footage"[79]  The new information about masturbation was not material because the defense already had a document suggesting the child masturbated (although on the witness stand her teacher denied such knowledge).  Finally, the District Attorney argued that the sign-in, sign-out log need not have been disclosed because it did not "touch upon defendant's guilt or innocence."[80]  The Appellate Division affirmed the lower court's ruling in an even more scathing opinion.[81]  The District Attorney's Office then agreed that it lacked any "reasonable cause" to continue the prosecution, and dismissed all charges.[82]

### b. The Attorney Grievance Process

Shortly after the trial court issued its decision vacating Ramos's conviction, Ramos's prosecutor received notice from the Departmental Disciplinary Committee of the New York State Supreme Court, Appellate Division, First Judicial Department, of a secret sua sponte disciplinary inquiry.[83]  The Departmental Disciplinary Committee is the New York State authority charged with the investigation and discipline of attorneys accused of professional misconduct.[84]  It may initiate an investigation of an attorney upon a complaint or "on its own initiative."[85]  Upon such investigation, it has the authority to impose sanctions on an attorney ranging from the most serious punishment of disbarment to a private letter of "admonition."[86]  Under the New York State Judiciary Law, the conduct of such an investigation—including its very existence—is confidential unless the Disciplinary Committee finds that the attorney should be publicly reprimanded.[87]

After learning of the Disciplinary Committee's investigation, Ramos's prosecutor sat down with Counsel to the District Attorney Anthony Girese,

76. Appellant's Brief at 29, People v. Ramos, No. 3280-84 (N.Y. App. Div. Sept. 7, 1993) (on file with author).

77. *See id.* at 30.

78. *Id.*

79. *Id.* at 31.

80. *Id.* at 32.

81. People v. Ramos, 614 N.Y.S.2d 977 (App. Div. 1994).

82. Ramos v. City of New York, 729 N.Y.S.2d 678, 685 (App. Div. 2001).

83. *Id.* at 668–69, 750–51.

84. *See Departmental Disciplinary Committee*, N.Y. STATE SUPREME COURT APPELLATE DIV. FIRST DEP'T., http://www.courts.state.ny.us/courts/ad1/Committees&Programs/DDC/index.shtml (last visited Oct. 20, 2011).

85. N.Y. COMP. CODES R. & REGS. tit. 22, § 605.6(a) (1994).

86. *Id.* § 605.5(a).

87. N.Y. JUDICIARY LAW § 90(10) (McKinney 2002).

and together they prepared a letter defending her conduct.[88]  The letter stated that there was "no misconduct" on her part, and asked that any inquiry be deferred until the appeal was decided.[89]  The prosecutor also wrote her own letters to the Disciplinary Committee defending her conduct.[90]  She also gave confidential sworn testimony, which she refused during the lawsuit to consent to unseal.[91]  The Committee dismissed the disciplinary action.[92]  At no time did the Committee afford Ramos or his counsel notice of the prosecutor's contentions or any opportunity to provide any materials or arguments concerning whether she had committed ethics violations.

### c.  The Civil Lawsuit

While the Ramos post-judgment hearing was underway, the Second Circuit decided *Walker v. City of New York*.[93]  *Walker* contained two principal legal holdings of relevance to Ramos.  First, a District Attorney's failure to adequately train or supervise his staff to comply with their obligations to disclose *Brady* material, and not to present false or perjured testimony, could give rise to *Monell* liability under § 1983.[94]  The plaintiff would have to show that the District Attorney had been deliberately indifferent to an obvious need for greater training, supervision, or discipline, and that this policy of indifference was a substantial cause of the violation of the plaintiff's federal constitutional rights.[95]  Second, although a New York municipality is not subject to suit under § 1983 for a District Attorney's "prosecutorial" decisions that he makes on behalf of the State, it may be sued for a District Attorney's "managerial" or "administrative" functions that he performs as a policymaker on behalf of the City of New York, including constitutionally faulty training or supervision of his staff.[96]

Based upon *Walker*, and armed with the Appellate Division's ringing denunciation of the District Attorney's conduct at Ramos' criminal trial,

---

88.  *See* Deposition of Diana Farrell at 683, Ramos v. City of New York, No. 21170-93 (N.Y. Sup. Ct. Bronx Co. deposed Oct. 7, 1997) (on file with author).

89.  *See id.* at 689.

90.  *See* Letter from Diana Farrell to Andral Bratton, Departmental Disciplinary Comm., Supreme Court of the State of N.Y., Appellate Div., First Dep't (Mar. 15, 1995) (on file with author); Letter from Diana Farrell to Andral Bratton, Departmental Disciplinary Comm., Supreme Court of the State of N.Y., Appellate Div., First Dep't (Nov. 29, 1994) (on file with author).

91.  *See* Deposition of Diana Farrell, *supra* note 88, at 687.

92.  *See id.*

93.  974 F.2d 293 (2d Cir. 1992).

94.  *See id.* at 296, 300.

95.  Although *Walker* suggested that a showing of inadequate *training* could be made without a history of prior complaints or findings of similar misconduct, that view was overruled by the Supreme Court in *Connick v. Thompson*, 131 S. Ct. 1350 (2011).  However, the Ramos lawsuit, and the others brought by the author, have been based on multiple prior incidents of misconduct, a history of failure to *discipline*, and evidence of ratification reflecting an unlawful policy.

96.  *Walker*, 974 F.2d at 301.

Ramos elected to bring a § 1983 lawsuit in the State Supreme Court in Bronx County.  Ramos claimed that the trial prosecutor's misconduct had resulted from the District Attorney's deliberate indifference to his staff's history of obtaining unlawful convictions by violating *Brady* and relying on false or misleading evidence and argument, exhibited by his failure to properly train, supervise, and discipline prosecutors to avoid or to deter such violations, and by his ratification of such misconduct when it occurred.[97]

To substantiate this claim, Ramos sought disclosure of the personnel and disciplinary records of the prosecutors who had been involved in seventy-two reported cases in which courts had found violations of *Brady* obligations (eighteen cases), or other violations of the duty not to present false, misleading, or inflammatory evidence or summation argument (fifty-four cases).  The majority of the decisions had been handed down between the mid-1970s and District Attorney Merola's death in 1987, but a significant number had occurred from 1989 through 1996, during the Administration of District Attorney Johnson.  The City resisted such document disclosure, and moved for dismissal or summary judgment regarding Ramos' § 1983 claim.  While the lower court denied this motion, it limited disclosure of records to those relating to just ten of the seventy-two court decisions.[98]  Both sides appealed.  Ramos fully prevailed.[99]

In its decision, the Appellate Division, noting the "catastrophic" result when prosecutors wrongfully convict a defendant by withholding materially favorable information,[100] upheld Ramos' civil rights claim, while granting all of the document discovery Ramos sought.  Agreeing with the Second Circuit's analysis in *Walker*, the court held that under state law, a District Attorney is a local policymaker with respect to training and supervising staff concerning its *Brady* obligations.[101]  The court further held that under the facts in Ramos's case, the City could be liable for both the District Attorney's consistent failure to discipline prosecutors who caused unconstitutional convictions—by withholding *Brady* material or by knowingly relying on false or misleading evidence or argument—and for the District Attorney's ratification of such misconduct in Ramos's own case, through his "strident opposition" to Ramos's motion and failure to discipline Ramos's trial prosecutor.[102]  The court directed the City to name the prosecutors involved in *all seventy-two* misconduct cases and to provide

---

97.  *See* Amended Complaint, *supra* note 66, at 24–36.  The complaint also named as defendants the Human Resources Administration (HRA) and the New York City Police Department, under different theories of liability. *Id.*

98.  Decision and Order, Ramos v. City of New York, No. 21770-93, 1999 WL 34804917 (N.Y. Sup. Ct. Bronx Co. dated Oct. 27, 1999) (on file with author).

99.  Ramos v. City of New York, 729 N.Y.S.2d 678 (App. Div. 2001).

100.  *See id.* at 681.

101.  *See id.* at 693.

102.  *See id.* at 694–95.

their personnel records, including their salary cards and evaluations, and any evidence of discipline.[103]

The records, finally disclosed a year later without any confidentiality order, revealed that from 1975 through 1996, during the administration of three District Attorneys, there was just *one* incidence of any prosecutor being disciplined.  This prosecutor was one of fourteen prosecutors who had been involved in more than one of the trials in which misconduct had been found.[104]  A second prosecutor had conducted five of the trials, while a third had conducted four,[105] yet neither of these latter two prosecutors, according to the records, had ever been disciplined.[106]  Indeed, the District Attorney's Office conceded that payroll and other records "do not indicate the existence of any disciplinary measures taken against any of th[e] ADAs."[107]  A more detailed review of the three prosecutors just mentioned is revealing.

The prosecutor who received "discipline" did so in connection with a robbery conviction he obtained after trial in February 1977.[108]  The criminal defendant promptly appealed that conviction and alleged an extraordinary number of prosecutorial improprieties.[109]  In a decision dated April 13, 1978, the Appellate Division resoundingly agreed.  It denounced the prosecutor for "overzealous," "improper conduct . . . throughout the trial, despite repeated admonitions by the court,"[110] including disparaging the "so-called presumption of innocence" and "reasonable doubt" and continually "disregard[ing] and overriding . . . the court's rulings and instructions."[111]  In reversing the conviction, the court cited the Code of Professional Responsibility and implied that the prosecutor had violated it.[112]  The prosecutor's salary record showed that when the trial occurred, he was earning $21,500.[113]  Notwithstanding the Office's notice of his misconduct presented by the defendant's appeal, he received salary increases over the next year of $4,500—or 21 percent.[114]  After the court handed down its decision, the prosecutor suffered a deduction of four weeks

---

103. *See id.*  The court's directive was contained in its initial, published decision and in an unpublished supplemental order on file with the author. Plaintiff's Second Supplemental Demand for Discovery & Inspection, Ramos v. City of New York, No. 21770-93 (N.Y. Sup. Ct. Bronx Co. Mar. 17, 1998) (on file with author); *see also* Order, Ramos v. City of New York, No. 21770-93 (N.Y. App. Div. dated Dec. 27, 2001) (on file with author).

