UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
                       :

ROHAN BOLT,                      :            **REPORT AND**
               Plaintiff,    :            **RECOMMENDATION**
                       :

       -against-           :            22-CV-3318 (DG)(PK)
                       :
                       :

CITY OF NEW YORK,        :
NANCY CARDAMONE, in her   :
capacity as administrator of the  :
Estate of Andrew Cardamone,   :
DENNIS BROOKS, LOUIS PIA,  :
RICHARD SICA, PAUL HEIDER, :
FRANK BOVINO, MARYANN   :
BUBELNIK, WILLIAM NEVINS,  :
MICHAEL FALCIANO,        :
and JOSEPH FEZZA,        :
                       :
             Defendants.   :
                       :
------------------------------------------------------------- x

**Peggy Kuo, United States Magistrate Judge:**

      Plaintiff Rohan Bolt ("Plaintiff" or "Bolt") was convicted of depraved indifference murder

and felony murder in 2000 and sentenced to a term of 50 years to life in prison.  In March 2021, his

conviction was vacated, and the case against him was dismissed.  Plaintiff has now brought this action

against the City of New York (the "City"), New York Police Department ("NYPD") Officers Dennis

Brooks ("Brooks"), Louis Pia ("Pia"), Richard Sica ("Sica"), Paul Heider ("Heider"), Frank Bovino

("Bovino"), Maryann Bubelnik ("Bubelnik"), William Nevins ("Nevins"), Michael Falciano

("Falciano"), and Joseph Fezza ("Fezza"), and Nancy Cardamone, as administrator of the Estate of

Officer Andrew Cardamone ("Cardamone") (collectively, "Individual Defendants," and together with

the City, "Defendants"), alleging violations of 42 U.S.C. § 1983 ("Section 1983") and New York state

common law, relating to his wrongful conviction.  (*See* Am. Compl., Dkt. 36.)

A partial motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) has been filed on behalf of all Defendants except Fezza[1] and Cardamone, requesting dismissal of the federal and state malicious prosecution claims (the First and Seventh Causes of Action), the federal fair trial claims against Nevins, Heider, and Falciano (in the Second and Third Causes of Action), the municipal liability claims (the Fourth and Fifth Causes of Action), the Section 1983 civil conspiracy claim (the Sixth Cause of Action), the intentional infliction of emotional distress claim (the Eighth Cause of Action), negligent training, supervision, and discipline (the Ninth Cause of Action), and a New York state constitutional due process claim against the City (in the Tenth Cause of Action). ("Motion," Dkt. 54; Defendants' Memorandum of Law in Support of Motion to Dismiss ("Defs. Mem."), Dkt. 56.)

Cardamone joins the Motion as to the First, Sixth, Seventh, and Eighth Causes of Action. (Notice of Motion, Dkt. 55.)

The Honorable Diane Gujarati referred the Motion to me for a report and recommendation.

Plaintiff does not oppose dismissal of his claims for intentional infliction of emotional distress or negligent hiring and supervision. (Plaintiff's Memorandum of Law in Opposition to Defendants' Fed. R. Civ. P. 12(b)(6) Motion to Dismiss ("Pl. Mem.") at 1, Dkt. 57.) Accordingly, I respectfully recommend that the Eighth and Ninth Causes of Action be dismissed.

I address the arguments regarding the remaining claims below.

---

[1] Fezza sought, and was granted, leave to file a separate motion to dismiss, which is not yet before the Court. (Order dated June 26, 2023.) As a result, Defendants do not seek to dismiss claims against Fezza in the Motion. (Defendants' Memorandum of Law in Further Support of Motion to Dismiss ("Defs. Reply") at 1 n.1, Dkt. 58.)

## BACKGROUND

The following facts are taken from the Amended Complaint (Am. Compl., Dkt. 36) and assumed to be true for purposes of the Motion.

### I.    The Murders and Plaintiff's Arrest

On December 21, 1996, Mike Epstein, the owner of a check cashing store, and Charles Davis, an off-duty police officer working as his security guard, were shot and killed in a failed robbery attempt at the store (the "Murders"). (Am. Compl. ¶ 24.)

Then-Mayor Rudolph Giuliani and top law enforcement officials "began exerting intense pressure" to solve the crime before Christmas, and the NYPD started a massive effort to identify and arrest the perpetrators. (*Id.* ¶¶ 25-26.) Initial attention focused on a local gang who had been involved in similar armed robberies in the area. (*Id.* ¶ 27.) The police placed wanted signs around the neighborhood stating that the suspects "were involved in a past robbery at a check cashing business in [Queens]" and describing the suspects as "three black men ranging from 5'11" and 6'3" in height and weighing 180, 185 and 190 pounds, respectively." (*Id.* ¶ 29.) The NYPD issued an "all points bulletin" which identified the wanted men as "suspects in a robbery of another check cashing store nearby" and stated that "two of the above individuals may be connected to the murder of the police officer on 12/21/96 in 115PCT" ("All Points Bulletin"). (*Id.* ¶ 31.) The *Daily News* reported that investigators believed that the suspects were members of a local gang that had committed other armed robberies in the area, including two armed robberies of check cashing businesses, one of which occurred two days before the Murders. (*Id.* ¶ 28.)

On December 23, 1996, the NYPD arrested John Mark Bigweh ("Bigweh") for selling marijuana. (*Id.* ¶ 32.) Bigweh, who was on probation for robbery and assault charges, was interrogated over the next two days. (*Id.* ¶¶ 33, 35.) He initially told the police that he had been partying with

George Bell ("Bell") and Gary Johnson ("Johnson") on December 20 and 21, and they later approached him on the street about going with them to commit a robbery, along with a person named "Zebedia," but Bigweh declined to go with them. (*Id.* ¶ 37.) NYPD Detective Michael Falciano then drove Bigweh around in a van for six hours, after which Bigweh provided a second statement, admitting that he participated in the robbery with Bell, Johnson, a person named "Roti," and a driver named "Jason." (*Id.* ¶¶ 38-39.)

Based on Bigweh's statement, the NYPD coerced confessions from Bell and Johnson. (*Id.* ¶ 42.)

As recounted in the Amended Complaint filed in *Bell v. City of New York et al*, No. 22-cv-3251 (DG)(PK) (E.D.N.Y. June 2, 2022) ("Bell Am. Compl."), paragraphs 64-139 of which Plaintiff incorporates into his own complaint (Am. Compl. ¶ 54), Defendants Pia and Sica beat and threatened Bell for several hours, causing him to falsely confess. Bell was terrified and "began repeating facts that Detective Pia [who had read Bigweh's statement]…fed to him," telling Pia "'what he wanted to know' to make the abuse and threats stop." (Bell Am. Compl. ¶¶ 102-03.) In addition to a written statement, which he signed but did not read, Bell also gave a videotaped confession. (*Id.* ¶¶ 104, 108-111.)

As part of his false confession, Bell stated that he was part of a group of four (later changed to five) people who committed the Murders, and that he was the shooter. (*Id.* ¶¶ 130, 133, 136.) He stated that he knew "'Rowdy, Rody, whatever his name is,'" for two years. (*Id.* ¶ 135.) He also stated that Bigweh was not involved in the Murders. (*Id.* ¶ 132.)

Pia and Sica realized that they had coerced Bell into implicating a person named Mendez Collier in the crime, who they did not believe was involved. In order to correct the error, Sica created a falsified "DD5" report, in which he stated that after the confession, Pia and Sica had a "brief conversation" with Bell in his cell, and that Bell said he falsely accused Mendez Collier because Bigweh

was close to "Roti" and Bell "was afraid that he would be hurt in jail" if he implicated Bigweh.  (*Id.* ¶¶ 121-23.)  Bell denies ever saying this.  (*Id.* ¶ 124.)

Pia and Sica provided Bell's false confession and the fabricated DD5 to prosecutors and, in turn, the grand jury, which issued an indictment against Bell for the Murders.  (*Id.* ¶¶ 126, 310.)

Defendants Cardamone, Bovino, and Brooks interviewed Johnson, who told them that he had passed out after a night of partying, was "still drunk" when he woke up, and that "he did not even remember the crime but had 'seen it on the news' but he 'didn't think [he] was involved in it because [he] woke up and it was just another day for [him].'"  (Am. Compl. ¶¶ 43, 47 (alterations in the original).)  He stated that he had driven to the check cashing store with "'Jason,'" who he "didn't really know," and "'two of Jason's friends that I didn't know.'"  (*Id.* ¶ 46.)  He also stated that Bell was already at the check cashing store when he arrived and that he and Bell did not speak that morning.  (*Id.* ¶ 47.)  Johnson stated that after the Murders he called Bell "'asking him what are you gonna do today,'" and Bell said he was sick; he later stated that he had instead spoken to Bell's sister, and "'never really got a chance to talk to Bell.'"  (*Id.* ¶ 48.)  Johnson screamed while he was being interrogated.  (*Id.* ¶ 49.)  He was also arrested and charged with the Murders.