104. Personnel records disclosed in discovery, Ramos v. City of New York, No. 21770-93 (N.Y. Sup. Ct. Bronx Co. filed Apr. 1, 1996) (on file with author).

105. *Id.*

106. *Id.*

107. Letter from Stuart P. Levy, Assistant Dist. Attorney, Office of the Dist. Attorney, Bronx Cnty., to Hon. Betty Owen Stinson, Supreme Court of the State of N.Y., Bronx Cnty. (July 24, 2002) (on file with author).

108. *See* People v. Bussey, 403 N.Y.S.2d 739, 739 (App. Div. 1978).

109. *See id.*

110. *Id.*

111. *Id.* at 741–42.

112. *Id.* at 742.

113. Personnel records disclosed in discovery, *supra* note 104.

114. *Id.*

of pay, or approximately $2,150.[115]  However, he then received a bonus of $250 on June 30, 1978, and a $2,500 salary increase on July 1, 1978, more than making up for his lost income.[116]

Between 1978 and 1981, the same prosecutor was derided by three more appellate opinions in two cases (although neither conviction was reversed),[117] but continued to receive raises in compensation.  Dissenting judges in two of the decisions suggested that such "egregious" conduct be referred for professional discipline,[118] noting that the same trial assistant had been denounced in prior decisions for "outrageous and abusive conduct"[119] and "improper and tasteless" behavior.[120]  On November 24, 1981, Associate Judge Bernard Meyer of the New York Court of Appeals reminded the District Attorney of his "continuing obligation with respect to his trial assistants . . . to instruct them clearly and firmly against using such tactics."[121]  Yet, during the four-year period beginning July 1, 1978, the prosecutor received "merit" and other raises totaling $13,500, until he was earning $42,000 by July 1, 1982.[122]

On November 22, 1982, District Attorney Merola wrote to a member of the Appellate Division's Departmental Disciplinary Committee, asking it to reconsider its initial finding in connection with a disciplinary inquiry concerning the conduct of the prosecutor.[123]  Merola assured the Committee that he already had authorized disciplinary measures which took into account all of the prosecutor's misconduct and that, in light of his subsequent performance, these early trials in his career were an "aberration."[124]  It appears the Committee did reconsider, as there is no evidence that the prosecutor was sanctioned.

Significantly, in the prosecutor's next evaluation after the court decisions in 1980 and 1981 that so vehemently condemned his performances, his bureau chief scored his overall quality of performance as a "4" out of a possible "5."[125]  While the supervisor noted the Assistant District Attorney's "involvement with the App[ellate] Div[ision] Disciplinary Committee," he did so not as a reflection of the quality of the prosecutor's trial performance, but rather as an explanation for his drop off in "productivity."[126]          Indeed, praised for being "cooperative and

---

115.  *Id.*

116.  *Id.*

117.  People v. Galloway, 54 N.Y.2d 396 (1981), *aff'g* 430 N.Y.S.2d 93 (App. Div. 1980); People v. Wheeler, 438 N.Y.S.2d 467 (App. Div. 1981).

118.  *Galloway*, 54 N.Y.2d at 414 n.4 (Meyer, J., dissenting).

119.  *Id.* at 415 (Meyer, J., dissenting) (quoting People v. Bussey, 403 N.Y.S.2d 739, 742 (App. Div. 1978)) (internal quotation marks omitted).

120.  *Id.* (quoting *Wheeler*, 438 N.Y.S.2d at 467) (internal quotation marks omitted).

121.  *Galloway*, 54 N.Y.2d at 415.

122.  Personnel records disclosed in discovery, *supra* note 104.

123.  Letter from Mario Merola, Dist. Attorney, Office of the Dist. Attorney, Bronx Cnty., to Martin London, Supreme Court, Appellate Div., Departmental Disciplinary Comm. (Nov. 22, 1982) (on file with author).

124.  *Id.*

125.  Personnel records disclosed in discovery, *supra* note 104.

126.  *Id.*

conscientious," the only additional criticism the prosecutor received was for "lateness . . . which he has been counseled about *repeatedly*."[127]   The following year, the same supervisor had nothing but superlatives for this Assistant District Attorney.[128]   Recommending him for promotion to "senior trial status," the Bureau Chief gushed: "Tremendous ability to plead def[endan]ts with the weakest proof."[129]   He continued as a Bronx Assistant District Attorney until his retirement in 1997.[130]

The prosecutor responsible for five of the misconduct decisions was found in an appellate decision in October 1982 to have engaged in "persistent misconduct [during summation, which] deprived the defendant of his right to a fair trial," resulting in the reversal of a manslaughter conviction.[131]   Three years later, the same court reversed another manslaughter conviction obtained by the same prosecutor six months after the prior decision.[132]   The court was irate that the prosecutor had "blatantly violated defendant's rights"[133] even after being chastised in the prior opinion, and termed the prosecutor's conduct "willful and deliberate."[134] The following year, reversing a third manslaughter conviction obtained by the same prosecutor, the same court commented:

> [W]hen the misconduct is so pervasive, so egregious and results in violations of fundamental due process rights, and the prosecutor's disregard of the court's rulings and warnings is as deliberate and reprehensible as that of this prosecutor, who has twice before provoked reversals by this court, a reversal is the only responsible remedy we can invoke as guardians of the rights of the People.[135]

The prosecutor left the Office's employ in 1984, after six years.  There was nothing in his personnel file to indicate that he did not leave voluntarily or was disciplined in any way.  *after* the trial in which he had "blatantly violated" the defendant's rights in conduct that the court found to have been "willful and deliberate"—he received a salary adjustment and "merit" bonus totaling $4,500, which amounted to more than 10 percent of his previous salary.[136]

As for the prosecutor cited in four decisions, three involved summation and other trial-related misconduct—resulting in two reversals and one finding of harmless error—and one involved an apparent *Brady* violation which was remanded for an evidentiary hearing.[137]   Within five weeks of

---

127.  *Id.*
128.  *See id.*
129.  *Id.*
130.  *See id.*
131.  *See* People v. Perez, 455 N.Y.S.2d 89, 91 (App. Div. 1982).
132.  *See* People v. Rosa, 489 N.Y.S.2d 722, 728 (App. Div. 1985).
133.  *Id.* at 726.
134.  *Id.* at 728.
135.  People v. Sandy, 499 N.Y.S.2d 75, 77 (App. Div. 1986) (citations omitted).
136.  Personnel records disclosed in discovery, *supra* note 104.
137.  *See* People v. Qualls, 70 N.Y.2d 863 (1987) (remanding for evidentiary hearing concerning apparent *Brady* violation); People v. Jorge, 566 N.Y.S.2d 649, 650 (App. Div. 1991) (reversing murder conviction because prosecutor misstated the testimony and cited the Bible while exhorting the jury to "do your duty"); People v. Taylor, 556 N.Y.S.2d 307 (App.

the first reversal, he received "merit" increases and bonuses totaling $11,500, or more than 15 percent of his previous salary.[138]  Following the other court decisions, including the reversal in 1991, he received yearly "merit" increases ranging from $1,000 to $4,000.[139]  His evaluations were not provided.

Ramos's trial prosecutor also received no sanction for her misbehavior.  During her deposition, she testified that "everything [she] did in connection with the Ramos prosecution was consistent with [her] training."[140]  She testified that she believed she was required to disclose only evidence that was "blatantly *Brady*" because it "tended to exonerate the defendant" or was "crucial" or, as to impeachment evidence, only if she determined after investigation that it was "truthful."[141]  She revealed that shortly after the hearing court's decision was handed down, she met with District Attorney Johnson, Chief Assistant Barry Kluger, and Counsel Girese, and received their complete support, including their agreement to appeal the decision.[142]  Before the appeal was denied, and believing that the negative publicity about the case had stalled her career, she voluntarily left the Office and solicited and obtained an appointment to the "18-B" panel, a court-certified panel of private attorneys assigned to represent indigent criminal defendants.[143]

Numerous other court decisions about which discovery was provided involved findings of deliberate, intentional, or flagrant misbehavior.  In one case, the appellate court upheld the defendant's claim that "he was deprived of due process by the prosecutor's knowing use of perjured testimony," and faulted the prosecutor's failure to comport with the district attorney's "responsibility and duty to correct what he knows to be false and elicit the truth."[144]  Another prosecutor, in *People v. Lantigua*,[145] was found to have knowingly withheld crucial *Brady* material which proved the falsity of her summation to the jury.  The appellate court wrote:  "It hardly advances the interest of justice for a prosecutor to use testimony she knows to be false to discredit the evidence given by defense witnesses during her summation."[146]  The appellate court found yet another prosecutor's "decision to accuse the defendant (and squarely implicat[e] his counsel) of fabricating his defense" during summation to be "indefensible."[147]  Other

---

Div. 1990) (declining to reverse for prosecutor's Biblical quotations); People v. Hamilton, 502 N.Y.S.2d 747, 748 (App. Div. 1986) (reversing robbery conviction "because the fundamental fairness of the trial was severely impaired by repetitive improper prosecutorial trial tactics").

138.  Personnel records disclosed in discovery, *supra* note 104.

139. *Id.*

140.  Deposition of Diana Farrell, *supra* note 88, at 844.

141. *Id.* at 303, 318–19, 762, 767, 769.

142. *Id.* at 667.

143. *Id.*

144.  People v. Olmo, 545 N.Y.S.2d 285, 286–87 (App. Div. 1989) (quoting People v. Savvides, 1 N.Y.2d 554, 557 (1956)).

145.  643 N.Y.S.2d 963 (App. Div. 1996).