The day after Bell and Johnson were arrested, Defendant Fezza stated in a police report that a "female crack user…'spotted a male Black who she identified as Roadie driving a red van.'"  (*Id.* ¶¶ 83, 85.)  Fezza and two other detectives followed the van to a parking lot where, according to Fezza, Bolt admitted his name was Roti.  (*Id.* ¶ 85.)  Bolt, who has never gone by the name Roti, denied saying this, and states that he told Fezza that Roti was not his name.  (*Id.* ¶ 86.)  Fezza arrested Bolt based on this identification.  (*Id.* ¶ 118.)

Bolt was also identified by witness Gregory Turnbull ("Turnbull"), who claimed that he saw three men flee the check cashing store, and refused to provide a sketch because "it could have been anybody" and he "didn't want the wrong person to be picked up."  (*Id.* ¶¶ 87-90.)  When Turnbull

first viewed Bolt in a lineup, he failed to identify Bolt. (*Id.* ¶ 90.) However, Plaintiff states that Bovino "pressured" Turnbull into claiming, and later testifying, that "he actually had identified Bolt in the lineup but was scared to say so." (*Id.*)

## II.    Additional Investigation into the Murders – Jason Ligon's Statement and Alibi

On May 30, 1997, Jason Ligon ("Ligon") was arrested and, after five hours in custody and interrogation by Defendants Bubelnik and Bovino, he confessed to being involved in the Murders. (*Id.* ¶ 58.) He stated that he was the driver, that Bell was the shooter, and that Bolt, now identified as the person whom Bigweh and Bell called "Roti," put the robbery plan together. (*Id.* ¶ 60.) Plaintiff alleges that Bubelnik and Bovino worked closely with Pia and Sica to "feed the same facts" as those given to Bell to coerce a confession. (*Id.* ¶ 59.) Bubelnik was present at Bigweh's confession. (*Id.*) Ligon's written and video confessions "mirrored" those given by Bell and provided more detail. (*Id.* ¶ 62.)

However, Ligon's counsel hired a private investigator who determined that Ligon was in Washington, D.C. at the time of the murders and that he was not involved. (*Id.* ¶ 63.) This alibi information was given to the Queens District Attorney's Office ("QDAO"), who confirmed its accuracy. (*Id.*) Ligon later told investigators that police officers gave him alcohol during the interrogation. (*Id.* ¶ 65.)

Plaintiff alleges that the QDAO was aware that Ligon was not involved in the Murders and had an alibi, but refused to dismiss the charges against Ligon until after Bell, Bolt, and Johnson were tried. (*Id.* ¶¶ 65, 67.) Bolt's counsel was not informed by Bubelnik, Bovino, or the QDAO that Ligon's confession, which implicated Bell, Johnson, and "Roti," was false. (*Id.* ¶ 72-73.) Bolt's counsel was also not informed that Defendants Bubelnik and Bovino were defendants in a pending lawsuit at the time, in which they were accused of participating in coercing a false confession, and which ultimately was settled. (*Id.* ¶¶ 75-77.)

### III.    Investigations into the Speedstick Gang

In a DD5 dated May 16, 1997, Defendant Heider memorialized an interview of "Witness #1" who provided a detailed account of the activities "'of a Robbery Ring that was run by the Twins Aaron and Ammon Boone.'" ("DD5 288") *(Id.* ¶¶ 136-37.)  DD5 288 provided background on the robbery gang's operations and summaries of at least seven armed robberies that the group carried out in 1996 and 1997.  (*Id.* ¶ 137.)  Witness #1 identified Jamal Clark as a member of the robbery gang.  He also stated that he had personally participated with Clark, Boone or Ammon Boone in several of the robberies.  (*Id.* ¶ 138.)  Witness #1 gave information that directly implicated this robbery gang in the Murders.  As set forth in DD5 288,

> *[Witness #1] stated that he was told by Jamal Clark that the group robbed a check cashing store on Astoria Blvd. This job was set up by the [Boone] Twins and that Jamal Clark was outside and that something went bad.  They did not get any money.* Witness #1 stated that this was a phone call and that Jamal Clark was down south at the club with the Twins after this robbery. Jamal told him that he was upset because he was doing a lot of jobs also in NY and down south and that he was not getting a fair share of the money. He was concerned that if he left that the Twins may kill him because they felt that he knew to[o] much and could tell the police. Jamal told him he was leaving and he did.
>
> *Witness #1 stated that Jamal Clark had a code name for all the robberies that he participated in with the group. The name is JASON.

(*Id.* ¶ 140 (alterations and emphasis in original).)   Witness #1 also stated that another gang member told him that Boone later shot Clark in the back of the head.  (*Id.* ¶ 142.)

Jamal Clark had been killed in March 1997, and a DD5 dated March 28, 1997 shows that information regarding Clark's murder was given to Pia and Sica ("DD5 63").  (*Id.* ¶ 157.)  Boone was indicted for Clark's murder in January 1999.  (*Id.* ¶ 144.)

DD5 288 and several other DD5s related to the NYPD's investigation into the Speedstick Gang (the "Speedstick Gang" or "Speedstick") were turned over to the QDAO.  (*Id.* ¶¶ 152, 156.) Detective Stacey Calantjis, one of the "lead detectives" working on the Speedstick investigation, also

stated that he and other Speedstick investigators had shared "everything" they learned about Speedstick with Pia, Sica, and Defendant Nevins, who was Pia and Sica's boss.  (*Id.* ¶¶ 159-60.)

In notes taken in 1997, in a folder labelled "Speedstick," the QDAO's lead trial counsel at Bell's trial, ADA Charles Testagrossa ("Testagrossa"), recorded that he was informed that Heider "'[b]elieve[d] Jamal was driver in Davis homicide [the homicide for which Mr. Bell was convicted]'; 'Jason was Jamal'; and 'Speed Stick Bosses: Twin Boones. Bernard Johnson. Jamal Clark "Jason."'" (*Id.* ¶¶ 167-68 (alterations in original).)

At Bell's trial, Bell's counsel sought to have Defendant Heider testify about Speedstick Investigation; however, ADA Testagrossa represented to the court that there was "no connection" between the crimes, and Heider's testimony was precluded.  (*Id.* ¶¶ 174-75.)

## IV.    Bolt's Trial and Conviction

### A. *Grand Jury Proceedings*

Individual Defendants forwarded the police reports they created as part of their investigation into the Murders to the QDAO and met with prosecutors prior to the grand jury presentation.  (*Id.* ¶ 97-98.)  On December 26, 1996, Bovino prepared a felony complaint report alleging that Bolt, Bell, Johnson, and Bigweh committed the Murders, that Bolt displayed a handgun and demanded money from one of the victims, and that Turnbull identified Bolt in front of the check cashing store.  (*Id.* ¶¶ 100, 110.)  The grand jury returned an indictment charging Bolt with murder and robbery.  (*Id.* ¶ 113.)

### B. *Evidence Presented at Bolt's Trial*

At Bolt's trial in April 2000, the QDAO, through prosecutor Brad Leventhal ("Leventhal" or "ADA Leventhal") offered testimony from Bigweh and Turnbull.  (*Id.* ¶¶ 115-17.)  The "female crack user" who identified Bolt did not testify.  (*Id.* ¶ 117.)  Bigweh testified that he was the lookout and watched the crime from a pay phone, and that Bolt was holding a "black Barretta."  (*Id.*)  Bigweh also stated that he identified Bolt while being driven around by an unnamed detective.  (*Id.* ¶ 118.)

Prosecutors introduced Turnbull's statement that he recognized Bolt in the lineup but did not identify him because he was scared. (*Id.* 125.)

Bolt and his mother testified that five or six minutes after 7:00 a.m. on the morning of the Murders, Bolt was at home getting ready for work, and that 20 or 25 minutes later he was with his mother at the restaurant he owned. (*Id.* ¶ 126.)

### C. Bolt's Conviction and Subsequent Exoneration

Bolt was found guilty on all counts, and on May 9, 2000, he was sentenced to 50 years to life in prison. (*Id.* ¶ 130.)

In March 2021, after investigation by the QDAO's Conviction Integrity Unit ("CIU"), the QDAO asked the state court to vacate Bell's conviction. (*Id.* ¶ 177.) The court granted the motion. *See People v. Bell*, 71 Misc. 3d 646 (N.Y. Sup. Ct. 2021). The QDAO then dismissed all charges against Bolt. (Am. Compl. ¶ 182.)

The exoneration was based in part on the revelation that *Brady* material was not disclosed to Bolt prior to his conviction. Plaintiff states that the most significant undisclosed exculpatory evidence is Heider's DD5 288, dated May 16, 1997, which contained the statement by Witness #1 that Speedstick member Jamal Clark described his own involvement in the robbery of the checking cashing store on Astoria Boulevard that had "gone bad." (*Id.* ¶¶ 135-36.) It was also discovered that DD5 288 and other DD5s related to the NYPD's investigation of Speedstick were turned over to the QDAO but not produced as *Brady* material. (*Id.* ¶ 156.)