146. *Id.* at 969.

147.  People v. Negron, 556 N.Y.S.2d 41, 43 (App. Div. 1990).

appellate decisions found flagrant or intentional summation misconduct as well as *Brady* violations requiring reversal.[148]  All of the prosecutors in these cases continued to receive increases in compensation; none, according to the records provided, were disciplined.

Two more depositions of note were conducted.  Mitchell Borger, the Assistant District Attorney who handled the beginning stages of the Ramos prosecution, including the submission of testimony to the grand jury, testified that he was unaware of any disciplinary policy or procedure while he was at the Office or that any prosecutor had ever been disciplined.[149] The Executive Assistant District Attorney under District Attorney Johnson, Eric Warner, who had been Farrell's bureau chief at the time of the Ramos trial and was involved in training at the time of his deposition in 2000, testified to his understanding that *Brady* only applied where the defendant had made a specific request for the material.[150]  He did not recall that there was any *Brady* training at all under District Attorney Merola or that he had received such training himself; he could not find any evidence of *Brady* training materials before 1995 (six years into Johnson's tenure);[151] and he was unaware of any Assistant District Attorney at the Office having ever been disciplined for violating *Brady*.[152]

Ramos's case was concluded before any of this evidence could be presented to a jury.  In 2003, Ramos accepted a settlement of $5 million.[153]

---

148. *See* People v. Banfield, 599 N.Y.S.2d 227 (App. Div. 1993) (reversing conviction where prosecutor promised witness "favorable disposition" of witness's case, but did not disclose that to defendants); People v. Byfield, 194 A.D.2d 331 (N.Y. App. Div. 1993) (companion case to *Banfield*); People v. Mudd, 585 N.Y.S.2d 364, 366 (App. Div. 1992) (finding summation statements "entirely outside the bounds of rhetorical comment"); People v. McReynolds, 572 N.Y.S.2d 8, 8 (App. Div. 1991) (finding that prosecutor "so overstepped the bounds of permissible comment that [the defendant] was denied a fair trial"); People v. Bagarozy, 522 N.Y.S.2d 848, 854–55 (App. Div. 1987) (deciding that inflammatory summation and evidence distracted jury from real issues in the case); People v. Bailey, 503 N.Y.S.2d 16, 18 (App. Div. 1986) (finding that inflammatory summation and vouching was "calculated to produce a wrongful conviction"); People v. Hamilton, 502 N.Y.S.2d 747, 750 (App. Div. 1986) (noting that "central theme" of summation was "wholly improper"); People v. Ortiz, 497 N.Y.S.2d 678, 680 (App. Div. 1986) (reversing conviction based on prosecutor's "obdurate pattern of inflammatory remarks throughout the . . . summation"); People v. Pressley, 462 N.Y.S.2d 864, 866–67 (App. Div. 1983) (reversing conviction for prosecutor's "repeated[ ] attack[s]" on defendant and improper "persistent references" to defendant's refusal to incriminate himself by cooperating with law enforcement); *see also* Rosario *Violation May Be Raised on CPA §440.10 Motion*, N.Y. L.J., Sept. 8, 1989, at 21 (summarizing decision in *People v. Okafor*, noting that court found *Rosario* and *Brady* violations and reversed conviction where prosecutor withheld potentially exculpatory witness statements in a child sex abuse case).

149. Deposition of Mitchell Borger at 184–92, Ramos v. City of New York, No. 21170-93 (N.Y. Sup. Ct. Bronx Co. deposed Mar. 11, 1998) (on file with author).

150. Deposition of Eric Warner at 52, Ramos v. City of New York, No. 21170-93 (N.Y. Sup. Ct. Bronx Co. deposed June 15, 2000) (on file with author). *But see* United States v. Agurs, 427 U.S. 97, 110–11 (1976) (*Brady* material must be turned over to defense even without specific request).

151. Deposition of Eric Warner, *supra* note 150, at 18–20.

152. *Id.* at 82–83.

153. Andrea Elliott, *City Gives $5 Million to Man Wrongly Imprisoned in Child's Rape*, N.Y. Times, Dec. 16, 2003, at B3.

At the time, this was the largest settlement of any wrongful conviction case in New York State.[154]  Defending the conduct of the District Attorney's Office to the *New York Times*, District Attorney Johnson and Chief Assistant Kluger contended that prosecutors were dealt with "on an individual basis," apparently informally, that often a prosecutor cited for misconduct was no longer employed by the Office when the appellate decision criticizing his conduct was handed down, and that "[n]ot one of [the seventy-two cases] involves a finding of deliberate or intentional . . . concealment of evidence. . . .  They were technical rulings or a slip of the tongue."[155]

### 2. The Maldonado *and* Poventud *Cases*

Despite the Ramos settlement and increased public attention to the problem of wrongful convictions, attitudes at the top of the Bronx District Attorney's Office do not appear to have changed.  This is revealed by depositions and document discovery in two additional companion lawsuits in which the author is co-counsel.  The lawsuits arise from a joint criminal prosecution in 1997–98 of two defendants, Robert Maldonado and Marcos Poventud, for the attempted murder and attempted robbery of a livery cab driver.  The cab driver, who was shot in the head and barely survived, was the only witness identifying either defendant at trial and linking them to the crime.  With the defense challenging the cab driver's ability to make accurate identifications, the police suppressed the fact that this eyewitness initially had identified as one of the perpetrators a man who was in prison when the crime occurred (the *Brady* material).  After this information later surfaced, Maldonado, who had spent four years in prison, was acquitted at a retrial, while Poventud succeeded in overturning his conviction after nine years in prison on collateral attack.  Maldonado's civil lawsuit is pending in the State Supreme Court in the Bronx; Poventud's is pending in the United States District Court for the Southern District of New York.[156]

In their separate lawsuits, both Maldonado and Poventud alleged that the police suppressed the *Brady* material from prosecutors as well as the defense, or alternatively that prosecutors learned about the *Brady* material but colluded with the police in suppressing it from the defense.  The latter theory was part of the plaintiffs' *Monell* claim, similar to the claim in the *Ramos* case, contending that the Bronx District Attorney's deliberate indifference to a history of *Brady* and related due process violations committed by his subordinates had been a substantial cause of the

---

154. *Id.*

155. Andrea Elliott & Benjamin Weiser, *When Prosecutors Err, Others Pay the Price*, N.Y. TIMES, Mar. 21, 2004, at 25.

156. *See* Poventud v. City of New York, 07 Civ. 3998 (S.D.N.Y. filed May 22, 2007); Maldonado v. City of New York, No. 17568-2004 (N.Y. Sup. Ct. Bronx Co. filed June 14, 2004).

misconduct that caused the plaintiffs' wrongful convictions.[157]  Discovery in the two cases was consolidated.

During pretrial discovery, the plaintiffs, as in the *Ramos* case, obtained disclosure of prosecutors' personnel and "disciplinary" records in connection with cases where courts had found misconduct.[158]  Plaintiffs' demand was limited to cases that were decided under District Attorney Johnson, from 1989 through 2006.[159]  Not a single document was produced evidencing any disciplinary action against any of the prosecutors.[160]

Depositions were taken of the Office's executive staff, including Odalys Alonso, the Chief Assistant District Attorney, who has responsibility for the overall management of the Office, including hiring, firing, and discipline; the Counsel to the District Attorney since 1989, Anthony Girese, who deals with legal issues and has been the Office's liaison with the Departmental Disciplinary Committee; the Chief of Appeals since 1994, Joseph Ferdenzi; and District Attorney Johnson.

Testifying as a representative witness under Federal Rule of Civil Procedure 30(b)(6) on the issue of discipline at the Office,[161] Alonso acknowledged that neither the Office's standard employment agreement, nor its employee manual, nor any other document, contains any provisions concerning internal disciplining of prosecutors for misconduct in connection with the handling of criminal cases.[162]  The Office has no written policy or procedure setting forth specific rules of behavior, defining infractions of such rules—including whether punishment may be inflicted for negligence, recklessness, or deliberate indifference to defendants' constitutional rights as opposed to willful, deliberate violations—or providing notice of the types of discipline that may be imposed for infractions.[163]  The "system" for discipline is that the District Attorney is told when court decisions or defense motions or appeals alleging improper behavior are received by the Office, and then he determines whether to conduct an investigation or to impose some form of discipline.[164]  There is

---

157.  *See* Amended Complaint, Poventud v. City of New York, 07 Civ. 3998 (S.D.N.Y. filed Oct. 28, 2010) (on file with author); Amended Complaint, Maldonado v. City of New York, No. 17568-2004 (N.Y. Sup. Ct. Bronx Co. filed Nov. 8, 2006) (on file with author).

158.  *See* Plaintiff's First Set of Interrogatories & Request for Document Production, Poventud v. City of New York, No. 07 CV 3998 (S.D.N.Y. filed Oct. 12, 2007) (on file with author); Plaintiff's First Set of Interrogatories and Request for Document Production, Maldonado v. City of New York, No. 17568-2004 (N.Y. Sup. Ct. Bronx Co. filed June 14, 2004) (on file with author).

159.  *See* Plaintiff's First Set of Interrogatories & Request for Document Production, Poventud v. City of New York, *supra* note 158; Plaintiff's First Set of Interrogatories & Request for Document Production, Maldonado v. City of New York, *supra* note 158.

160.  Personnel records disclosed in discovery, Poventud v. City of New York, No. 07 CV 3998 (S.D.N.Y. filed May 22, 2007); Letter from Gerard J. Marino, Assistant Corp. Counsel, City of New York Law Dep't, to Anthony Cecutti, Romano & Kuan, LLC (Nov. 26, 2007) (on file with author).