The CIU investigation uncovered additional exculpatory evidence that was not disclosed to Bolt, for example: the NYPD All Points Bulletin, which stated that suspects in a nearby robbery of a check cashing store were also suspects in the Murders; a DD5 indicating that days before the Murders,

three or four men, including one whose scar and mustache matched that of Jamal Clark's, appeared to be casing Epstein's check cashing store; eyewitness statements and a DD5 that contradicted Bell's confession regarding the color of the getaway car; interviews with two eyewitnesses who described the getaway vehicle as having North or South Carolina license plates, tying the Murders to the Boone twins, who owned a nightclub in South Carolina; and information regarding Bigweh's testimony, including a DD5 reflecting that Bigweh stated that he was not involved in the Murders, information that Bigweh's cooperation agreement was terminated shortly before Bolt's trial, and documents showing that Bigweh had attempted suicide in custody and experienced auditory hallucinations for which he had received psychiatric evaluation.  (*Id.*)

DD5 575, prepared by Bubelnik, contained statements by Rodney Boone (no relation to Aaron or Ammon Boone) that Bubelnik "'had the right people,'" that "'word on the street' was that Rohan Bolt supplied the guns and got them in Brooklyn," and identified Ligon as a participant in the Murders. (*Id.* ¶ 163.)  The CIU interviewed Rodney Boone as part of its investigation; he denied making any of these statements.  (*Id.* ¶¶ 164-65.)

### V.     Policies and Practices of the QDAO

Plaintiff alleges that the *Brady* violations that occurred in relation to his conviction were not an isolated incident, but part of a pattern and practice of the QDAO to encourage *Brady* violations in order to secure convictions.  (*Id.* ¶ 215.)  The QDAO allegedly had a policy and practice of "siloing" information across bureaus, making it difficult for prosecutors from different bureaus to access and share information, and giving "plausible deniability" to prosecutors who did not search beyond their own bureaus for exculpatory materials.  (*Id.* ¶¶ 219, 247.)  The office also did not provide any training to prosecutors on how to locate *Brady* material known to other prosecutors in the office.  (*Id.* ¶¶ 222, 245.)  In Plaintiff's case, the QDAO confirmed during its post-conviction investigation that

"significant" *Brady* material relating to the Speedstick Gang was not located in the files of Bolt, Bell, or Johnson, but rather, all Speedstick material was stored in a separate bureau. (*Id.* ¶¶ 225-29.)

ADA Testagrossa stated that the failure to produce *Brady* material was a "'law office failure' that occurred as a result of 'silo procedures engaged in by the [QDAO] during the late 1990s.'" (*Id.* ¶ 232.) ADA Leventhal stated that the failure to produce *Brady* material "'was the result of the [QDAO's] architecture during the last millennium, which created an environment in which significant possibilities for the failure to share critical information existed.'" (*Id.* ¶ 240.)

In addition to not training prosecutors on their *Brady* obligations, Plaintiff alleges that the QDAO failed to investigate or discipline prosecutors for violations of those obligations. (*Id.* ¶ 257.) District Attorney Richard Brown ("Brown"), the policymaker for the QDAO at the time of Bolt's conviction, did not conduct internal investigations or discipline prosecutors who committed violations; instead, the policy and practice of the QDAO was to give prosecutors who engaged in misconduct raises, promotions, and commendations, based in part on their winning record at trial. (*Id.* ¶¶ 257, 263-64.) In 1996, the QDAO compiled a Prosecutorial Misconduct Survey ("Survey"), which identified at least 39 cases where an appellate court found, or the QDAO admitted, that the QDAO committed misconduct, including *Brady* violations. (*Id.* ¶¶ 324-26.) Plaintiff alleges that this represents "just a fraction" of all instances of misconduct committed by the QDAO between 1988-1995 and identifies an additional 19 judicial decisions finding misconduct that were not included in the Survey. (*Id.* ¶¶ 327, 344.) Plaintiff alleges that, despite this knowledge of documented misconduct, QDAO leadership did not discipline prosecutors or implement any policies, procedures, evaluations, or other changes to avoid committing *Brady* violations. (*Id.* ¶¶ 330, 341, 349, 351.)

## VI.   Policies and Practices of the NYPD

Plaintiff alleges that the NYPD had inadequate policies and practices that led to his wrongful conviction, concerning "the use of excessive promises of rewards and unduly coercive interrogation

11

techniques with vulnerable potential witnesses…and/or individuals fearing prosecution and imprisonment for their own criminal behavior," "[t]he determination of probable cause to make an arrest," and the duty of police officers to preserve and disclose *Brady* material to prosecutors. (*Id.* ¶ 421.) At the time of Bolt's arrest and prosecution, the NYPD provided no training regarding coercive interrogation techniques or *Brady* obligations, and officers who were deposed in other lawsuits regarding that time were not familiar with *Brady* at all. (*Id.* ¶¶ 422, 422 n.7.)

The prevalence of coercive interrogation, *Brady* violations, and other misconduct was known to the NYPD. Between 1992 and 2000, the NYPD was subject to fifty civil lawsuits credibly alleging that police falsified or withheld evidence, or conducted searches or arrests without probable cause, and were criticized in numerous judicial decisions for failing to train and supervise officers regarding *Brady* violations. (*Id.* ¶ 425.) The New York City Comptroller's Office and the Bar Association of New York also criticized the NYPD for failing to address misconduct with disciplinary or other remedial action. (*Id.*) In 1994, the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department published a report (the "Mollen Report") finding that the "practice [of police falsifications] is…widely tolerated by corrupt and honest officers alike, as well as their supervisors…What breeds this tolerance is deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world." (*Id.* ¶¶ 427-28.)

## STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion, Plaintiff's allegations must be supported by "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court accepts "all factual

allegations in the complaint as true and draw[s] all reasonable inferences in favor of the plaintiff." *Hayles v. Aspen Properties Grp., LLC*, 782 F. App'x 3, 5 (2d Cir. 2019). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "A complaint is properly dismissed where, as a matter of law, 'the allegations in a complaint, however true, could not raise a claim of entitlement to relief.'" *Hayles*, 782 F. App'x. at 5 (quoting *Twombly*, 550 U.S. at 558).

## DISCUSSION

### I.    Malicious Prosecution Claims Against all Individual Defendants

Plaintiff alleges that Individual Defendants manufactured or caused to be manufactured false statements and identifications that caused the QDAO to commence or continue criminal charges against Bolt for the Murders. (Am. Compl. ¶¶ 186-91, 444-49.) The First Cause of Action asserts a federal claim under 42 U.S.C. § 1983, and the Seventh Cause of Action asserts a claim under state common law.[2]

The elements of federal and state law malicious prosecution claims are "substantially the same." *Boyd v. City of New York.*, 336 F.3d 72, 75 (2d Cir. 2003). To demonstrate a § 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment" and "prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) (quotations omitted).[3]

---

[2] Plaintiff also alleges that the City is liable for the state common law malicious prosecution claim under the principle of *respondeat superior*. (*Id.* ¶ 449.) Defendants do not challenge that, if Individual Defendants were found liable for common law malicious prosecution, the City could be held liable as well.

[3] "In addition, under Section 1983, the plaintiff must further demonstrate 'a post-arraignment deprivation of liberty that rises to the level of a constitutional violation.'" *Jackson v. Nassau Cnty.*, 552 F. Supp. 3d 350, 370

Defendants argue that the malicious prosecution claims fail because Plaintiff has not plausibly alleged how the conduct of Individual Defendants overcomes the presumption of probable cause created by the grand jury indictment, and that Individual Defendants had no duty to provide exculpatory information to the grand jury.  Defendants also contend that Plaintiff has not adequately pled that Individual Defendants other than Bovino initiated or continued criminal proceedings against him.  (Defs. Reply at 1-2.)

### A. **Probable Cause**

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York."  *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003).  "'[I]ndictment by a grand jury creates a presumption of probable cause.'"  *Manganiello*, 612 F.3d at 161-162 (quoting *Savino*, 331 F.3d at 72).

"If plaintiff is to succeed in his malicious prosecution action after he has been indicted, he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith."  *Colon v. City of New York*, 60 N.Y.2d 78, 83 (1983).  "A plaintiff may demonstrate fraud or perjury through 'evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith.'"  *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 612 (E.D.N.Y. 2017) (quoting *Rothstein v. Carriere*, 373 F.3d 275, 283 (2d Cir. 2004)).  "[A] police officer may not reasonably rely on a known coerced confession as lawful grounds for probable cause."  *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997).  Allegations that police officers coerced a false confession or withheld exculpatory evidence are sufficient to overcome a presumption of probable cause.  *Rodriguez*

---

(E.D.N.Y. 2021) (quoting *Bailey v. City of New York*, 79 F. Supp. 3d 424, 448 (E.D.N.Y. 2015)).  The parties do not dispute that Plaintiff experienced a deprivation of liberty.

*v. City of New York*, 590 F. Supp. 3d 518, 539 (E.D.N.Y.), *amended on reconsideration in part*, 607 F. Supp. 3d 285 (E.D.N.Y. 2022).