161.  Deposition of Odalys Alonso at 2, Poventud v. City of New York, 07 Civ. 3998 (S.D.N.Y. deposed Nov. 29, 2010) (on file with author).

162.  *Id.* at 39–42.

163.  *Id.* at 66–70.

164.  *Id.* at 44–45.

no standard for determining when discipline will be imposed, other than the subjective judgment of the District Attorney.

Alonso, who has been a supervisor or a member of the executive staff during Johnson's entire twenty-two-year tenure in office, recalled only a single instance of formal discipline, occurring in January 2002.[165] Girese, in his deposition, could recall no instance.[166] Neither could District Attorney Johnson.[167] In the incident recalled by Alonso, Johnson himself happened to walk into a courtroom where one of his Assistant District Attorneys was delivering a summation and was offended that it contained gratuitously inflammatory content.[168] Alonso testified that Johnson immediately instructed that Assistant District Attorney's supervisor to discipline the Assistant District Attorney, which she purportedly did through an oral admonishment and by withholding any raise or bonus at the prosecutor's next salary review.[169] However, no records were produced evidencing that such sanctions were imposed.[170] On appeal, the Office fully defended the Assistant District Attorney's conduct as appropriate[171] despite the supposed finding by the District Attorney himself that the prosecutor had behaved so inappropriately that he deserved to be sanctioned. This was the single prosecutor during Johnson's twenty-two years in office that anyone could recall was formally "disciplined" for violating a rule of behavior in the prosecution of a criminal case.

Alonso did testify, however, that she was told by her predecessor, Chief Assistant District Attorney Kluger, that under Johnson's policy, whenever the Appellate Division reversed convictions for summation misconduct, he would orally chastise the Assistant District Attorney if he or she was still in the Office.[172] In most of these cases, the Office was at the same time arguing on appeal that there had been no misconduct. Johnson was unaware of any record of Assistant District Attorneys who have been orally chastised, and could not recall any specific instance where it occurred.[173] Johnson said that prior misconduct would be a factor in a subsequent disciplinary decision, but acknowledged that no records are kept of such misconduct or admonitions for it.[174] Records are kept, however, of individual prosecutors' successes in obtaining convictions at trial and by

---

165. *Id.* at 59–60. Odalys Alonso recalled that at some point in the past Assistant District Attorneys in the office were informed that another Assistant District Attorney was disciplined, but she did not recall any details about it, and the prosecutor did not receive any negative evaluation. *Id.* at 64.

166. Deposition of Anthony Girese at 119–20, *Poventud v. City of New York*, 07 Civ. 3998 (S.D.N.Y. deposed Mar. 24, 2011) (on file with author).

167. Deposition of Robert Johnson at 60–66, *Poventud v. City of New York*, 07 Civ. 3998 (S.D.N.Y. filed May 22, 2007) (on file with author).

168. Deposition of Odalys Alonso, *supra* note 161, at 124–25.

169. *Id.* at 131–33.

170. *Id.* at 140, 145–47 (stating that the prosecutor received a merit bonus and raise); *see also* Personnel records disclosed in discovery, *supra* note 160 (on file with author).

171. *Id.* at 154–57.

172. *See* Deposition of Odalys Alonso, *supra* note 161, at 81–82, 289–90.

173. *See* Deposition of Robert Johnson, *supra* note 167, at 64–66.

174. *See id.* at 58–59, 65–67.

guilty plea.[175]  Johnson testified that he has never had to consider any discipline for *Brady* violations because there have been no "intentional" violations, to his knowledge, during his twenty-two-year tenure.[176]  In fact, during the Johnson era, there have been numerous court decisions finding flagrant or intentional *Brady* violations or misconduct during summations.[177]  Moreover, there have been "dozens" more decisions finding improper behavior but declining to reverse under the harmless error doctrine.[178]

Johnson acknowledged that his Office has no policy concerning referrals of prosecutors to the outside Departmental Disciplinary Committee for apparent ethical violations.[179]  He also did not believe that the Office had ever made such a referral during his tenure.[180]  Counsel to the District Attorney Girese testified that it has been his role, since Johnson took office in 1989, to respond to inquiries from the Disciplinary Committee about alleged prosecutorial misconduct in his Office.  He was unaware, however, of any instance in which any prosecutor was sanctioned in relation to the handling of a criminal matter.[181]

---

175.  *See id.* at 71–72.  Johnson denied that he gives this factor any weight in promotions. *Id.*

176.  *See id.* at 43.

177.  *See, e.g.*, People v. Garcia, 848 N.Y.S.2d 137, 140 (App. Div. 2007) (finding prosecutor committed "flagrant violation" when he withheld material impeachment evidence, and criticizing the People's defense of this conduct as "disingenuous" and "disquieting"); People v. Mickel, 710 N.Y.S.2d 70, 71 (App. Div. 2000) (reversing conviction where prosecutor failed to disclose "significant" *Brady* material); People v. Olivero, 710 N.Y.S.2d 29, 31 (App. Div. 2000) (finding prosecutor's comments in summation "manifestly unfair"); People v. Lantigua, 643 N.Y.S.2d 963, 969 (App. Div. 1996) (finding that prosecutor intentionally withheld *Brady* material and made knowingly false argument in summation); People v. Williams, 622 N.Y.S.2d 275, 275 (App. Div. 1995) ("The basis for the reversal of this case lies in the prosecutor's repeated disregard of the rulings of the trial court . . . in asking improper questions of witnesses so that the constitutional right of the defendant to a fair trial was violated."); People v. Banfield, 599 N.Y.S.2d 227, 227 (App. Div. 1993) (reversing conviction where prosecutor promised witness "favorable disposition" of witness's case, but did not disclose that to defendants); People v. Byfield, 194 A.D.2d 331, 332 (N.Y. App. Div. 1993) (companion case to *Banfield*); People v. Hernandez, 585 N.Y.S.2d 436, 436 (App. Div. 1992) (affirming conviction, but stating that it "deplore[d] [prosecutor's] excesses [in summation] in the strongest possible terms and ask[ed] that prosecutors be trained and admonished to refrain from such unnecessary conduct"); People v. Butler, 585 N.Y.S.2d 751, 753 (App. Div. 1992) (prosecutor's "overzealous[ ]" conduct and "numerous unwarranted remarks" during cross-examination and summation "deprived defendant of a fair trial"); People v. Mudd, 585 N.Y.S.2d 364, 366 (App. Div. 1992) (finding summation comments "directly contradictory to the evidence, prejudicial and entirely outside the bounds of acceptable rhetorical comment"); People v. McReynolds, 572 N.Y.S.2d 8, 8 (App. Div. 1991) (noting that prosecutor "impugn[ed] the defense counsel's integrity"); People v. Negron, 556 N.Y.S.2d 41, 43 (App. Div. 1990) (finding summation comments "particularly offensive" and conduct "grossly improper").

178.  Deposition of Anthony Girese, *supra* note 166, at 129.

179.  *See* Deposition of Robert Johnson, *supra* note 167, at 72–73.

180.  *Id.*

181.  Deposition of Anthony Girese, *supra* note 166, at 165–66.

### B. The Queens District Attorney's Office:  The Su Case

#### 1.  Criminal Proceedings

Shih Wei Su was eighteen years old when he was convicted of attempted murder at trial in Queens in 1992.  The underlying incident involved the shooting of two victims at a pool hall in what the prosecution contended was a youth gang-related incident.[182]  The principal prosecution witness was Jeffrey Tom, a member of the Green Dragons,[183] which was a rival of the gang with which Su was allegedly affiliated, the White Tigers.[184]  Neither Tom nor the two victims who were with him at the time of the shooting implicated Su in their initial statements to police,[185] but they all changed their story at about the same time and implicated him in one way or another.[186]  Tom was the most damaging witness, claiming that he knew Su and heard him give an order to shoot.[187]  Although Tom had his own robbery-by-extortion case, he denied, under questioning by the prosecutor, that the lenient plea bargain he had received (a youthful offender adjudication and sentence of probation) had resulted from any deal with the District Attorney's Office.[188]  The prosecution in her summation argued that Tom's testimony was truthful.[189]  Su was convicted and received the maximum sentence of sixteen and two-thirds to fifty years in prison.[190]

Su repeatedly challenged his conviction, both on direct appeal and collateral attack,[191] claiming that Tom must have received some sort of promise or benefit in exchange for his testimony.[192]  However, the District Attorney argued successfully that either Su or his attorneys were remiss for not making Tom's sealed plea and sentencing minutes part of the record.[193]  In 1999, over the District Attorney's objection, a judge finally ordered Tom's plea and sentencing minutes unsealed, reasoning that the District Attorney "has no legitimate interest in shielding possible perjury."[194]  The minutes proved that a prosecutor had made an explicit, on-the-record deal with Tom to grant him leniency in exchange for his trial testimony against Su.[195]  Tom's flat denials, elicited by a different prosecutor at Su's trial,

---

182.  Su v. Filion, 335 F.3d 119, 122 (2d Cir. 2003).

183.  *See id.* at 121–22.

184.  *See id.* at 122.

185.  *See* Complaint at 4, Su v. City of New York, No. 06 Civ. 687 (E.D.N.Y. filed Feb. 16, 2006) (on file with author).

186.  *Id.*

187.  *Su*, 335 F.3d at 122.

188.  *Id.* at 123–24.

189.  *Id.* at 124–25.

190.  Complaint, *supra* note 185, at 8.

191.  People v. Su, 624 N.Y.S.2d 904 (App. Div. 1995), *leave to appeal denied*, 85 N.Y.2d 980 (1995); People v. Su, 699 N.Y.S.2d 291 (App. Div. 1999), *leave to appeal denied*, 94 N.Y.2d 925 (2000); People v. Su, 721 N.Y.S.2d 841 (App. Div. 2001).