Defendants argue that Plaintiff does not overcome the presumption of probable cause afforded by indictment because his allegations are vague, conclusory, and speculative, and he has failed to address what occurred in the grand jury.  (Defs. Reply at 1-2.)

I find that Plaintiff has made sufficient factual allegations that each Individual Defendant misrepresented, falsified or withheld evidence by alleging the following: while driving Bigweh around for six hours in a van, Falciano coerced a false confession from Bigweh that implicated Bell, Bolt, and Johnson, which he forwarded to prosecutors (Am. Compl. ¶¶ 36-39, 97); Pia and Sica used violence and threats to coerce Bell's false confession, which implicated Bolt, and which they then forwarded to prosecutors *(Id.* ¶¶ 55, 97); Cardamone and Brooks coerced Johnson's false confession, which implicated Bolt, and forwarded it to prosecutors *(Id.* ¶¶ 42-53, 97; Bell Am. Compl. ¶¶ 64-139); after Gregory Turnbull initially failed to identify Bolt in a lineup, Bovino pressured Turnbull into claiming that he had identified Bolt in a lineup but was too scared to say so, and Bovino then signed the felony complaint stating that Bolt committed the Murders *(Id.* ¶¶ 89-90, 100); Bovino and Bubelnik coerced Jason Ligon into confessing that he was the getaway driver, identifying Bell as the shooter and Bolt as having planned the robbery, then forwarded the confession to prosecutors and withheld exculpatory information that Ligon was, in fact, in Washington D.C. at the time of the robbery *(Id.* ¶¶ 56-72; 97); Heider made false statements to prosecutors by telling them there was no connection between the Speedstick Gang and the Murders *(Id.* ¶¶ 135-36, 170, 174-75); and Nevins met with prosecutors prior to the grand jury presentation,  and concealed exculpatory information relating to the Speedstick investigation from them *(Id.* ¶¶ 98-99, 160-61).

Moreover, despite Defendants' assertions, Plaintiff is not required "to prove what happened before the grand jury to negate probable cause" when he bases his malicious prosecution claims on

what occurred outside—not inside—the grand jury proceedings.  (*See* Defs. Mem. at 4 (quoting *Frederick v. New York City*, No. 11 CIV. 469 (JPO), 2012 WL 4947806, at *9 (S.D.N.Y. Oct. 11, 2012) (grand jury minutes ordered to be produced for court's *in camera* review in order to determine whether there was a "particularized need" justifying unsealing) and citing *Rothstein*, 373 F.3d at 283 (malicious prosecution claim dismissed where plaintiff failed "even to attempt to make [a] showing" of "fraud, perjury, suppression of evidence or other misconduct in the grand jury" when plaintiff alleged only that defendant made false and malicious report to law enforcement).)

Defendants argue that to the extent that Plaintiff alleges that the presumption of probable cause was overcome, his pleadings are not sufficient because those allegations are limited to the failure of the QDAO to elicit exculpatory evidence, and prosecutors are not required to present exculpatory evidence to a grand jury.  (Defs. Mem. at 5.)  However, Plaintiff's allegations are not limited to the failure of the QDAO to elicit exculpatory evidence; they are based on the conduct of NYPD officers who falsified, misrepresented, or withheld evidence from prosecutors.

## B.  Initiation or Continuation of a Prosecution

To initiate or continue a prosecution, a defendant must "play[] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Manganiello*, 612 F.3d at 163 (quoting *Rohman v. New York City Transit Authority*, 215 F.3d at 217).  "A jury may permissibly find that a defendant initiated a prosecution where he 'fil[ed] the charges' or 'prepar[ed an] alleged false confession and forward[ed] it to prosecutors.'" *Manganiello*, 612 at 163 (2d Cir. 2010) (quoting *Ricciuti*, 124 F.3d at 130).  "With respect to Section 1983 malicious prosecution claims, district courts in this circuit have 'held that a jury could find an officer liable despite the fact that he did not bring the formal charges or fill out a complaining affidavit, [because] that officer reported the evidence to the complaining officer.'" *Rodriguez*, 590 F. Supp. 3d at 535 (quoting *Bryant v. Crowe*, 697 F. Supp. 2d 482, 492-93 (S.D.N.Y. 2010)).  "When a police officer creates false

information likely to influence a jury's decision and forwards that information to prosecutors, ... the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Matthews v. City of New York*, 889 F. Supp. 2d 418, 440 (E.D.N.Y. 2012) (quoting *Ricciuti*, 124 F.3d at 130). "[T]here is no requirement that an officer have direct contact with the prosecutor." *Maldonado v. City of New York*, No. 11-CV-3514 (RA), 2014 WL 787814, at *6 (S.D.N.Y. Feb. 26, 2014).

While conceding that Bovino executed the criminal complaint against Plaintiff, Defendants argue that Defendants Bubelnik, Brooks, Sica, Pia, Falciano, Nevins, and Heider did not initiate proceedings against Plaintiff. (Defs. Mem. at 5.)

I find that Plaintiff has sufficiently pled that Bubelnik, Brooks, Sica, Pia, Falciano, Nevins, and Heider initiated or continued prosecution against him. Although Individual Defendants (except Bovino) did not sign Bolt's criminal complaint or coerce his confession, coercing confessions from other witnesses and forwarding them to prosecutors constitutes "initiating" proceedings. *See Buari v. City of New York*, 530 F. Supp. 3d 356, 385 (S.D.N.Y. 2021) ("Precedent is clear that police officers who induce a witness to give false testimony that results in an arrest and grand jury indictment have 'initiated' a criminal proceeding.") (collecting cases). Plaintiff alleges that: Bubelnik coerced Ligon's confession implicating Bolt and forwarded it to prosecutors (Am. Compl. ¶¶ 56-72; 97); Brooks and Cardamone coerced Johnson's confession implicating Bolt and forwarded it to prosecutors (Am. Comp. ¶¶ 42-53, 97); Sica and Pia coerced Bell's confession implicating Bolt and forwarded it to prosecutors (Am. Compl. ¶¶ 55, 97); and Falciano coerced Bigweh's confession and forwarded it to prosecutors (Am. Compl. ¶¶ 36-39, 97).

Plaintiff alleges that Nevins and Heider met with prosecutors and affirmatively misled them by stating that there was no connection between the Murders and Speedstick when they had information of such a connection. (Am. Compl. ¶¶ 98-99; 160-61.) "Showing that the police 'failed

to make a complete and full statement of facts to the District Attorney, misrepresented or falsified evidence, withheld evidence or otherwise acted in bad faith' satisfies the initiation element of malicious prosecution." *Bailey v. City of New York*, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015) (quoting *Manganiello*, 612 F.3d at 160). An officer may be held liable for malicious prosecution when that officer "withhold[s] relevant and material information." *Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006). Here, Plaintiff alleges that Nevins and Heider withheld exculpatory information, which encouraged prosecutors to pursue charges against Bolt, along with Bell and Johnson, and to represent to the court at trial that there was no connection between the Murders and Speedstick.

Accordingly, I find that Plaintiff has sufficiently pled malicious prosecution claims.

## II.    Fair Trial Claims Against Heider, Nevins, and Falciano

"A fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights." *Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016) (citing *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010)). "A fair trial claim may. . .arise where the police or prosecutors withhold material exculpatory or impeaching evidence from a defendant. Th[is] theory of liability is essentially a civil claim seeking damages for a *Brady* violation." *Id.* at 118 (citing *Bermudez v. City of New York*, 790 F.3d 368, 376 n.4 (2d Cir. 2015)).

A violation of *Brady v. Maryland*, 373 U.S. 83 (1963) has three elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Fappiano*, 640 F. App'x at 118 (quoting *United States v. Rivas*, 377 F.3d 195 (2d Cir. 2004)). "To establish prejudice, a plaintiff must show the evidence was material; i.e., whether the evidentiary suppression undermines confidence in the outcomes of the trial." *Id.* at 118 (quotation omitted). "The Second Circuit has 'suggested, though without so concluding, that a civil *Brady* claim requires a showing that the non-disclosure was intentional.'" *Fraser v. City of New York*, No. 20-CV-

04926 (CM), 2021 WL 1338795, *5 (S.D.N.Y. Apr. 9, 2021) (quoting *Bellamy v. City of New York*, 914 F. 3d 727, 751 n.23 (2d Cir. 2019)).

A police officer also "denies a defendant a fair trial when she creates 'false information likely to influence a jury's decision and forwards that information to prosecutors.'" *Fappiano v. City of New York*, 640 F. App'x at 118 (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d at 130). The elements of a fabrication of evidence claim are: "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016).

### A. Heider

Plaintiff alleges that Heider deliberately chose not to disclose *Brady* evidence and affirmatively misled prosecutors by representing that his investigation into the Speedstick Gang had no relation to the Murders, and deliberately stopped developing evidence that Jamal Clark was "Jason," depriving Plaintiff of the right to a fair trial. (Am. Compl. ¶¶ 98-99, 174-76, 199.)