192.  Complaint, *supra* note 185, at 8 (reciting grounds for Su's post-trial motions).

193.  *Id.* at 8–9 (describing People's opposition).

194.  Motion:  Unsealing at 2, People v. Su, No. 658-91 (N.Y. Sup. Ct. Queens Co. dated Jan. 21, 1999) (on file with author).

195.  Su v. Filion, 335 F.3d 119, 123 (2d Cir. 2003).

had been false.[196]  But the New York courts still would not grant Su any relief, accepting the District Attorney's additional procedural argument that Su's *Brady* violation claim should not be considered on the merits.[197]

Finally, on July 11, 2003, the Second Circuit granted Su's federal habeas corpus petition and directed that he be retried within sixty days or released.[198]  The court excoriated the prosecutor for "knowingly elicit[ing] false testimony"[199] from a witness whose credibility was "central to the deliberations of any reasonable jury,"[200] for failing to correct such false testimony, and for "bolster[ing]" Tom's lies during her closing argument.[201]  In vacating the conviction, it reasoned that a conviction obtained through "testimony the prosecutor knows to be false is repugnant to the Constitution."[202]  As the Bronx District Attorney's Office had done in the *Poventud* case, the Queens District Attorney tried to get Su to accept a "time-served" plea bargain, but Su refused.  After postponing the trial on several occasions, District Attorney Richard Brown's Office, on November 5, 2003, moved to dismiss all charges.[203]

### 2. The Attorney Grievance Process

On September 12, 2003, even while he was facing the prospect of retrial, Su filed a formal pro se complaint against the prosecutor with the Grievance Committee of the New York State Appellate Division, Second Judicial Department.[204]  He asked for an investigation and sanction of the prosecutor for knowingly eliciting and failing to correct false testimony, and attached a copy of the Second Circuit's decision.[205]  Su later submitted a supplemental letter, informing the Committee that his case had been dismissed for insufficient evidence, and that the prosecutor had been responsible for his wrongful imprisonment from ages seventeen through thirty.[206]  He said he could not afford an attorney and that "while [the prosecutor] certainly will have her powerful attorneys and friends on her

---

196. *See id.* at 121.

197. *See id.*

198. *See id.* at 130.

199. *Id.* at 128.

200. *Id.* at 129.

201. *Id.* at 127.

202. *Id.* at 126.

203. *See* Proceedings at 2, People v. Su, No. 0658-91 (N.Y. Sup Ct. Queens Co. dated Nov. 5, 2003) (on file with author).

204. Letter from Shih Wei Su to Second Dep't Grievance Comm. (Sept. 12, 2003) (on file with author).

205. *Id.*

206. Letter from Shih Wei Su to Melissa D. Broder, Assistant Counsel, N.Y. State Grievance Comm. for the Second & Eleventh Judicial Dists. (Nov. 6, 2003) (on file with author); *see also* Jim Dwyer, *Prosecutor Misconduct, at a Cost of $3.5 Million*, N.Y. TIMES, Oct. 22, 2008, at A27 (reporting on Su's correspondence with the Grievance Committee).

side, I firmly believe . . . this committee will not allow [the prosecutor] to manipulate the justice [sic] again."[207]  Su was wrong.

On December 12, 2003, the prosecutor submitted a remarkable letter prepared by her attorney, but which she endorsed with her signature.[208]  It pleaded with the Committee for sympathy, pointing out that she was married and had two young children.  The Su case "was considered old and probably in a position to be dismissed for failure to prosecute . . . [and] was thought to be a loser and was dumped in her lap," the letter contended.[209]  "[P]erhaps without being adept as a result of her inexperience," the letter asserted, the prosecutor had inadvertently elicited false answers from her witness and had not known how to correct them.[210]  While acknowledging that the prosecutor's conduct had been "naive, inexperienced and, possibly, stupid," the letter shifted blame to the District Attorney's Office for not ensuring that she knew about the deal made by another prosecutor with her witness, contending, "[P]rosecutorial misconduct need not be the doing of the last assigned assistant, though he/she unwittingly kept it in motion and caused it to occur."[211]

Su refuted the prosecutor's arguments by letter dated January 22, 2004.[212]  He contended that she had not just been a passive, hapless victim of a rogue witness, but had refused to correct Tom's testimony when Su's trial counsel had complained that it could not be true, and that she then "*capitalized*" on the false testimony in her summation by "vouch[ing] for Tom's truthfulness, honesty, and lack of evasiveness."[213]  Su pointed out that the Second Circuit's decision had found her misconduct to have been deliberate.  Further, Su contended, the prosecutor could not blame her knowing elicitation of and failure to correct false testimony on inexperience when basic attorney disciplinary rules prohibit deceitful behavior and reliance on false or misleading evidence, and prosecutors are required by such rules to make timely disclosure of exculpatory evidence.  "The Grievance Committee and the Appellate Division regularly sanction attorneys for mere negligence in handling client funds and other client matters," Su wrote.[214]  Observing that the prosecutor had "cost me 13 years of my life," Su continued, "[e]ven intentional misconduct in such matters

---

207. Letter from Shih Wei Su to Melissa D. Broder, Assistant Counsel, N.Y. State Grievance Comm. for the Second & Eleventh Judicial Dists. (Nov. 6, 2003) (on file with author).

208. Letter from Jerome Karp to Melissa D. Broder, Assistant Counsel, N.Y. State Grievance Comm. for the Second & Eleventh Judicial Dists. (Dec. 12, 2003) (on file with author); Dwyer, *supra* note 206, at A27.  This letter was quoted in Mr. Dwyer's article, was the subject of questioning during the prosecutor's deposition in Su's civil rights case, and was introduced as an exhibit.

209. Letter from Jerome Karp to Melissa D. Broder, *supra* note 208.

210. *Id.*

211. *Id.*

212. Letter from Shih Wei Su to Melissa D. Broder, Assistant Counsel, N.Y. State Grievance Comm. for the Second & Eleventh Judicial Dists. (Jan. 22, 2004) (on file with author).

213. *Id.*

214. *Id.*

pales in importance compared to the damage done by a public prosecutor who knowingly withholds exculpatory evidence or misleads the court or the defense."[215] He asked for permission to participate in the proceedings regarding the prosecutor.

Su did not hear at all from the Committee, until he received a seven-line letter from Chief Counsel Diana Maxfield Kearse over a year later. It informed Su that, on December 14, 2004, "all the facts pertaining to your complaint were presented to the Grievance Committee," and it had taken "appropriate action": "the attorney has been issued an *Admonition* and a permanent record has been made."[216] An "admonition" is the lightest sanction that may be imposed in New York, and does not result in any public record.[217]

On February 28, Su wrote Ms. Kearse, asking what "investigation," if any, had been conducted.[218] "Was [the prosecutor]'s unbelievable defense that she was unaware of her obligation to correct testimony she knew to be false challenged in any way? . . . What was the Committee's reasoning in concluding that knowing misconduct by an *experienced* prosecutor (*four years* in the Office!) resulting in a wrongful conviction and 13 years imprisonment merited only an Admonition?"[219] Su requested the opportunity to present his case to the full Committee.[220]

Assistant Counsel Melissa D. Broder responded on March 22, 2005. There is no procedure to appeal a sanction, she wrote. Su was "free to consult with counsel regarding any civil remedies which may be available to you regarding the above-named attorney."[221] Su still did not give up. On March 30, he again wrote Chief Counsel Kearse:

> Even jaywalking can get prison time. So can stealing a loaf of bread. How is it possible that an experienced prosecutor who knowingly broke every bar association code, every Constitutional law, and more only gets an admonition?
>
> I am not a lawyer . . . but I guarantee you that any person, no matter how "naive, inexperience[d], or possibly stupid," will know that false evidence is not allowed in the court.

---

215. *Id.*

216. Letter from Diana Maxfield Kearse, Chief Counsel, N.Y. State Grievance Comm. for the Second & Eleventh Judicial Dists., to Shih Wei Su (Feb. 3, 2005) (on file with author).

217. *See* Appellate Div. Second Judicial Dep't, *Attorney Matters: How to Make a Complaint About a Lawyer*, http://www.courts.state.ny.us/courts/ad2/attorneymatters_ComplaintAboutaLawyer.shtml (last visited Oct. 20, 2011), ("An Admonition is issued in those cases in which the committee finds that the lawyer committed clear professional misconduct that was not sufficiently serious to warrant the commencement of a formal disciplinary proceeding.").

218. Letter from Shih Wei Su to Diana Maxfield Kearse, Chief Counsel, N.Y. State Grievance Comm. for the Second & Eleventh Judicial Dists. (Feb. 28, 2005) (on file with author).

219. *Id.*

220. *Id.*

221. Letter from Melissa D. Broder, Assistant Counsel, N.Y. State Grievance Comm. for the Second & Eleventh Judicial Dists., to Shih Wei Su (Mar. 22, 2005) (on file with author).