Defendants argue that Plaintiff fails to plead any facts supporting the allegation that Heider withheld exculpatory information from prosecutors or fabricated evidence. They contend, to the contrary, that Heider created DD5 288 (which he did provide to prosecutors), that Heider cannot be held accountable for notes taken by ADA Testagrossa, and that Testagrossa's notes contain information provided by Heider which Plaintiff does not contend is false. (Defs. Mem. at 8; Defs. Reply at 5.)

I find that Plaintiff plausibly alleges that Heider possessed and failed to turn over exculpatory material to prosecutors, and that he fabricated evidence. As one of the lead detectives investigating Speedstick, Heider was "aware of substantial evidence" that members of the Speedstick Gang, not Bell, Bolt, and Johnson, had committed the Murders. He prepared the DD5 288 containing a witness

statement linking Jamal Clark and the Speedstick Gang to the Murders and identifying Clark as using the code name "Jason."

ADA Testagrossa's notes indicate that, at some point in 1997, Heider shared at least some information with the prosecution regarding the Speedstick Gang, including that the driver "Jason" was actually Jamal Clark, and who the "Bosses" of the gang were. *(Id. ¶¶ 167-68.)*

However, when Bell's counsel sought to have Heider testify at Bell's trial, his testimony was precluded based on ADA Testagrossa's representation to the court that there was "no connection" between Heider's Speedstick investigation and the Murders. *(Id. ¶¶ 174-75.)* It is plausible, as Plaintiff alleges, that at the time of Bell's trial in 1999, Heider fabricated evidence when he falsely misrepresented to ADA Testagrossa that there was no connection between the Murders and Speedstick, notwithstanding any previous communications. *(Id. ¶ 175.) See Morse v. Fusto*, 804 F.3d 538, 547-48 (2d Cir. 2015) (finding fabrication of false or misleading evidence, including omissions of evidence, denied plaintiff a fair trial). It is also plausible that Heider suppressed evidence when he did not share with prosecutors all the information in his possession that was exculpatory as to Bell's guilt. Plaintiff infers that Heider took these actions to avoid implicating Speedstick, which would have established that Bolt, Bell, and Johnson were innocent. *(Id. ¶ 176.)* It is certainly plausible, given the direct link between the information Heider possessed and the Murders, that Heider's withholding of exculpatory material was intentional.

### B. Nevins

Plaintiff alleges that Nevins possessed information about the Speedstick Gang's involvement in the Murders which he did not provide to prosecutors. ((Am. Compl. ¶¶ 97-99.)

Defendants argue that Plaintiff improperly alleges a theory of supervisory liability against Nevins, that there is no fair trial claim based on a police officer's failure to conduct an adequate investigation, and that Plaintiff has not plausibly alleged that Nevins suppressed evidence. (Defs.

Mem. at 6-7; Defs. Reply at 3-4.)  Defendants contend that the allegation that Nevins withheld exculpatory information about the connection between the investigation into the Speedstick Gang and the Murders is "completely conclusory and speculative" because Plaintiff "in no way specifies exactly what information he is referring to or that Lt. Nevins was the NYPD officer investigating this case who had the responsibility for interacting with the [QDAO] prosecutors regarding such information."  (Defs. Mem. at 7.)

Plaintiff's claim against Nevins is not premised on a theory of supervisory liability but is based on his individual actions in "approving and then conveying fabricated evidence to the prosecutors" and "conceal[ing] the exculpatory evidence linking Speedstick to the crime."  (Pl. Mem. at 10-11.) Plaintiff alleges that Nevins possessed information about the Speedstick Gang's involvement in the Murders because Det. Calantjis, one of the lead detectives in the Speedstick investigation, "provided all of the information he had" to Pia, Sica and Nevins.  (Am. Compl. ¶¶ 160.)  Plaintiff may seek to hold Nevins liable for his personal involvement in fabricating or suppressing evidence.  *See Jackson*, 552 F. Supp. 3d at 376-77 (noting that there is no special test for supervisory liability under Section 1983 and permitting claims against supervisory officer to proceed where plaintiff pleaded "direct participation in certain constitutional violations.").

Likewise, Plaintiff does not assert that Nevins is liable under Section 1983 for failure to conduct an adequate investigation by not pursuing leads regarding Speedstick's involvement in the Murders.  Rather, Plaintiff's allegations against Nevins rest on his fabrication of evidence and his failure to turn over potentially exculpatory information in his possession to prosecutors.

The information from the Speedstick investigation would have included material showing the possible involvement of members of Speedstick in the Murders and could have been favorable to Plaintiff.  Nevertheless, Plaintiff alleges that Nevins met with prosecutors but did not provide this information to them.  (*Id.* ¶¶ 98-99, 159-61.)  Drawing all reasonable inferences in favor of Plaintiff,

as is required at this stage, it is reasonable to infer that Nevins possessed exculpatory information from the Speedstick investigation that he withheld from prosecutors.  *See Ying Li*, 246 F. Supp. 3d at 627 (finding that plaintiff sufficiently pled a *Brady* violation where defendant police officer did not inform the district attorney's office about exculpatory evidence).  Plaintiff does not need to specify what information Nevins had concerning Speedstick, because Det. Calantjis provided "all" the information he had about the Speedstick investigation with Nevins, which would include information about the connection between Speedstick members and the Murders.

Without deciding whether the non-disclosure of exculpatory evidence must be intentional for a fair trial claim based on a violation of *Brady,* I also find that because Nevins withheld information of obvious exculpatory value from prosecutors, it is reasonable to infer that the non-disclosure was intentional.  *See Valentin v. City of Rochester*, No. 11-CV-6238 (CJS), 2018 WL 5281799, at *13 (W.D.N.Y. Oct. 24, 2018), *aff'd*, 783 F. App'x 97 (2d Cir. 2019) (stating that a police officer intentionally suppresses exculpatory evidence when he "hides the information, which is known only to the police, from the prosecutor.").

### C. Falciano

Defendants argue that Plaintiff's allegation that Falciano coerced Bigweh is conclusory.  (Defs. Reply at 5.)

Although Plaintiff does not plead facts regarding what occurred during the six hours when Falciano drove Bigweh around in the van, it is reasonable to infer that Falciano coerced Bigweh into confessing to the Murders because despite initially denying any participation in the Murders, when they returned from the drive, Bigweh confessed to participating in the crime and implicated Bell, Johnson, and "Roti."  (Am. Compl. ¶¶ 37-39.)

Accordingly, I find that Plaintiff has sufficiently alleged fair trial claims against Defendants Nevins, Heider, and Falciano.

22

### III.   Civil Conspiracy Claim

Plaintiff alleges that Individual Defendants conspired to have Bolt falsely arrested, prosecuted, convicted, and to cover up each other's misconduct. (Am. Compl. ¶ 437-43.)

"To support a claim under § 1983 for conspiracy, a plaintiff must show: '(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.'" *Zilioli v. City of New York*, No. 17-CV-9495, 2020 WL 1548763, at *4 (S.D.N.Y. Apr. 1, 2020) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)).  "Allegations of direct evidence of conspiracy are not necessary, as conspiracies have long been recognized to be secretive by nature and often are proven by circumstantial evidence. . .though detailed allegations of the conspiracy's time and place are helpful to cross the plausibility threshold." *Butler v. Hesch*, 286 F. Supp. 3d 337, 363 (N.D.N.Y. 2018).

"For claims of § 1983 ... conspiracies to survive a motion to dismiss, the plaintiff must provide some factual basis supporting a meeting of the minds." *D.K. by L.K. v. Teams*, 260 F. Supp. 3d 334, 363 (S.D.N.Y. 2017) (quoting *Biswas v. City of New York*, 973 F.Supp.2d 504, 533 (S.D.N.Y. 2013).  A factual basis may be demonstrated by showing "that defendants entered into an agreement, express or tacit, to achieve the unlawful end, augmented by some details of time and place and the alleged effects of the conspiracy." *Rodriguez v. City of New York*, 590 F. Supp. 3d at 548 (quoting *Blue v. City of New York*, No. 16-CV-9990 (VSB), 2018 WL 2561023, at *9 (S.D.N.Y. June 4, 2018)).

Defendants argue that Plaintiff has not pled any facts supporting a "meeting of the minds" to achieve an unlawful objective.  (Defs. Mem. at 9.)

Although Plaintiff does not provide allegations of direct evidence of a conspiracy, he alleges circumstantial evidence plausibly showing that Individual Defendants entered into a tacit agreement to "frame" Bolt.  Plaintiff notes that despite being elicited by different officers, each of Bigweh, Bell,

23

Bolt, Johnson, and Ligon's statements contained similar facts that were later proven false, such as that "Jason" was the getaway driver. (Pl. Mem. at 14.)