> With all due respect, the message that this committee is sending out is loud and clear:  Don't worry about using false evidence; you will only get an admonition if you are stupid enough to admit it.[222]

On April 26, 2005, Broder curtly reminded Su that "this matter is closed" and that he could consult with counsel regarding "civil remedies . . . . This should conclude our correspondences regarding this matter."[223]

### 3.  The Civil Lawsuit

On February 16, 2006, Su took up the Grievance Committee's suggestion.  He filed suit against the City of New York in the United States District Court for the Eastern District of New York, seeking monetary damages pursuant to § 1983 for his wrongful conviction.[224]  His lawsuit, modeled after the *Ramos* and *Walker* cases, contended that the prosecutor's misconduct had resulted from the deliberate indifference of the Queens District Attorney to his obligation to properly train, supervise, and discipline his staff regarding their *Brady* and related due process obligations.[225]  Su attached to his complaint an exhibit listing twenty-eight cases, decided between 1985 and 2004, involving wrongful withholding of evidence by Queens prosecutors, and fifty-nine cases in which such prosecutors during the same time frame relied on false, misleading, or inflammatory evidence or argument.[226]

During discovery proceedings, the court directed the City to provide personnel and disciplinary records (if any) for prosecutors involved in seventy-three appellate reversals for such misconduct, during the thirteen-year period from 1985 through 1998, including twenty-five cases involving the withholding of material evidence.  When disclosed, the records did not reveal a single instance through 2000 in which any prosecutor had been disciplined by way of dismissal, suspension, demotion, transfer, reduction in or withholding of compensation, negative written evaluation, or referral to the court's Grievance Committee, for any of the seventy-three cases.[227]  Discovery materials showed that, as in the Bronx, the Queens District Attorney's Office had (and has) no published or formal code of conduct for prosecutors, or any formal disciplinary policies or procedures.  The informal "procedure" was for the Chief of Appeals, whenever a motion or brief was received that caused him to be "concerned" about possible misconduct, to bring the matter to the attention of the Chief Assistant

---

222. Letter from Shih Wei Su to Diana Maxfield Kearse, Chief Counsel, NYS Grievance Comm. for the Second & Eleventh Judicial Dists. (Mar. 30, 2005) (on file with author).

223. Letter from Melissa D. Broder, Assistant Counsel, NYS Grievance Comm. for the Second & Eleventh Judicial Dists., to Shih Wei Su (Apr. 26, 2005) (on file with author).

224. Complaint, *supra* note 185, at 1.

225. *See id.* at 12–15.

226. *See id.* at Ex. B.

227. Personnel records disclosed in discovery, Su v. City of New York, 06 Civ. 687 (E.D.N.Y. filed Feb. 16, 2006) (on filed with author).  As with the Bronx District Attorney's Office, names of the line prosecutors apparently involved in misconduct have been omitted, as they are unnecessary for the purposes of this Article.

District Attorney or District Attorney Richard Brown.[228]   Trial bureau supervisors might also report concerns up the chain of command.[229]   Also, the District Attorney would receive copies of appellate decisions.[230]   If the District Attorney concluded that a verbal reprimand was in order, he would handwrite a note to the Chief Assistant District Attorney, John Ryan, to "speak to" the Assistant District Attorney involved.[231]   However, only three such notes were produced,[232] neither Castellano nor Testagrossa knew of any Assistant District Attorney who actually had been "spoken to,"[233] and there was no such evidence in any prosecutor's personnel file[234]—with one exception.

Assistant District Attorney Claude Stuart was caught apparently lying to a state court judge about whether an exculpatory witness was available to come to court to testify, and his alleged misconduct was reported in the news media.[235]   The Disciplinary Committee ultimately suspended him from practice and he was fired by the District Attorney's Office.[236]   This fiasco might never have occurred had the Office disciplined Stuart when he previously was exposed for alleged misconduct.   In 1995, Stuart had obtained a conviction in *People v. Walters*[237] by arguing in summation that the defendant had committed a shooting with a gun recovered from him which Stuart *knew* had not been used in the crime.[238]   The appellate court reversed the conviction, finding Stuart's conduct "an abrogation of his responsibility as a prosecutor," "egregious," and "improper."[239]   The District Attorney's Chief of Appeals, John Castellano, testified in his deposition that he told the Chief Assistant District Attorney, John Ryan, that Stuart's conduct had been "not tolerable" and "inexcusable."[240]   However, Castellano was unaware if Stuart had been disciplined for that misconduct, and there was no discovery suggesting that he had been.[241]

The deposition of Su's prosecutor provided an interesting insight into the Office's attitude regarding *Brady* compliance.   While she acknowledged that her failure to disclose the truth about Jeffrey Tom's relationship with the Office had been inexcusable, she revealed that it had been consistent with her *training* to erect a "Chinese wall" in order to avoid obtaining

---

228.   Deposition of John Castellano at 22–23, Su v. City of New York, 06 Civ. 687 (E.D.N.Y. deposed May 29, 2008) (on file with author).

229.   Deposition of Charles Testagrossa at 19, Su v. City of New York, 06 Civ. 687 (E.D.N.Y. deposed June 11, 2008) (on file with author).

230.   *Id.* at 27.

231.   Deposition of John Castellano, *supra* note 228, at 257–58.

232.   Personnel records disclosed in discovery, *supra* note 227.

233.   *See* Deposition of Charles Testagrossa, *supra* note 229, at 19; Deposition of John Castellano, *supra* note 228, at 257–58.

234.   Personnel records disclosed in discovery, *supra* note 227.

235.   Stacy Albin, *Queens:  Murder Conviction Questioned*, N.Y. Times, Nov. 14, 2002, at B12.

236.   *In re* Stuart, 803 N.Y.S.2d 577 (App. Div. 2005).

237.   674 N.Y.S.2d 114 (App. Div. 1998).

238.   *See id.* at 116.

239.   *Id.*

240.   Deposition of John Castellano, *supra* note 228, at 263.

241.   *Id.* at 263–64; *see also* Personnel records disclosed in discovery, *supra* note 227.

knowledge of deals other prosecutors in the Office had made with cooperating witnesses.[242]   This policy was inconsistent with Ethical Consideration 7-13 of the New York State Code of Professional Responsibility, which prohibited prosecutors from consciously avoiding knowledge they are required to disclose to their adversaries.[243]

The Chinese wall policy was exposed and condemned in *People v. Steadman*,[244] even before Su's case was tried.  In *Steadman*, the New York Court of Appeals blasted the Queens District Attorney's unlawful policy, promulgated at an executive level, to erect just such a Chinese wall between trial prosecutors utilizing a cooperating witness and the prosecutor making a deal with the witness.[245]   The Office's Chief of Trials, Daniel McCarthy, had made the deal with a witness's *attorney*, knowing that the witness would later invoke attorney-client privilege to shield himself from cross-examination when he falsely denied knowledge of promised benefits.[246] The trial prosecutors had kept themselves ignorant of the discussions, and had done nothing to correct the witness's false or misleading denial of knowledge of any promises.[247]   After the witness's attorney, as an act of conscience, had disclosed the scheme to the defense and it had been denounced in a scathing opinion by the trial judge (issued before Su's trial),[248] the Office defended it on appeal as lawful, and promoted one of the two line prosecutors to a supervisory position.[249]   This prosecutor was not even chastised for his behavior in the case.[250]   Meanwhile, Chief of Trials McCarthy was hired by Bronx District Attorney Johnson to become his Director of Trial Training.[251]   In his deposition, Johnson denied having ever been aware of *Steadman*, before or after hiring McCarthy,[252] even though McCarthy's misconduct had been denounced in written opinions by the trial judge, the Appellate Division, and the Court of Appeals.   The Queens District Attorney conducted no internal investigation.[253]

---

242. Deposition of Su's Prosecutor at 39–41, Su v. City of New York, 06 Civ. 687 (E.D.N.Y. deposed June 19, 2008) (on file with author).

243*. See* New York Lawyer's Code of Professional Responsibility EC 7-13, *available at* http://www.nysba.org/Content/NavigationMenu/ForAttorneys/ProfessionalStandardsforAttorneys/LawyersCodeDec2807.pdf ("[A] prosecutor should not intentionally avoid pursuit of evidence merely because he or she believes it will damage the prosecutor's case or aid the accused.").  Though this ethics code has been superseded, it was the relevant language at the time of Su's prosecution.

244. 82 N.Y.2d 1 (1993).

245. *See id.* at 7–8.

246. *See id.*

247. *Id.*

248. Opinion and Order at 6–7, People v. Steadman, No. 3331-88 (N.Y. Sup. Ct. Queens Co. dated Apr. 20, 1990) (on file with author).

249. *See* Deposition of Jack Warsawsky at 12, Su v. City of New York, 06 Civ. 687 (E.D.N.Y. deposed July 15, 2008) (on file with author) (testifying as to the promotion).

250. *See id.* at 135–36.

251. Deposition of Daniel McCarthy at 9, Su v. City of New York, 06 Civ. 687 (E.D.N.Y. deposed Aug. 11, 2008) (on file with author).

252. Deposition of Robert Johnson, *supra* note 167, at 76–78.

253. Deposition of John Castellano, *supra* note 228, at 204.

Su's prosecutor's behavior in failing to disclose the truth about the Jeffrey Tom deal should have been known internally for years, but the Office was indifferent to it. Prosecutors assigned to oppose Su's direct appeal and collateral attacks on his conviction acknowledged that they had an ongoing *Brady* obligation to investigate whether Su's *Brady* allegations were correct, but they never did so. When one such Assistant District Attorney attempted to question Su's trial prosecutor, the latter refused to cooperate, and no one in the Appeals Bureau brought this remarkable and intolerable stonewalling to the attention of executives in the Office.[254] After Su filed his federal habeas petition, Chief of Appeals Castellano questioned Su's prosecutor, who claimed not to recall why she had not corrected Tom's false testimony, and Castellano conducted no further investigation into her behavior before preparing opposition papers.[255] In 2003, shortly after she had left the Office, Su's prosecutor learned from a news report that the Second Circuit had vacated Su's conviction, and telephoned John Ryan, the District Attorney's long-time Chief Assistant, to complain. Ryan responded: "[Y]ou are just going to have a bad day, that's all."[256] Another high-level prosecutor in the Office told her, "Don't worry, you're a good attorney. Everything will work out."[257]