Plaintiff also alleges that Pia, Sica, Bubelnik, Bovino, Nevins, and Heider were aware that Jamal Clark was likely "Jason" as a result of their Speedstick investigation and thus aware that Jason Ligon did not participate in the Murders, but withheld this information and, even after learning that Ligon was in Washington D.C. at the time of the Murders, did not pursue additional leads. (Am. Compl. ¶¶ 172-73.) One could plausibly infer that these Defendants agreed not to drop the charges because they did not want to jeopardize their shared objective of securing a conviction against Bell, Bolt, and Johnson. Individual Defendants, who were colleagues working on shared investigations, likely had opportunities to enter into an agreement and a shared motivation to do so. *See McCray v. City of New York*, No. 03-CV-10080 (DAB), 2007 WL 4352748, at *23 (S.D.N.Y. Dec. 11, 2007) (finding a Section 1983 conspiracy plausible where "Defendant police officers and prosecutors acted in concert to coerce and fabricate statements and conceal exculpatory evidence," stating "'we do not encounter here a bare allegation of conspiracy supported only by an allegation of conduct that is readily explained as individual action plausibly taken in the actors' own economic interests.'"); *Biswas v. City of New York*, 973 F. Supp. 2d 504, 533-34 (S.D.N.Y. 2013) (permitting a civil conspiracy claim to proceed where plaintiff alleged that police officers "'devis[ed] a plan to arrest, detain, restrain, prosecute and suspend [the plaintiff], all knowing that there was no evidence linking [the plaintiff] to any criminal conduct'"); *c.f. McDaniel v. City of New York*, 585 F. Supp. 3d 503, 521 (S.D.N.Y. 2022), *report and recommendation adopted*, No. 19-CIV-11265 (ATR)(WL), 2022 WL 874769 (S.D.N.Y. Mar. 24, 2022) (dismissing a Section 1983 civil conspiracy claim where plaintiff failed to plead that police officer defendants who conducted traffic stop and arrest acted pursuant to an agreement); *Zilioli v. City of New York*, No. 17-CV-9495, 2020 WL 1548763, at *4 (S.D.N.Y. Apr. 1, 2020) (finding, on summary judgment motion, no issue of fact as to existence of agreement where there was no evidence that a police officer

defendant was aware that the other police officer defendant had sexually assaulted plaintiff when she wrote a report omitting that information.)

Accordingly, I find that Plaintiff has sufficiently pled a conspiracy claim under Section 1983.

## IV.    New York State Constitutional Violation Claim

Defendants argue that Plaintiff's claim against the City for violations of his rights under the New York State Constitution is duplicative of his federal claims and should be dismissed.  (Defs. Mem. at 13.)

Plaintiff alleges that the City is liable under the principle of *respondeat superior* for violations of Plaintiff's rights under the New York State Constitution "(a) to be free of unlawful arrest not based on probable cause, (b) to not have a government officer acting in an investigating capacity fabricate evidence against him, (c) to due process of law, (d) to a fair trial, (e) to not be convicted based on false or misleading evidence and argument, and suppression of Brady material, and (f) to not be incarcerated when actually innocent."  (Am. Compl. ¶¶ 457-60.)

Courts in the Second Circuit have "uniformly held that no private right of action exists for violations of the New York State Constitution where the plaintiff has an alternative remedy under § 1983 for violations of parallel provisions of the U.S. Constitution."  *Alwan v. City of New York*, 311 F. Supp. 3d 570, 586 (E.D.N.Y. 2018) (collecting cases).  As a result, "where a complaint alleges no theories of liability that are cognizable exclusively under the New York State Constitution, any claims brought under the state constitution are ordinarily dismissed."  *Talarico v. Port Auth. of New York & New Jersey*, 367 F. Supp. 3d 161, 171 (S.D.N.Y. 2019).

However, "§ 1983 is not an adequate alternative remedy for state-constitutional claims that rely on a theory of respondeat superior," and claims seeking to hold a municipality liable under such a theory may survive.  *Alwan*, 311 F. Supp. 3d at 587; *Buari*, 530. F. Supp. 3d at 409 (collecting cases).

Because Section 1983 is not an adequate alternative remedy for Plaintiff's state constitutional claims against the City, a private right of action for his claim exists under the New York State Constitution.

## V.    Municipal Liability

Plaintiff alleges that the City is liable under 42 U.S.C. § 1983 for the deprivation of Plaintiff's constitutional rights under a theory of municipal liability because of policies and customs of the QDAO (Am. Compl. ¶¶ 213-15) and the NYPD (Am. Compl. ¶¶ 419-31).[4]

"A municipality may be liable under Section 1983 if a municipal 'policy or custom' causes 'deprivation of rights protected by the Constitution.'" *Ying Li*, 246 F. Supp. 3d at 636 (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978)). "A policy or custom may be established by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff." *Moran v. Cnty. of Suffolk*, No. 11-CIV-3704 (PKC)(GRB), 2015 WL 1321685, at *9 (E.D.N.Y. Mar. 24, 2015); *Vives v. City of New York*, 524 F.3d 346, 350 (2d Cir. 2008) (formal policy or actions by a municipal official possessing decision-making authority constitute custom or policy); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (widespread and persistent practice constitutes a custom or policy); *Parker v. City of Long Beach*, 563 F. App'x 39, 41 (2d Cir. 2014), *as amended* (Apr. 21, 2014) (failure

---

[4] In addition to the arguments described in this section, Defendants ask the Court to dismiss Plaintiff's *Monell* claims because they are "many hundreds of paragraphs long" and cite to what Defendants argue is unrelated material in violation of Federal Rule of Civil Procedure 8's requirement that a complaint contain a "short and plain statement of the claim." (Defs. Mem. at 15-17.) While the section of the Amended Complaint alleging *Monell* liability is, indeed, lengthy, the pleadings are relevant and necessary to Plaintiff's claims, and the claims should not be dismissed on this basis.

to train amounting to deliberate indifference constitutes custom or policy).  In addition, a plaintiff must demonstrate "a causal connection between the custom or policy" and the alleged deprivation of rights.  *Cordero v. City of New York*, 282 F. Supp. 3d 549, 563 (E.D.N.Y. 2017).  "The pleading standard for Monell claims is no greater than for any other claim subject to Federal Rule of Civil Procedure 8(a)."  *Newson v. City of New York*, No. 16-CV6-773 (ILG)(JO), 2019 WL 3997466 (E.D.N.Y. Aug. 23, 2019).

A plaintiff can demonstrate that a practice is widespread and persistent by showing "that there is 'a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity.'"  *Gem Fin. Serv., Inc. v. City of New York*, 298 F. Supp. 3d 464, 491 (E.D.N.Y. 2018), *as amended* (June 27, 2018) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).  A persistent and widespread policy exists where "a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions."  *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007).  When a plaintiff alleges that the actions of subordinate employees give rise to a claim, "the unlawful practice must be 'so manifest as to imply the constructive acquiescence of senior policy-making officials.'"  *Gem Fin. Serv., Inc.*, 298 F. Supp. 3d at 491 (quoting *Newton v. City of New York*, 779 F.3d 140, 156 n.18 (2d Cir. 2015)).  "Repeated and consistent conduct often indicate city involvement or acquiescence to a deprivation of liberty."  *Cordero*, 282 F. Supp. 3d at 564.

"Plaintiffs may adequately plead the existence of de facto customs or policies based on governmental reports documenting constitutional deficiencies or misconduct," *Felix v. City of New York*, 344 F. Supp. 3d 644, 658 (S.D.N.Y. 2018), and may also "cit[e] to complaints in other cases that contain similar allegations. . .involve factually similar misconduct, [are] contemporaneous to the misconduct at issue in the plaintiff's case, and result in an adjudication of liability."  *Buari*, 530 F. Supp. 3d at 398.

27

"The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray v. City of New York*, 490 F.3d 189, 196 (2d Cir. 2007). "To establish 'deliberate indifference,' a plaintiff must show that: [1] a policymaker knows 'to a moral certainty' that city employees will confront a particular situation; [2] the situation either presents the employee with 'a difficult choice of the sort that training or supervision will make less difficult' or 'there is a history of employees mishandling the situation;' and [3] 'the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.'" *Id.* (quoting *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992)). Proof that a policymaker failed to respond to repeated complaints of constitutional violations is sufficient to establish deliberate indifference, but not required; a plaintiff need only show that the policymaker's inaction was the result of a "conscious choice" rather than negligence. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 128 (2d Cir. 2004) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)). In addition, "where. . .a city has a training program, a plaintiff must—in addition—'identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.'" *Wray*, 490 F.3d at 196 (quoting *Amnesty Am.*, 361 F.3d at 129 (internal quotations omitted)).

## B. QDAO

Plaintiff asserts two theories of municipal liability against the QDAO. He pleads that the QDAO had a policy, custom, or practice of suppressing *Brady* material through its widespread practice of siloing exculpatory information across separate bureaus, and that QDAO policymakers failed to train or discipline ADAs for *Brady* violations, thus exhibiting deliberate indifference to constitutional violations. (Am. Compl. ¶¶ 213-418.)