In another case resulting in federal habeas relief and strong condemnation of the prosecutor's conduct, there was no internal discipline but instead the prosecutor was *promoted*. In *Jenkins v. Artuz*,[258] a federal judge, granting habeas relief, found that the prosecutor had "engaged in a pattern of misconduct that was designed to conceal the existence of [a witness's] cooperation agreement during [Jenkins's] trial,"[259] and that this misconduct was "improper and, when considered cumulatively, severe."[260] Refusing to admit error, the District Attorney's Office appealed. The Second Circuit affirmed the District Court's issuance of the writ, holding that the prosecutor "misled the jury," both in her questioning of the cooperating witness and during her summation,[261] and that "no doubt . . . [this] behavior violated Jenkins's due process rights."[262] Deposition testimony and other discovery revealed that the Queens District Attorney did not even informally admonish the prosecutor.[263] She received a promotion not long after Jenkins was convicted and currently is a Deputy Chief in one of the Queens District Attorney's Office's trial bureaus.[264] Numerous additional

---

254. Deposition of Ranjana Piplani at 24–26, Su v. City of New York, 06 Civ. 687 (E.D.N.Y. deposed May 22, 2008) (on file with author).
255. Deposition of John Castellano, *supra* note 228, at 73–77, 87.
256. Deposition of Su's Prosecutor, *supra* note 242, at 19.
257. *Id.* at 18.
258. 294 F.3d 284 (2d Cir. 2002).
259. *Id.* at 290 (quoting Jenkins v. Artuz, No. 98-CV-277, slip op. at 27 (S.D.N.Y. May 16, 2001)).
260. *Id.*
261. *Id.* at 294.
262. *Id.*
263. *See* Deposition of Therese Lendino at 11, Su v. City of New York, No. 06 Civ. 687 (E.D.N.Y. deposed Aug. 6, 2008) (on file with author).
264. *See id.*

decisions used strong language in condemning what the courts sometimes concluded was intentional misconduct,[265] but records reflected no internal sanctions.

While no records were kept of complaints, findings of misconduct, or alleged reprimands, the contrary was true when it came to success in obtaining convictions.  Charles Testagrossa, Executive Assistant District Attorney in charge of the Major Crimes Division in 2008 and an executive at the office for nearly twenty years, testified at his deposition that Assistant District Attorneys and their supervisors, under previous and the present District Attorneys, kept track of their trial win-loss records.[266]  He said he perceived that their victory percentage affected their promotions and compensation.[267]

As discovery in the Su case neared completion, the City strenuously opposed the plaintiff's efforts to depose the District Attorney, Richard Brown, and his chief assistant, John Ryan, concerning their *Brady* disclosure and disciplinary policies.  After the court directed Ryan to submit to a deposition and held open the possibility that Brown could be deposed as well, the parties reached a $3.5 million settlement.

### C. Brooklyn District Attorney's Office:  The Zahrey Case

### 1. Criminal Proceedings

Zaher Zahrey was an undercover narcotics detective for the New York City Police Department's Brooklyn North narcotics division with an excellent performance record when he fell under investigation by the NYPD's Internal Affairs Bureau (IAB) in 1994.[268]   IAB had been reconstituted to more vigorously combat police corruption after highly-

---

265. *See, e.g.*, People v. Ni, 742 N.Y.S.2d 61, 62 (App. Div. 2002) ("[I]nstances of prosecutorial misconduct were flagrant."); People v. Mackey, 670 N.Y.S.2d 879, 880 (App. Div. 1998) ("[P]rosecutor deliberately withheld information which was likely to be elicited on cross-examination."); People v. Elder, 615 N.Y.S.2d 915, 916 (App. Div. 1998) (finding that prosecutor's improper summation comments were "flagrant"); People v. Scott, 629 N.Y.S.2d 267, 268 (App. Div. 1995) (finding "flagrant" and "pervasive" prosecutorial misconduct); People v. Robinson, 594 N.Y.S.2d 801, 802–03 (App. Div. 1993) (noting that prosecutor's improper trial tactics and summation comments were "continued" and "persistent"); People v. Gomez, 548 N.Y.S.2d 568, 570 (App. Div. 1989) (reversing conviction for prosecutor's "frequen[t]" and "outrageous" "misconduct" during trial); People v. Perez, 511 N.Y.S.2d 687, 690 (App. Div. 1987) (finding that prosecutor made a "deliberate attempt to mislead the jury").  In other cases, the appellate courts criticized prosecutors' conduct as reckless or negligent. *See, e.g.*, People v. Banch, 80 N.Y.2d 610, 621 (1992) (criticizing "the People's seeming lack of care in discharging their discovery obligation").

266. *See* Deposition of Charles Testagrossa, *supra* note 229, at 44–45.

267. *See id.* at 46.

268. Fifth Amended Complaint at 11, 14, Zahrey v. City of New York, No. 98 Civ. 4546 (S.D.N.Y. filed Feb. 23, 2004) (on file with author). *See generally* Zahrey v. Coffey, 221 F.3d 342 (2d Cir. 2000).

publicized hearings had exposed the department's lethargy in that regard.[269] Zahrey was suspected because he had continued playing playground "pick-up" basketball games with several individuals whom the police believed had been involved in criminal activity, including a local basketball legend and childhood friend, William Rivera.[270]   When Rivera was murdered, Zahrey came forward to try to assist Rivera's family in finding out the status of the homicide investigation, only to walk into a hornet's nest of IAB detectives who were on the case because the murder weapon had been an off-duty police officer's gun.[271]

An intensive, two-year investigation yielded just one witness—a crack-addicted career criminal named Sidney Quick—who claimed knowledge that Zahrey had committed crimes.[272]   At the direction of the Brooklyn District Attorney's Office, IAB Detective-Sergeant Robert Boyce repeatedly interviewed Quick, obtaining bizarrely inconsistent accusations that Zahrey had provided Rivera's alleged hold-up crew with confidential Police Department information on drug spots that could be robbed.[273] When these interviews led nowhere, Boyce later traveled to Sing-Sing State Prison, where Quick was by then serving a six-to-life sentence for robbery.[274]   Remarkably, Boyce tape-recorded the entire, two-hour interview in which he promised Quick "a very sweet deal" in exchange for his cooperation against Zahrey, and suggested a story to Quick, which was demonstrably false, implicating Zahrey in the attempted robbery and murder of a drug dealer.[275]   Brooklyn prosecutors who heard the tape tried for nearly two years to develop corroboration for Quick's accusations, a necessary prerequisite for prosecution under New York State law, but when they were unable to do so, they convinced federal authorities (who were not legally required to obtain corroboration) to take over the case and to prosecute—without initially disclosing the Quick tape and other exculpatory and impeaching information.[276]   Zahrey was held for nearly nine months without bail, pending the conclusion of federal trial proceedings.[277]   After a six-week trial, at which the author represented him, he was fully acquitted in June 1997.[278]

### 2. Civil Proceedings

In 1998, Zahrey brought a lawsuit against various individual prosecutors and detectives for investigative misconduct, and against the City of New

269.  Craig Horowitz, *A Cop's Tale*, N.Y. MAG., July 16, 2001, at 32 (explaining that the Internal Affairs bureau was "beefed-up" shortly before the *Zahrey* prosecution "in the wake of the Mollen Commission report").
270.  Fifth Amended Complaint, *supra* note 268, at 11–13.
271.  *See id.* at 12.
272.  *See id.* at 14–16.
273.  *See id.*
274.  *See id.* at 16.
275.  *See id.* at 18–24.
276.  *See id.* at 37–39.
277.  *See id.* at 47, 50–51.
278.  *See id.* at 52.

York.[279]  One of his claims was that the indifference of Brooklyn District Attorney Charles J. Hynes to violations of the Office's *Brady* and related due process obligations had caused the Office's line prosecutors investigating the matter to withhold exculpatory information from the United States Attorney's Office, while simultaneously urging that Office to initiate Zahrey's prosecution.[280]   The *Brady* claim was ultimately dismissed,[281] but before settling,[282] Zahrey succeeded in obtaining considerable discovery showing that the Brooklyn District Attorney's Office, like its counterparts in Queens and the Bronx, has no formal disciplinary rules and procedures, and no history of disciplining prosecutors found to have engaged in misconduct, including the withholding of *Brady* material.

In a deposition held on October 18, 2005, Dino G. Amoroso, former Counsel to the District Attorney, and then Executive Assistant District Attorney, testified that he was responsible for implementing Hynes' policies to ensure compliance with ethical standards and was knowledgeable about any specific investigations of prosecutors for alleged misconduct since Hynes' tenure began in 1990.[283]   The Office had no employee manual or other published rules or procedures concerning standards of behavior, potential sanctions for violating them, or procedures for investigating and imposing discipline, including with regard to *Brady* obligations.[284]   The Office would distribute memoranda on discovery and *Brady* obligations, but had no follow-up procedure to make sure individual prosecutors read them, and no *Brady* "policy."[285]   Prosecutors were told informally that "conscious" ethical violations, including under *Brady*, would have the "highest consequence," including dismissal from the Office—as opposed to inadvertent mistakes during the "hurly-burly of trials."[286]   Consistent with that approach, while it was conceivable that a

---

279.  Zahrey v. City of New York, No. 98 Civ. 4546 (S.D.N.Y. filed June 26, 1998).

280.  Fifth Amended Complaint, *supra* note 268, at 65–66.

281.  Zahrey v. City of New York, No. 98 Civ. 4546, 2009 WL 54495, at *26 (S.D.N.Y. Jan. 7, 2009) (reasoning that Zahrey had not been prejudiced by any *Brady* violations since he was acquitted at trial, but holding that Brooklyn prosecutors were subject to personal liability for their involvement in manufacturing and using evidence they knew had been manufactured to cause federal criminal proceedings to be initiated and continued against Zahrey).

282.  Zahrey settled in 2009 with the City and five individual defendants, including two supervisory prosecutors.  These two prosecutors, Charles Guria, the Chief of the Brooklyn District Attorney's Civil Rights Bureau, and Theresa Corrigan, now the Chief of the Gang Unit of the Nassau County District Attorney's office and formerly a supervisor in Brooklyn, agreed to a judgment without admitting liability, pursuant to Federal Rule of Civil Procedure 68, under which they were jointly and severally liable for $750,001 plus reasonable attorneys' fees for their alleged investigative misconduct.  The judgment was paid by New York City.