### 1. **Persistent and Widespread Policy**

Defendants argue that Plaintiff has not provided sufficient evidence that the practice was widespread beyond the cases against Plaintiff, Bell, and Johnson—the three individuals prosecuted for the Murders—and that any *Brady* violations due to siloing practices may have been negligent but were not a "conscious choice" of the City.  (Defs. Mem. at 18; Defs. Reply at 7 (quoting *Amnesty Am.*, 361 F.3d at 128.)

Plaintiff need not allege that any *Brady* violations or the practices leading to them were the "conscious choice" of the City or QDAO.  To establish the existence of a widespread de facto custom or policy, plaintiff must "plausibly allege a practice so widespread that it may be inferred [that]… policymakers were aware of 'subordinate[s'] unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.'"  *Buari*, 530 F. Supp. 3d at 401 (quoting *Amnesty Am.*, 361 F.3d at 126)).  One may infer from a sufficiently widespread practice that policymakers acquiesced in its existence and continuation.  *See Gem Fin. Serv., Inc.*, 298 F. Supp. 3d at 491.  Therefore, it is sufficient for Plaintiff to allege that policymakers consciously chose not to take action against the widespread and persistent practice of siloing exculpatory information in order for that practice to constitute a de facto policy; it is not necessary to allege that the practice itself was a conscious choice by the City.

Plaintiff alleges that the QDAO had "office-wide policies and practices that encouraged *Brady* violations as a means of securing convictions."  (Am. Compl. ¶ 215.)  For example, Plaintiff alleges that the QDAO deliberately "siloed" information, such that there was "no effective mechanism" for prosecutors to obtain *Brady* information, thereby giving prosecutors "plausible deniability" for failing to search for or produce exculpatory material.  (*Id.* ¶¶ 219, 247.)  During Bolt's post-conviction investigation, the QDAO stated that "significant" exculpatory information relating to the Speedstick Gang was maintained in the Major Crimes and Career Criminal Bureau, and not contained in Bolt's case file, which was in the Homicide Bureau.  (*Id.* ¶¶ 225-29.)  A prosecutor's *Brady* obligations extend to all material evidence known to that prosecutor, and "[a] prosecutor is presumed to know all

29

information gathered by his office in connection with an investigation of the case" and "'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case.'" *United States v. Ferguson*, 478 F. Supp. 2d 220, 238 (D. Conn. 2007) (citing *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir.1998) and quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

Plaintiff offers multiple forms of evidence to substantiate his claim that the siloing practice was widespread and persistent. The Amended Complaint contains sworn statements from QDAO prosecutors testifying to a widespread siloing practice at the time of Plaintiff's case. (Am. Compl. ¶¶ 232-42.) ADA Testagrossa stated that the *Brady* violations in Plaintiff's case were a "'law office failure' that occurred as a result of 'silo procedures engaged in by the [QDAO] during the late 1990s.'" (*Id.* ¶ 232.) ADA Leventhal stated that the *Brady* violations were "'the result of the [QDAO's] architecture during the last millennium, which created an environment in which significant possibilities for the failure to share critical information existed.'" (*Id.* ¶ 240.)

Plaintiff also provides a list of judicial decisions describing prosecutorial misconduct, citing to, among others, *People v. Steadman/Blair*, 82 N.Y.2d 1 (1993), where the Court of Appeals ruled that "'the scheme employed by the District Attorney's office,'. . .revealed 'a determined effort . . . to avoid' its Brady obligations [and] 'undermine[d] the purposes of the Brady and [related state] rules'" (Am. Compl. ¶¶ 285, 329); *Su v. Filion*, 335 F.3d 119 (2d Cir. 2003), overturning a conviction where the prosecutor "'knowingly elicited false testimony from a crucial witness'" (*Id.* ¶ 292); *People v. Baba-Ali*, 179 A.D.2d 725 (2d Dep't 1992), reversing a conviction where "the QDAO prosecutor failed until the eve of trial" to disclose exculpatory material (Am. Compl. ¶ 347); *People v. Banch*, 80 N.Y.2d 610, 621 (1992), where the Court of Appeals reversed a conviction due to a failure to produce impeachment material, "noting the [QDAO's] 'seeming lack of care in discharging their discovery obligation'" (*Id.*); *People v. Shim*, 218 A.D.2d 757 (2d Dep't 1995), where the court "fault[ed] the QDAO for failing to disclose potential impeachment evidence" (*Id.*); *People v. Fearnot*, 200 A.D.2d 583 (2d Dep't 1994),

where the conviction was reversed "where the QDAO withheld potential impeachment material" and engaged in other misconduct (*Id.* ¶ 329); *People v. Kirchner*, 200 A.D.2d 766 (2d Dep't 1994), reversing a conviction where the QDAO failed to disclose impeachment evidence (*Id.* ¶ 347); *People v. Curry*, 153 Misc.2d 61 (Sup. Ct. Queens Cty. Jan. 16, 1992), dismissing an indictment where the QDAO prosecutor failed to inform the grand jury that the complainant had recanted his identification (*Id.* ¶ 347); and *People v. Jenkins*, Ind. No. 2213/1992, "declaring a mistrial" based on the prosecutor's "'hold[ing] back exculpatory information as long as possible' from defense counsel" (*Id.*). Plaintiff cites additional cases finding other forms of misconduct, such as summation misconduct and use of unfairly prejudicial evidence, that are not similar to the alleged *Brady* violations.

Plaintiff also describes the Survey from 1996 in which the QDAO recorded at least 39 instances of misconduct in the "few years" before Plaintiff's trial and conviction, "including *Brady* and related discovery violations, summation misconduct, improper reliance on false evidence, and prejudicial degradation of criminal defendants." *(Id.* ¶¶ 324-28.) While not all of the cases recorded in the Survey and cited by Plaintiff concern prosecutorial misconduct related to *Brady* violations, many of them do, thus supporting the allegation of a widespread and persistent practice of failing to produce exculpatory information, including impeachment material.

Defendants argue that *Steadman/Blair* is not sufficiently similar to Plaintiff's claims because "in that case. . .the QCDA purposely shielded the trial attorneys from an agreement with a cooperating witness," and that absent reliance on *Steadman/Blair*, the single underlying incident in this case alone cannot give rise to a municipal liability claim. (Defs. Reply at 6-7.) While the court's decision in *Steadman/Blair* does not specifically reference the siloing practice described by ADAs Testagrossa and Leventhal (although the shielding of trial attorneys from cooperation agreements has some similarity to siloing), it contains a finding by an appellate court of *Brady* violations committed by QDAO prosecutors in an adjudicated case within a few years of Plaintiff's arrest, investigation, and trial. It,

along with several of the other state appellate court cases cited by Plaintiff, are factually similar to Plaintiff's allegations in that they concern failures to produce exculpatory evidence, were sufficiently contemporaneous, and contained findings in adjudicated cases. *See Buari*, 530 F. Supp. 3d at 398. The decisions, therefore, may be relied upon to support Plaintiff's allegation that the QDAO had a widespread and persistent practice of not discovering and producing *Brady* material.

Therefore, I find that Plaintiff has sufficiently alleged a practice at the QDAO of not complying with *Brady* obligations that is so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon its policymakers. *See Fraser*, 2021 WL 1338795 at *11 ("[D]istrict courts in this Circuit have consistently refused to dismiss Monell claims alleging that a county prosecutor's office has sanctioned an unlawful practice.").

## 2.  Failure to Train or Supervise

Defendants argue that Plaintiff fails to state a *Monell* claim against the QDAO for failure to train or supervise because he does not plausibly allege deliberate indifference: Plaintiff alleges neither a pattern of similar complaints regarding the QDAO's alleged siloing practice, nor that any siloing that did occur was a "'conscious choice'" by the City. (Defs. Reply at 7-8.) Defendants also contend that the allegations collected in the Survey are not sufficiently connected to the facts of Plaintiff's case to make out a pattern of similar conduct and, contrary to Plaintiff's claims, demonstrates that the QDAO did investigate claims of misconduct. (*Id.* at 8-9.) Finally, Defendants argue that there is no causal connection between any failure to discipline or train and the alleged siloing. (*Id.* at 8.)

Defendants' arguments are unavailing.

In order to show that the City's failure to train or supervise amounts to deliberate indifference to the rights of those with whom its employees interact, it is not necessary to allege that the violative practice itself, *i.e.,* siloing, was a "conscious choice" by the City. It is sufficient to show that a

32

policymaker's *inaction* in responding to repeated complaints of constitutional violations was the result of a "conscious choice" rather than negligence. *Amnesty Am.*, 361 F.3d at 128.

Moreover, Plaintiff is not required to allege a pattern of conduct regarding the QDAO's siloing practice. Plaintiff's allegations about the QDAO's failure to train, supervise, or discipline regarding *Brady* violations are not limited to the practice of siloing. (Pl. Mem. at 23.) He alleges that the "QDAO provided no training to prosecutors on how to locate *Brady* material known to other prosecutors in the office" and "had a custom and practice not to internally investigate, reprimand, sanction or discipline prosecutors for trial and pre trial misconduct, including Brady violations." (Am. Compl. ¶¶ 222, 257.)