283.  Deposition of Dino G. Amoroso at 16–17, Zahrey v. City of New York, 98 Civ. 4546 (S.D.N.Y. deposed Oct. 18, 2005) (on file with author).

284.  *Id.* at 91–92.

285.  Deposition of Dennis Hawkins at 10–11, Zahrey v. City of New York, 98 Civ. 4546 (S.D.N.Y. deposed Mar. 13, 2000) (on file with author).

286.  Deposition of Dino G. Amoroso, *supra* note 283, at 90, 181–82.

prosecutor might deserve sanction for merely violating *Brady* "negligently," ordinarily only intentional misconduct would be punished.[287]

Amoroso testified that when a complaint or court decision was received identifying a possible ethical issue, it would be brought to the attention of the District Attorney, who would decide whether an investigation should be conducted or whether any other action was necessary.[288] Amoroso was fully informed about all such investigations that were conducted from 1990 to 2005. While he initially claimed that several disciplinary inquiries were conducted, he then acknowledged that none of them were for the purpose of determining whether a prosecutor had engaged in ethical lapses during the handling of criminal prosecutions. Rather, the investigations either were into personal misconduct by Assistant District Attorneys having nothing to do with their handling of individual cases, or concerned whether to retry defendants whose convictions had been reversed or vacated.[289] He did not know of a single instance in which any prosecutor had been so much as admonished for misconduct related to his or her handling of a criminal investigation or prosecution.[290]

During this fifteen-year period, however, there were numerous court decisions finding serious misbehavior by Brooklyn prosecutors, including in the *Brady* context. These cases included instances where Assistant District Attorneys withheld exculpatory witness statements or impeachment material, or made false and/or misleading presentations of the evidence at trial.[291] Numerous additional instances of misconduct through the present day were identified in the complaint in *Collins v. City of New York*, a lawsuit the author recently filed based upon findings by a federal judge of pervasive *Brady* violations, witness coercion, and other misconduct by the Chief of District Attorney Hynes' Rackets Division, Michael F. Vecchione.[292] In the highly publicized Jabbar Collins murder case,

287. *Id.* at 102–05.
288. *Id.* at 92–94.
289. *Id.* at 96–102, 105, 107, 110, 126–28, 133, 145–48.
290. *Id.* at 101–02, 105, 107, 128, 146–48.
291. *See, e.g.*, Leka v. Portuondo, 257 F.3d 89, 106 (2d Cir. 2001) (prosecutor suppressed evidence that would have had a "seismic impact" on the case); People v. Calabria, 94 N.Y.2d 519 (2000) (prosecutor repeatedly defied court's ruling and made false or misleading argument to the jury); People v. Cotton, 662 N.Y.S.2d 135, 136 (App. Div. 2000) (prosecutor's summation betrayed his "duty not only to seek convictions but also to see that justice is done" and his "duty of fair dealing to the accused and candor to the courts") (citation omitted) (internal quotation marks omitted); People v. LaSalle, 663 N.Y.S.2d 79, 80 (App. Div. 1997) (prosecutor withheld impeachment evidence that "clearly" should have been disclosed); People v. Roberts, 611 N.Y.S.2d 214, 215 (App. Div. 1994) ("There is no doubt that the People violated the principles of *Brady*."); People v. Khadaidi, 608 N.Y.S.2d 471, 472–73 (App. Div. 1994) (prosecution withheld interview notes with complainant containing prior inconsistent statements); People v. Jackson, 603 N.Y.S.2d 558, 559 (App. Div. 1993) (prosecution withheld several pieces of exculpatory and impeachment evidence in arson case); People v. Inswood, 580 N.Y.S.2d 39, 40 (App. Div. 1992) (prosecutor failed to turn over *Brady* material that revealed existence of potentially exculpatory witnesses).
292. *See generally* Complaint, Collins v. City of New York, No. 11 Civ. 766 (E.D.N.Y. filed Feb. 16, 2011); John Eligon, *In Suit, Freed Man Accuses Prosecutors of Misconduct*, N.Y. TIMES, Feb. 17, 2011, at A26.

Hynes's office agreed to federal habeas corpus relief for Collins,[293] his immediate release after fifteen years in prison, and the dismissal of the indictment without retrial,[294] rather than have Vecchione, the Office's chief "anti-corruption" prosecutor,[295] and other prosecutors in the Office, testify at a habeas hearing ordered by Federal District Judge Dora Irizarry.[296] The Office admitted that it had failed to disclose a secret recantation by its chief witness,[297] a recantation that Vecchione, in a previous sworn affidavit, had categorically denied ever occurred.[298]  In testimony that the federal court found "credible," a second key witness testified that he was a drug addict at the time he was questioned by Vecchione, and that Vecchione threatened him with physical harm and secretly incarcerated him for a week without following required material witness procedures.[299]  The court characterized the prosecution's failure to disclose this information, along with additional evidence refuting the testimony of the third and final significant prosecution trial witness, as "shameful."[300]  Immediately after Judge Irizarry made her denunciation of Vecchione's behavior and the conduct of the Office, Hynes ratified that behavior.  He told the news media that he would conduct no investigation, praised Vecchione as "a very, very principled lawyer,"[301] and pronounced him "not guilty of any misconduct."[302]   Collins's lawsuit contends that Vecchione's behavior did not simply result from Hynes's indifference to coercion of witnesses and *Brady* violations but that such misconduct, at least in high-profile cases that the Office was anxious to win, was the *policy* of the Office.[303]

293.  *See* Sean Gardiner, *Attorney Drops Attempt at Retry*, WALL ST. J., June 10, 2010, at A25; Tom Robbins, *Presumed Guilty:  A Jailhouse Lawyer Says a Top Brooklyn Prosecutor Rigged His Murder Conviction*, VILLAGE VOICE, June 2, 2010, at 8; A. G. Sulzberger, *Murder Conviction Voided over Prosecutors' Conduct*, N.Y. TIMES, May 26, 2010, at A21; A. G. Sulzberger, *Witness Issue Prompts a Hearing on Possible Misconduct by Prosecutors to Be Postponed*, N.Y. TIMES, May 27, 2010, at A27.

294.  *See* A. G. Sulzberger, *Facing Misconduct Claims, Brooklyn Prosecutor Agrees to Free Man Held 15 Years*, N.Y. TIMES, June 9, 2010, at A18; *see also* Mark Fass, *Judge Orders Inmate's Release, Blasts D.A.'s Lack of Remorse*, N.Y. L.J., June 9, 2010, at 1.

295.  KINGS COUNTY DISTRICT ATTORNEY'S OFFICE:  BUREAUS, UNITS & DIVISIONS, http://www.brooklynda.org/kcda-bur-units-divisions/kcda-bur-unit-div.htm (last visited Oct. 20, 2011) (listing Michael Vecchione as Chief of the Rackets Division, which "investigate[s] and prosecute[s] serious and complex crimes in the areas of organized crime, criminal misconduct by public officials and police officers, gang-related activity, major frauds, arson, narcotics and tax revenue crimes").

296.  Sulzberger, *supra* note 294, at A18.

297.  Supplemental Affidavit in Opposition [to] Amended Petition for Writ of Habeas Corpus of Kevin Richardson at ¶ 6, Collins v. Ercole, 08-CV-1359 (E.D.N.Y. filed May 7, 2010) (on file with author).

298.  Affirmation of Michael F. Vecchione at ¶ 15, People v. Collins, No. 2884-94 (N.Y. Sup. Ct. Kings Co. dated Nov. 3, 2006) (on file with author).

299.  Transcript of Civil Cause for Hearing Before the Honorable Dora L. Irizarry, United States Dist. Judge at 120, Collins v. Ercole, 08-CV-1359 (E.D.N.Y. dated June 8, 2010) (on file with author).

300.  *Id.* at 133.

301.  Sulzberger, *supra* note 294, at A18.

302.  Sean Gardiner, *A Solitary Jailhouse Lawyer Argues His Way Out of Prison*, WALL ST. J., Dec. 24, 2010, at A1.

303.  Complaint, *supra* note 292, at ¶¶ 437–523.

Conclusion

Contrary to the Supreme Court's assumption in *Imbler* and in subsequent decisions, experience shows that prosecutors are not disciplined—either internally by their Offices or externally by court or bar disciplinary committees—for violating their *Brady* or other due process obligations during criminal proceedings.  Three major District Attorneys' Offices in "progressive" New York City lack any formal disciplinary rules or procedures, despite being large organizations employing hundreds of prosecutors and support staff.[304]  Their informal "policy" is to confine consideration of discipline to cases in which courts have found "intentional" or willful misbehavior, even though courts often do not reach the issue of willfulness as it may be irrelevant to whether there was a violation of the defendant's due process rights requiring reversal of the conviction.  In the relatively few *Brady* or other cases in which the court has found willfulness, the District Attorneys avoid discipline by rejecting the court's conclusion, or just passively failing to follow up with any investigation or consideration of discipline.[305]

In future cases, when analyzing policy considerations relating to individual and municipal liability by prosecutors or their employers for violations of the constitutional rights of criminal suspects or defendants, the Supreme Court should abandon the false assumption that prosecutors, theoretically subject to professional codes, really are disciplined or have reason to fear being disciplined by their offices or by outside disciplinary bodies.  Otherwise, the Court will continue to premise significant civil rights decisions on a fiction that has plagued constitutional jurisprudence for thirty-five years.

---

304. *See supra* notes 149, 151–52, 155, 162–64, 228–231 and accompanying text.
305. *See supra* notes 123–30, 136, 138–39, 181, 227, 249–53 and accompanying text.