Thus, the pattern of similar complaints need not reference the practice of siloing and may include complaints of *Brady* violations more generally, since complaints in individual criminal cases are likely to focus on specific instances of failures to discover and turn over exculpatory material rather than delve into the institutional reasons for such failures.

Plaintiff alleges that District Attorney Richard Brown and Chief Assistant District Attorney Barry Schwartz read and were aware of the appellate decisions finding that *Brady* violations had occurred, were policymakers at the QDAO at the time the Survey was compiled, and "'expressed concern' to each other 'about reversals that characterized the trial assistant engaging in what the courts like to call 'prosecutorial misconduct.'"" (Am. Compl. ¶¶ 338-40.) Despite this, the QDAO did not implement any training, and did not discipline any prosecutors for misconduct. (*Id.* ¶ 349.) To the contrary, Plaintiff alleges that prosecutors who engaged in *Brady* violations received positive evaluations for their conduct and were rewarded with bonuses and promotions. In one example cited by Plaintiff, a prosecutor who failed to disclose *Brady* material and misrepresented that all *Brady* material had been disclosed during a 1990 case—and who was later admonished by the Grievance Committee for the Ninth Judicial District for his conduct—received positive evaluations noting that

33

"[t]his assistant likes to win and fights toward that end" and "is a true warrior in that he never backs down or gets intimidated"; no mention is made of his misconduct. (*Id.* ¶¶ 367-70.) In 1995, a conviction by this same prosecutor was overturned because he failed to turn over *Brady* material, yet that same year, he was promoted to Deputy Bureau Chief of the Supreme Court Long Island City Bureau, where he supervised 10-11 prosecutors. (*Id.* ¶ 375-76.) The conviction secured by another prosecutor was reversed in 1992 after the court found that she failed to produce *Brady* material and misrepresented that *Brady* material did not exist; after the reversal, that prosecutor was not disciplined, received no additional training, and no note was placed in her evaluation. (*Id.* ¶ 392-93.) Instead, the prosecutor was given salary increases and bonuses and promoted to Bureau Chief. (*Id.* ¶ 393.)

"As the Supreme Court explained in [*Connick v. Thompson*, 563 U.S. 51 (2011)], a 'pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of a failure to train.'" *Bertuglia v. City of New York*, 839 F. Supp. 2d 703 (S.D.N.Y. 2012) (denying a motion to dismiss plaintiff's failure to train claim where plaintiff alleged "the City has a longstanding, de facto policy of never disciplining prosecutors who commit specified types of prosecutorial misconduct and not otherwise training them to avoid misconduct" and pointed to "over fifteen cases where City prosecutors allegedly committed misconduct" and "allege[d] the existence of many more."). As discussed *supra*, Plaintiff has alleged that *Brady* violations were a widespread institutional failure at the QDAO, establishing a pattern of similar conduct by untrained employees.

Plaintiff has adequately alleged deliberate indifference. The City and QDAO knew to a moral certainty that ADAs will come into possession of *Brady* materials because "these are basic facets of an ADA's job." *Bertuglia*, 839 F. Supp. 2d at 738. Plaintiff has alleged that there was a history of *Brady* violations at the QDAO. Despite the QDAO policymakers' awareness of the prevalence and

34

consequences of *Brady* violations, they did not take any action to train, supervise, or discipline prosecutors, and instead rewarded prosecutors who committed *Brady* violations.

The fact that the Survey documenting prosecutorial misconduct does not, as Defendants argue, demonstrate that it implemented training or discipline as a result. Plaintiff alleges that QDAO policymakers were aware of the Survey, as well as judicial decisions reflecting prosecutorial misconduct including *Brady* violations, yet took no action whatsoever as a result of this knowledge. (Am. Compl. ¶¶ 324, 330-36.)

Plaintiff alleges that the QDAO's failure to train or discipline regarding *Brady* violations led prosecutors to "repeatedly, without fear of reprisal, with[hold] valuable Brady material" in Plaintiff's case. *(Id.* ¶¶ 413.) This is sufficient to allege a causal connection between the alleged failure to train or discipline and Plaintiff's wrongful conviction and incarceration.

I, therefore, find that Plaintiff has adequately stated a *Monell* claim based on the QDAO's failure to train or discipline its employees for *Brady* violations that amounted to deliberate indifference to the constitutional rights of the individuals whom it prosecuted.

### B. NYPD

Plaintiff alleges that policymakers at the NYPD demonstrated deliberate indifference to the constitutional rights of suspects by failing to implement policies, procedures, training, and discipline concerning: (1) the use of excessive promises of rewards and unduly coercive interrogation techniques with vulnerable potential witnesses, (2) the determination of probable cause to make an arrest, and (3) the continuing duty to preserve and disclose evidence, including *Brady* material, to the QDAO. (Am. Compl. ¶ 421.)

Defendants argue that Plaintiff's allegations concerning the NYPD consist of "threadbare conclusory legal conclusions" that mix elements of the four theories of municipal liability and that the research reports cited by Plaintiff do not have any connection to this case. (Defs. Mem. at 24.)

Specifically, Defendants take issue with Plaintiff's citations to the Mollen Report "without making a connection to the specific facts of the case." (*Id.*) Defendants additionally argue that the NYPD's alleged policy, practice or custom is not the "moving force" behind Plaintiff's injury and, therefore, Plaintiff fails to allege causation. (*Id.* at 25.)

Plaintiff's municipal liability claim relating to the policies and practices of the NYPD is based on the failure to train or discipline police officers, exhibiting deliberate indifference to the rights of criminal defendants. (Pl. Mem. at 23.) Plaintiff alleges that at the time of his arrest and prosecution, NYPD policymakers were aware of fifty civil lawsuits credibly alleging that police had falsified or withheld evidence, or conducted searches or arrests without probable cause, numerous judicial decisions "criticizing the NYPD for failing to train and supervise officers in their Brady obligations and for failing to adopt adequate *Brady* disclosure policies," and reports from city offices criticizing the NYPD for failing to address misconduct with discipline or other remedial action. (Am. Compl. ¶ 425.)

The Mollen Report, published in 1994, documented the "widely tolerated" practice of police falsifications and perjury. (Am. Compl. ¶¶ 427-28.) "Courts that have rejected reliance on government reports like the Mollen Commission Report have done so because such reports bore no connection to the specific factual allegations of the plaintiff's case." *Buari*, 530 F. Supp. 3d at 401 (collecting cases). Here, Plaintiff has plausibly alleged a connection to the Mollen Report, as he alleges that the Individual Defendants coerced confessions and fabricated police reports in 1996, shortly after the Mollen Report was issued.

Plaintiff has adequately alleged deliberate indifference. The City and Police Commissioner "knew…to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases." (Am. Compl. ¶ 423.) Plaintiff has alleged that there was a history and documentation of falsifications and *Brady*

violations committed by NYPD officers.  Despite the NYPD policymakers' awareness of the prevalence of this misconduct, they did not take any action to train, supervise, or discipline officers.

Plaintiff alleges that the NYPD's failure to train or discipline "foreseeably encouraged such violations to continue and was a substantial cause of the violations of Bolt's constitutional rights beginning with his false arrest and the initiation of a criminal prosecution against him without probable cause." *(Id.* ¶ 431.)  Plaintiff alleges that the Individual Defendants coerced false confessions, fabricated evidence, and suppressed evidence that they did not disclose to prosecutors.  This is sufficient to allege a causal connection between the alleged failure to train or discipline and Plaintiff's wrongful conviction and incarceration.

I, therefore, find that Plaintiff has adequately stated a *Monell* claim based on the NYPD's failure to train or discipline its employees for *Brady* violations that amounted to deliberate indifference to the constitutional rights of criminal defendants.

In addition, I find that Plaintiff's allegations about the failure to train or discipline regarding the use of probable cause and interrogation techniques, although more limited than those regarding *Brady* violations, are also sufficient at this stage of litigation.  Plaintiff states that some of the judicial decisions he references contain credible allegations that officers conducted searches and arrests without probable cause.  The Mollen Report states that at the time, police falsifications were "widely tolerated," and Plaintiff alleges that some civil lawsuits credibly alleged that NYPD officers falsified evidence.  Although Plaintiff does not cite to a portion of the Mollen Report or a judicial decision describing coercive interrogation techniques, it is plausible that at least some of the falsified evidence was obtained through improper interrogation practices.  These allegations are sufficient to demonstrate that policymakers at the NYPD were aware of constitutional violations relating to these matters, but failed to respond to them with training or discipline.

**CONCLUSION**

For the foregoing reasons, I respectfully recommend that the Motion be granted as to the Eighth and Ninth Causes of Action and denied as to all other Causes of Action.

Any written objections to this Report and Recommendation must be filed within 14 days of this report. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to file objections within the specified time waives the right to appeal any order or judgment entered based on this Report and Recommendation. *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

**SO ORDERED:**

*Peggy Kuo*

PEGGY KUO
United States Magistrate Judge

Dated: Brooklyn, New York
September 15, 2023